UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF ILLINOIS

KEVIN BEAM,                          )
                                     )
            Plaintiff,               )
v.                                   ) No. 3:18-cv-02018-SMY
                                     )
WATCO TRANSLOADING, LLC,             ) **Benton, IL**
                                     )
            Defendant.               )


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
DAY 2 OF 5

BEFORE THE HONORABLE STACI M. YANDLE
UNITED STATES DISTRICT JUDGE

December 7, 2021


REPORTED BY:        Christine Dohack LaBuwi, RDR, CRR
                    Official Court Reporter
                    301 West Main Street
                    Benton, Illinois  62812
                    (618) 439-7725
                    Christine_Dohack@ilsd.uscourts.gov

Proceedings recorded by mechanical stenography, produced by
computer-aided transcription.

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:        Samantha Demuren, Esq.
                           Roland Thomas Christensen, Esq.
 3                         ARNOLD & ITKIN, LLP
                           6009 Memorial Drive
 4                         Houston, TX  77007
                           (713) 222-3800
 5                         sdemuren@arnolditkin.com
                           rchristensen@arnolditkin.com
 6            ALSO PRESENT:  Kevin Beam, Plaintiff

 7   FOR DEFENDANT:        Ronald E. Fox, Esq.
                           Stanislav Levchinsky, Esq.
 8                         FOX SMITH, LLC
                           One South Memorial Drive, 12th Floor
 9                         St. Louis, MO  63102
                           (314) 588-7000
10                         rfox@foxsmithlaw.com
                           slevchinsky@foxsmithlaw.com
11
              ALSO PRESENT:  Allan Saunders, Watco Corporate Rep.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                          WITNESSES

3     ALL WITNESSES:                                 PAGE:

4       TODD COWEN for Plaintiff:
          Direct Examination by Ms. Demuren          173:13
5         Cross-Examination by Mr. Levchinsky        195:12

6       ANDREA BRADFORD for Plaintiff:
          Direct Examination by Ms. Demuren          211:19
7         Cross-Examination by Mr. Levchinsky        221:7

8       HELEN RINEHART for Plaintiff:
          Direct Examination by Ms. Demuren          237:11
9
        SWASTIK SINJA for Plaintiff:
10        Video Deposition by dated 03/01/2021       242:6

11      KEVIN BEAM for Plaintiff:
          Direct Examination by Ms. Demuren          243:12
12        Cross-Examination by Mr. Fox               278:7

13      KENNETH McCOIN for Plaintiff:
          Direct Examination by Ms. Demuren          331:6
14
        KAREN SPLANE for Plaintiff:
15        Video Deposition by dated 03/05/2021       353:14

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings began in open court at 9:00 a.m.)

2          COURTROOM DEPUTY:  The Court calls Case No.

3    18-CV-2018, *Beam versus Watco Companies, LLC, et al.*  This

4    matter is called for Day Two of trial.

5          Would the parties please state your presence for

6    the record?

7          MS. DEMUREN:  Good morning, Your Honor.  Samantha

8    Demuren on behalf of the plaintiff Kevin Beam.

9          THE COURT:  Good morning, Miss Demuren.

10         MR. CHRISTENSEN:  Good morning, Your Honor.  Roland

11   Christensen on behalf of plaintiff, as well.

12         THE COURT:  Good morning, Mr. Christensen.

13         MR. FOX:  Good morning.  Ron Fox on behalf of the

14   defendant Watco Transloading, LLC.

15         THE COURT:  Good morning, Mr. Fox.

16         MR. LEVCHINSKY:  Your Honor, good morning.

17   Stanislav Levchinsky, also on behalf of defendant.

18         THE COURT:  Good morning, Mr. Levchinsky.

19         All right.  Good morning, everybody.  It's a little

20   more comfortable in here today but, work with us.  If you

21   get too warm, let me know.  But at least it's not 64.

22         Okay, is the plaintiff ready to proceed?

23         MS. DEMUREN:  Yes, Your Honor, we are.

24         THE COURT:  Okay.

25         MS. DEMUREN:  And the plaintiff will call Dr. Todd

1    Cowen.

2              (Witness sworn by courtroom deputy.)

3              COURTROOM DEPUTY:  Please state your full name and

4    spell your last name.

5              THE WITNESS:  Todd Cowen, C-O-W-E-N.

6              MS. DEMUREN:  May I, Your Honor?

7              THE COURT:  You may.

8                              *  *  *  *  *

9                         TODD COWEN,

10   having been first duly sworn, was examined and testified

11   via videoconference technology as follows:

12                      DIRECT EXAMINATION

13   BY MS. DEMUREN:

14   Q.     Good morning, Dr. Cowen.

15   A.     Good morning.

16   Q.     Dr. Cowen, what type of expert are you in this

17   case?

18   A.     I'm a specialist in physical medicine

19   rehabilitation, pain management, and life care planning.

20   Q.     Okay.  And are you here today as a life care

21   planner?

22   A.     I am.

23   Q.     Okay.  Before we kind of get into it and talk about

24   the particulars of this case, can you tell the judge a

25   little bit about yourself.  Let's start with, where did you

1  go to undergrad?

2  A.      Sure.  Did undergraduate at LSU in Baton Rouge.

3  Q.      And where did you go to medical school?

4  A.      LSU Health Science Center in Shreveport, Louisiana.

5  Q.      Where did you do your residency?

6  A.      I did that at the University of Alabama-Birmingham

7  in physical medicine and rehabilitation.

8  Q.      After your residency, did you have a fellowship?

9  A.      I did not.  The residency was -- completed the

10  actual formal training.

11  Q.      Dr. Cowen, I understand that you have been the

12  Medical Director of the Spine Center of Excellence in

13  Thibodaux, Louisiana.  What does your job there entail as

14  it relates to people with spinal injuries?

15  A.      So, it's twofold.  One is going to be in assessing

16  patients as they enter the system either through a direct

17  referral from a physician or person referring themselves.

18  And my job is to look at their clinical data and then

19  decide who they should see, whether it should be someone

20  like me, one of the interventional pain doctors, a

21  neurosurgeon, physical therapy, et cetera.  So, my role is

22  deciding who those people go to and how quickly they should

23  be seen.

24          And then the other part of that is, as a treater, I

25  see patients both at the onset of injuries but also long

1    term.  I'm -- physical medicine rehabilitation doctors are

2    often the folks that are seeing patients long term, after

3    their injuries, in managing their chronic issues.

4    Q.    And in that role of treating patients long term and

5    managing their chronic issues, do you treat people with

6    injuries similar to Mr. Beam on a regular basis?

7    A.    All the time, yes.

8    Q.    And these people that you treat, you treat them for

9    long periods of time?

10   A.    I do.  Typically, for years and years, yes.

11   Q.    Dr. Cowen, I understand that you're a physical

12   medicine and rehabilitation specialist.  Could you please

13   briefly explain to the Court what the specialty is?

14   A.    Sure.  I'm still trying to explain that to my

15   family.  A lot of folks have trouble understanding.  So, we

16   deal holistically with the, I guess, the whole person, if

17   you will, focusing on function, quality of life, in some

18   situations pain management.  And we deal with a variety of

19   neuromusculoskeletal -- that's a mouthful -- issues from

20   spinal disorders, nerve injuries, strokes, brain injuries.

21   And we're often the doctors that become not the primary

22   care doctor, but the primary care doctor for their

23   long-term pain and neuromuscular needs, if you will.

24   Q.    Dr. Cowen, thank you for that.  Are you board

25   certified in physical medicine and rehabilitation?

1    A.      I am.

2    Q.      Now, Dr. Cowen, are you here today as a retained

3    expert paid by my firm Arnold and Itkin?

4    A.      Yes, ma'am.

5    Q.      I want to move on and get to the life care plan you

6    authored in this case.  Dr. Cowen, I believe you authored

7    two reports, right?  Plaintiff's Exhibit 26 and Exhibit 27.

8    Do you have that in front of you, sir?

9    A.      I do.

10   Q.      Okay.  Are Exhibits 26 and 27 true and accurate

11   copies of the reports that contain your opinions in this

12   case?

13   A.      Yes.

14          MS. DEMUREN:  Your Honor, plaintiffs move to admit

15   Exhibits 26 and 27 into evidence.

16          MR. LEVCHINSKY:  Could you just give us the date on

17   those?

18          MS. DEMUREN:  I do not have that in front of me.

19   Bear with me one moment.  They're the only two reports that

20   we produced --

21          MR. LEVCHINSKY:  I just -- I just want to make a

22   record for the --

23   A.      I can't --

24          THE COURT:  Hold on for a second, sir.

25          Do you have the exhibits?

1          MR. LEVCHINSKY:  I do.  I just want to --

2          THE COURT:  Do you have any objection?

3          MR. LEVCHINSKY:  I just want to -- before -- we

4    don't have an objection, so long as they're the reports

5    dated September 7, 2018, and April 21st, 2020.

6          THE COURT:  Do you have Plaintiff's Exhibits?

7          MR. LEVCHINSKY:  Yes.

8          THE COURT:  Okay.  So, 26 and 27.  Do you have any

9    objections to Exhibits 26 and 27, sir?

10          MR. LEVCHINSKY:  Your Honor, they weren't listed

11    with their dates on the exhibit list.  I just want to

12    verify --

13          THE COURT:  You have them.  Could you look at them?

14          MR. LEVCHINSKY:  I have my copies in front of me,

15    Your Honor.  I -- if we could just verify that these were

16    the ones that were disclosed.

17          THE COURT:  These were the ones that were shared

18    with everyone.  These are the ones that I have been

19    provided.

20          MR. LEVCHINSKY:  No objection then, Your Honor.

21          THE COURT:  All right.  Plaintiff's Exhibits 26 and

22    27 are admitted.

23    Q.    (BY MS. DEMUREN) Dr. Cowen, could you please

24    explain the differences between these two plans you

25    authored?

1    A.    Sure.  So, of course, they take place in two points

2    in time.  The second one being done, as we mention, in

3    April of '20.  At that point, there were new medical

4    records to consider, so the report was updated to reflect

5    the clinical changes that had occurred.

6    Q.    Dr. Cowen, does your reports contain your

7    methodology that you used in this case?

8    A.    They do.

9    Q.    Okay.  Could you please briefly walk the Court

10   through this methodology that you employed in formulating

11   your opinion with the life care plan?  Let's start with, as

12   part of that methodology, did you review medical records in

13   this case?

14   A.    I did.

15   Q.    Did you review medical records that predated this

16   incident of November 2017?

17   A.    I did, yes, ma'am.

18   Q.    Dr. Cowen, was there anything about the predated

19   records that you reviewed that cause you to believe that

20   Mr. Beam's injuries were caused by any preexisting

21   condition?

22   A.    There were not.

23   Q.    As part of your methodology, sir, did you assess

24   Mr. Beam?

25   A.    I did.

1    Q.      Okay.  And the assessment you provided Mr. Beam, is

2    that similar to one that you would provide a patient of

3    your own?

4    A.      It is, yes.

5    Q.      And does that assessment allow you to make your own

6    diagnosis as a doctor?

7    A.      It does.  I take in the information from the

8    clinical exam and history and then of course the records,

9    yes.

10   Q.      Dr. Cowen, what, if anything, was notable about

11   your assessment and exam?

12   A.      You mean, the physical examination part?

13   Q.      Yes, Dr. Cowen.  Thank you for clarification.

14   A.      Yeah, let me go through that.  So, I'll just kinda

15   go through briefly.  He had some stiffness in his spine

16   when coming from sitting to standing.  He had some

17   difficulty moving the right shoulder.  Of course, he had

18   just had a shoulder injury, so I wasn't able to fully range

19   his right shoulder.

20           He had limited rotation of the cervical spine, both

21   to the right and to the left; also had some limitation of

22   forward flexion of the cervical spine; there was tenderness

23   in the cervical spine, as well as spasm.

24           There was tenderness in the parathoracic spine,

25   with localized spasm, as well.  He had double -- pardon me

1    -- he had trouble forward flexing in that part of the

2    spine, as well as going into extension or arching

3    backwards.

4          Same thing in his lumbar spine.  He had paralumbar

5    tenderness in the musculature, had difficulty flexing more

6    than about 30 degrees forward, as well as with extension.

7          As far as his extremities, he had some tenderness

8    about the right shoulder.  Had limited motion on the right

9    shoulder as well, as I discussed.

10   Q.     Dr. Cowen, after you review the medical records,

11   you assess Mr. Beam and perform a physical examination, do

12   you, as part of your methodology, make recommendations?

13   A.     I do.

14   Q.     And I'm not going to belabor the point because this

15   is a bench trial, but are those recommendations contained

16   within your reports that have been entered as Exhibit 26

17   and 27?

18   A.     Yes, that's correct.

19   Q.     And those recommendations that are contained within

20   Exhibit 26 and 27, did you make those based on a reasonable

21   degree of medical probability?

22   A.     I did.

23   Q.     Now, after -- you review medical records, assessed

24   Mr. Beam, done a physical examination and made

25   recommendations.  What do you do next?

A.      So, those recommendations I made regarding the future care recommendations are those that are -- they're made based upon the diagnoses being considered.  In other words, I don't make recommendations based upon treating any other condition other than the ones listed.  And so, basically, map those out, what I believe his probable future care needs, and then cost research is done to find out what the cost of those items.

Q.      I want to talk about the cost of research for a moment.  That cost research, is that based upon a vendor survey in the geographic location?

A.      Yes, most of it is.  Yes.

Q.      And as part of that cost research, do you look at percentiles?

A.      I do.

Q.      Do you also look at actual cost, if available, of where the client or patient is treating?

A.      Yes.  So, the first step, if an individual is treating with a certain provider at a certain facility and there's a quote for a specific procedure, for instance, the first thing we use is that, that cost, because that will be the cost that the person will encounter.  In the absence of having future quotes, then we typically would use a database or surveys to get those costs.

Q.      So, let me make sure I understand that correctly,

1    Dr. Cowen.  Where there is specific costs provided by a

2    specific treating physician, do you use that cost?

3    A.      I do, yes.

4    Q.      Okay.  And when you do not have that cost, is that

5    when you turn to the vendor survey?

6    A.      That's correct.

7    Q.      Now, in terms of just the different levels of cost,

8    I just want to touch on that very briefly.  There are lots

9    of level of costs that can be reasonable.  Is that fair?

10   A.      That is fair.

11   Q.      Okay.  Do you believe that it's good to have both

12   to make the future care recommendations more realistic?

13   And what I mean by both is, looking at the vendor survey as

14   well as the actual specific costs by a treating physician?

15   A.      Well, sure.  When we have a quote for an item, of

16   course we'll default to that because that is realistically

17   the cost that the person will incur.  In the absence of

18   that, which is frequent, then we'll use the vendor surveys.

19   Q.      Dr. Cowen, after you have done these four steps,

20   review medical records; assessing the client, in this case

21   Mr. Beam; doing a physical evaluation of him, or exam,

22   rather; and, running costs, what do you do next?

23   A.      Well, from there, the report would be generated.

24   And it'll summarize his diagnoses being considered and the

25   care that's going to be required, and that's laid out in

1    tables as far as what the future costs would be.

2    Q.      And, Dr. Cowen, what's the ultimate goal or what

3    are the goals, if any, of creating a life care plan?

4    A.      Well, the clinical goal is when I'm looking at the

5    future care that's going to be required, it's going to

6    center upon four different clinical type goals, if you

7    will.  And so, the items will strive to improve a person's

8    quality of life; improve their function or maximize their

9    function to their, their capability in spite of what injury

10   or illness they may have; also, will strive to reduce pain

11   and suffering; and, also, to prevent complications of an

12   injury.

13   Q.      Okay.  And, Dr. Cowen, these four goals, to

14   minimize pain, improve function, prevent complications, and

15   improve the quality of life, are they the reasons that you

16   have suggested certain care, medical care for Mr. Beam into

17   the future?

18   A.      Yes.  All of the care in the plan is going to

19   strive towards at least one of those, yes.

20   Q.      Dr. Cowen, I know we briefly discussed generally

21   speaking how you cost out your life care plans.  I want to

22   focus specifically on Mr. Beam.  Can you please describe

23   for the Court briefly how you calculated the medical care

24   Mr. Beam would need?

25   A.      As far as the actual -- the cost data, you mean?

1   Q.      Yes.

2   A.      Yes.  So, of course, I looked at the records to see

3   what cost data was in those records.  And in this case,

4   there were some quotes for specific procedures and, and I

5   used those.  And then when I did not have that, utilized

6   the database or vendor surveys to get the cost of the other

7   items, and then map them out in those tables.

8   Q.      And do you specify within your reports where you

9   have an actual cost estimate?

10  A.      I do.  All the cost data is, is sourced.  And if

11  you're looking at the second report, in Section 3.2, all of

12  the cost data is going to be sourced.  It's going to be an

13  explanation to the reader where that -- those numbers come

14  from.

15  Q.      Dr. Cowen, I want to switch gears a bit and talk

16  about the recommendations for future care.  Okay?  Could

17  you please provide a very brief summary of some of the care

18  you recommended for Mr. Beam in the future?

19  A.      Sure.  And probably the easiest way to do that, if

20  we begin -- I'm looking at page 49 of the second report,

21  and that's where the cost tables are listed.  And again,

22  stop me if I'm giving too much detail or prompt me if need

23  to give more.  But in that --

24  Q.      Just bear with me briefly, Dr. Cowen.  Let's make

25  sure that Her Honor and counsels have gotten to that page.

1    So, you said Exhibit 27, page 49?

2    A.    Yes.

3        THE COURT:  I'm there.

4        MS. DEMUREN:  Thank you.

5    Q.    (BY MS. DEMUREN)  Go ahead, Dr. Cowen.  My

6    apologies.

7    A.    Sure.  And again, cue me if I need to give more or

8    if I'm giving you too much, because I know the data is

9    there.

10        So, in this first section, it's going to be

11    physician services cost, so these are going to include

12    items, office visits.  For instance, follow-up.  If you

13    look at that first item, it reads from left to right,

14    physical medicine rehab/pain management beginning at age

15    54.  And again, reading left to right, it's three visits

16    for one year for his duration of lifetime, 27 years.  The

17    unit cost is the cost of each visit.  And the total cost is

18    going to be the cost over the 27 years.

19        And so, there's follow-up with that physician, type

20    of physician.  There's less frequent follow-up with

21    orthopedics.

22        A periodic cervical epidural steroid injections.

23    Again, if you look at that left to right again, that's not

24    injections every year.  That's, on average, three

25    injections every four years.  On average.

```
 1          It also includes a radiofrequency ablation for the
 2   thoracic spine.  It says one per year, but that's only for
 3   six years.  So, it's six total in his lifetime.
 4          So, basically, this section is going to be those
 5   things provided directly by a physician -- other than
 6   surgery -- office visits, and injections.
 7   Q.     Dr. Cowen --
 8   A.     And I'll just keep --
 9   Q.     I'm sorry.  Go ahead, sir.
10   A.     Go ahead.  I was going to go to the next page, but
11   if you need me to talk more about this, I will.
12   Q.     I appreciate that.  Because this is a bench trial
13   and we have moved into the exhibit -- the exhibit has been
14   entered in, I'll let Her Honor look at that.
15          But what I do want to ask you, Dr. Cowen, is, what
16   is the total cost for the future care for Mr. Beam that you
17   believe is necessary?
18   A.     In this section or the whole report?
19   Q.     The whole report, Doctor.
20   A.     Yeah, so the whole report, that's going to be on
21   page 47.  And I'll give you all a second to get there.
22          So, that's going to list a total cost in each
23   category, Physician Services, Diagnostics, Medications, so
24   forth, and the total cost over his lifetime for all of
25   those 789,531.26 dollars.
```

Q.      And, Dr. Cowen, is all of this care reasonable and necessary based on Mr. Beam's injuries he sustained from being struck by the cable on November 12, 2017?

A.      I believe it is, yes.

Q.      Okay.  And, Dr. Cowen, for the care that you have recommended for Mr. Beam, did you come up with these recommendations based upon your education, expertise, your review of the medical records, and your physical examination of Mr. Beam?

        MR. LEVCHINSKY:  Objection, Your Honor --

A.      I did.

        MR. LEVCHINSKY:  Oh, sorry.  Lacks foundation as to cure.

        THE COURT:  Overruled.

Q.      (BY MS. DEMUREN)  Go ahead, Dr. Cowen.

A.      Yes, I did.

Q.      And, Dr. Cowen, are the charges reflected in your report either based on actual quotes from providers Mr. Beam is seeing, or saw, alternatively, the reasonable and customary charges for the geographic region where Mr. Beam was going to get medical care?

A.      Yes, that's correct.

Q.      Okay.  And where Mr. Beam was getting medical care, is that in Houston, Texas?

A.      For the ones that we have the quotes on, yes.

1    Q.      Okay.  Dr. Cowen, I want to talk about some

2    specific procedures for a moment, very briefly.  What is an

3    adjacent level disc disease?

4    A.      So, whenever an individual has a fusion of the

5    spine, in this case we're talking about the cervical spine,

6    you've got several different motion segments in the spine.

7    And when some of those segments are fused, in this case

8    from C5 to C-7, then the segment above that fusion and

9    below that fusion over time will take more wear and tear

10   and become more likely to degenerate and need further

11   attention, such as an adjacent level fusion, down the road,

12   15, 20 years down the road.

13   Q.      Dr. Cowen, to a reasonable degree of medical

14   probability, do you believe that Mr. Beam will need

15   additional future surgeries because of an adjacent level

16   disc disease?

17   A.      I do.

18   Q.      Dr. Cowen, I want to talk for a moment about loss

19   of household services.  Are you familiar with that

20   terminology?

21   A.      I am.

22   Q.      And what does that mean?

23   A.      It means that a person, because of some illness or

24   injury, may have lost the ability to perform certain

25   household tasks.  It may be cleaning a house, mowing the

1    lawn, going shopping, et cetera, those type of items.

2    Q.    Did you reach an opinion on this case regarding Mr.

3    Beam and loss of household services?

4    A.    I do believe he does have a loss of household

5    services.  I did not quantify it in the report.

6    Q.    Okay.  And very briefly but, specifically, when you

7    say you do believe he has loss of household services, can

8    you elaborate on that?  What do you mean by that?

9    A.    Sure.  Well, because of his, his injuries, I

10    believe he will have decreased ability to do heavy

11    house-type activities, lawn care, mowing the lawn, heavy

12    house cleaning, those types of tasks.  He's had decreased

13    range of motion.  He's got pain.  I think he'll have some

14    degree of restriction doing those tasks.

15    Q.    Dr. Cowen, as part of your life care plan did you

16    address Mr. Beam's ability to work?

17    A.    I mean, I believe he'll have restrictions.  I

18    didn't -- I don't have it in the plan but I do believe

19    he'll have work restrictions.

20    Q.    Now, yesterday, Dr. Cowen, Dr. Small testified that

21    he did not believe Mr. Beam would be able to return to even

22    sedentary work based on his most recent treatment of Mr.

23    Beam.  As far as Mr. Beam's current ability to work, do you

24    defer to Dr. Small on that?

25        MR. LEVCHINSKY:  Objection, Your Honor.

1          Your Honor, this opinion, whatever it is that Miss

2    Demuren is eliciting here, goes well beyond the scope of

3    Dr. Cowen's report, which is, the last supplement is dated

4    April 21st, 2020.

5          THE COURT:  Miss Demuren, did Dr. Cowen address

6    this specific issue of workability in his -- in either of

7    his reports?

8          MS. DEMUREN:  Not specifically, Your Honor.  I do

9    believe that Dr. Cowen just testified that he did discuss

10   it.  In terms of reaching specific opinions on his

11   workability, he did not.

12         THE COURT:  Objection sustained.

13         MS. DEMUREN:  Okay.

14   Q.    (BY MS. DEMUREN)  Dr. Cowen, are you aware that Dr.

15   Small performed surgery on Mr. Beam's thoracic spine after

16   you issued your report?

17         MR. LEVCHINSKY:  Objection, Your Honor.  Again,

18   this is a similar objection.  Anything that Dr. Small did

19   with respect to Mr. Beam was done -- the first operation

20   was nearly a year after Dr. Cowen's --

21         THE COURT:  Sir, could you give your legal

22   objection?

23         MR. LEVCHINSKY:  Yes.  Excuse me, Your Honor.

24         THE COURT:  Is it funny?

25         MR. LEVCHINSKY:  No, it's not.

 1          THE COURT:  Okay.  We deal with legal objections

 2    here.

 3          MR. LEVCHINSKY:  I understand, Your Honor.  I

 4    apologize.  My objection is that this goes beyond the scope

 5    of Dr. Cowen's report and that this opinion lacks

 6    foundation.

 7          THE COURT:  She hasn't solicited an opinion yet.

 8    She didn't even get the question out, so I'm not really

 9    sure what she is inquiring into.  I'll give her some

10    leeway.  Objection overruled.

11    Q.    (BY MS. DEMUREN)  Dr. Cowen, do you need me to

12    reask the question?

13    A.    If you don't mind, sure.

14    Q.    Not a problem, sir.  Are you aware that Dr. Small

15    performed surgery on Mr. Beam's thoracic spine after you

16    issued your report?

17    A.    Yes.

18    Q.    Did you have that surgery recommended in your

19    report?

20    A.    I did not.

21    Q.    Okay.  Does that mean, based on your knowledge,

22    experience, and training that that surgery was not

23    medically necessary?

24          MR. LEVCHINSKY:  Objection, Your Honor.  Same

25    objection, this lacks foundation.  And this opinion goes

1    well beyond the scope of Dr. Cowen's April 21st report.

2          THE COURT:  Overruled.

3    Q.      (BY MS. DEMUREN)  You can answer, Dr. Cowen.

4    A.      It does not mean that.

5    Q.      And why did you not include that in your report?

6    A.      When I did the report, I was aware that he had a

7    T11-12 disc herniation, a sizable disc herniation.  A

8    thoracic spine surgery is fairly uncommon.  It's a unique

9    surgery.  So, at that point in time, I chose a conservative

10   option of not including it because at that time I wasn't

11   confident it was going to be performed.  But, of course,

12   now we know it was.

13   Q.      Now, Dr. Cowen, I want to finish up by asking you

14   some questions about medical causation for Mr. Beam's

15   injuries, the different parts of his body, if you will.

16   But before I ask you those questions, as part of your work

17   in this case, did you make a determination on what injuries

18   were causally related to the incident where Mr. Beam was

19   struck by the metal cable on November 12, 2017?

20   A.      I did.

21   Q.      So, put differently, Dr. Cowen.  If an injury was

22   not caused by being struck by the cable, did you include

23   treatment for that injury in your plan for future care?

24   A.      I did not.

25   Q.      Dr. Cowen, do you have an opinion to a reasonable

1   degree of medical certainty what -- about what caused Mr.

2   Beam's injury to his cervical spine in this case?

3   A.      Yes.  So, the cable incident of November 12 of '17.

4   Q.      Dr. Cowen, do you have an opinion to a reasonable

5   degree of medical certainty about what caused Mr. Beam's

6   injury to his T7 vertebrae?

7           MR. LEVCHINSKY:  Your Honor, just to preserve the

8   record, I'm making the same objection.  An opinion as to

9   the injury to the T7 vertebrae goes beyond the scope of Dr.

10  Cowen's most recent report, and lacks foundation.

11          THE COURT:  Sir?  I have made a prior ruling on

12  causation and testimony regarding causation, as you know.

13  It's reserved, preserved, overpreserved.  In all due

14  respect, I'm asking counsel to be mindful of my prior

15  rulings, that they are already preserved on the record, and

16  the Court's desire to try to go through the evidence

17  without unnecessary objection.  Objection overruled.

18          MR. LEVCHINSKY:  Your Honor, may I just make a

19  record?

20          THE COURT:  Your record is made, sir.  Objection

21  overruled.

22          MR. LEVCHINSKY:  Yes, Your Honor.

23  Q.      (BY MS. DEMUREN)  Dr. Cowen, I'll re-ask the

24  question.

25          Do you have an opinion to a reasonable degree of

```
1    medical certainty about what caused Mr. Beam's injury to

2    his T7 vertebrae?

3    A.      Yes.  The same cable incident of November 12 of

4    '17.

5    Q.      Dr. Cowen, do you have an opinion to a reasonable

6    degree of medical certainty about what caused Mr. Beam's

7    injuries to his right shoulder?

8    A.      The same incident of November 12 of '17.

9    Q.      Okay.  Dr. Cowen, do you have an opinion to a

10   reasonable degree of medical certainty about what caused

11   the T11-T12 disc herniation to Mr. Beam?

12   A.      The same incident of November 12, '17.

13   Q.      Dr. Cowen, do you have an opinion to a reasonable

14   degree of medical certainty about what caused Mr. Beam's

15   anxiety, depression, and PTSD?

16   A.      The same incident, November 12, '17.

17   Q.      Dr. Cowen, do you have an opinion to a reasonable

18   degree of medical certainty about what caused Mr. Beam's

19   injuries to his lumbar spine?

20   A.      Same incident, November 12, '17.

21   Q.      Dr. Cowen, have you recommended any care in your

22   life care plan that would be to treat previous unrelated

23   conditions of Mr. Beam prior to November 12, 2017?

24   A.      I have not.

25   Q.      And for the record to be clear, Dr. Cowen, when you
```

1  say the same incident of November 12, 2017, are you

2  referring to the incident where Mr. Beam was struck by the

3  cable at work?

4  A.      That's correct.

5  Q.      All right.  Dr. Cowen, have all of your opinions

6  that you have provided the Court here today been given to a

7  reasonable degree of medical certainty?

8  A.      They have, yes.

9  Q.      Thank you, sir.

10         MS. DEMUREN:  I offer for cross.

11                    CROSS-EXAMINATION

12  BY MR. LEVCHINSKY:

13  Q.      Dr. Cowen, good morning.

14  A.      Good morning.

15  Q.      You have testified that your role in this case --

16  well, your role in your practice is to assess patients and

17  decide who they should see, and on occasion treat patients,

18  as well; is that correct?

19  A.      Not on occasion.  Actually, I treat patients pretty

20  much every day in my practice, but I also have that role as

21  triaging folks.

22  Q.      Fair enough.  Sir, have you ever treated Mr. Beam

23  as a patient?

24  A.      I have not.

25  Q.      Your role in this case is purely as a retained

1    expert for the purpose of litigation; correct?

2    A.    Correct.

3    Q.    And the records that you reviewed which form the

4    basis of the opinions expressed in your two reports, are

5    summaries of those records all contained in those reports?

6    A.    The summaries of those records in the reports, yes.

7    Q.    And all of the dates of the records you summarize,

8    those are also contained in those reports?

9    A.    Yes.

10    Q.    Suffice it to say, if there is a medical record

11    pertaining to Mr. Beam, the date of which or a summary of

12    which is not included in either one of your reports, those

13    records did not go into the basis of your opinion?

14    A.    At least not in the reports.  Of course, I have

15    seen some records since.  But as far as in the reports,

16    that's correct.

17    Q.    Well, let's talk about that.  When did you see

18    records that postdated the last record that's noted in your

19    report?

20    A.    That would have been in the last -- last few days,

21    preparing for today.

22    Q.    And those were records that were provided to you by

23    plaintiff's counsel?

24    A.    Correct.

25    Q.    And that was for the purpose of you being able to

1  refer to things during the course of your testimony in this

2  trial?

3  A.      Well, for me to be up to date on what's transpired,

4  sure.

5  Q.      Is it your testimony today that those records that

6  you received in the past couple days go into your opinions

7  in this case?

8  A.      Those records don't go into my opinions that are in

9  this report, but I certainly have seen them and they

10 haven't changed my opinions.

11 Q.      So, you would agree with me that your report

12 summarizing your opinions that you were retained to express

13 in this litigation, that report has not been supplemented

14 since April 21st, 2020?

15 A.      It has not been supplemented, that's correct.

16 Well, since April 1st of '20, correct -- 21st of '20,

17 right.

18 Q.      And that report of April 21st of 2020 contains no

19 mention whatsoever of Dr. Small; correct?

20 A.      Bear with me, before I tell you something wrong.

21 (Pause.)  That is correct.

22 Q.      Dr. Cowen, is it true that you have worked as a

23 retained expert for Arnold and Itkin over 100 times in

24 approximately the past eight years?

25 A.      Since 2012, so over nine years, so that's probably

1    true.

2    Q.      And in this case, you actually met with Mr. Beam

3    August 16, 2018; is that correct?

4    A.      That is correct.

5    Q.      And prior to your deposition in this case, which

6    was in July of 2020, you had not seen Mr. Beam since August

7    16th of 2018; correct?

8    A.      That's correct.

9    Q.      Have you seen him since?

10   A.      I have not.

11   Q.      Have you spoken with Mr. Beam since then?

12   A.      I spoke with him yesterday evening, actually.  Yes.

13   Q.      Have you spoken to him at any point -- prior to

14   yesterday evening, have you spoken to him at any point

15   after August 16, 2018?

16   A.      I have not.

17   Q.      Dr. Cowen, you are not in any way an expert on

18   accident reconstruction; correct?

19   A.      You are correct.

20   Q.      And you have not been to the scene of the incident

21   that's the subject of this litigation; correct?

22   A.      Correct.

23   Q.      Have you seen any photographs or blueprints

24   pertaining to the scene that's the subject of this

25   incident?

1    A.       No, sir.

2    Q.       And you are not an expert on biomechanics, are you?

3    A.       I am not.

4    Q.       In terms of the biomechanical method of Mr. Beam's

5    injury, you cannot provide an expert opinion on that, can

6    you?

7    A.       Correct.  As far as forces applied and speed and so

8    forth, no.

9    Q.       And you would agree with me that Mr. Beam had

10   preexisting conditions regarding neck and back pain;

11   correct?

12   A.       He had been treated in the past for that, yes, sir.

13   Q.       And those preexisting conditions were orthopedic in

14   nature, weren't they?

15   A.       I guess you could call them orthopedic.  They're

16   musculoskeletal, sure.

17   Q.       And his conditions that he has been treated for

18   since the incident are also orthopedic in nature, are they

19   not?

20   A.       They are.  They're a good bit different but, yes,

21   they are.

22   Q.       And, sir, you are not an orthopedist in any way,

23   are you?

24   A.       I am not.  I have a lot of overlap in my practice

25   with orthopedic and musculoskeletal medicine, but I'm not

1    an orthopedist.

2    Q.      You are not board certified in orthopedics, are

3    you?

4    A.      I am not.

5    Q.      And you are also not -- radiology is not a

6    specialty of yours, is it?

7    A.      It's not.  I review films all the time and reports

8    all the time, but I'm not a radiologist.

9    Q.      You would agree with me that a board certified

10   radiologist is, is more qualified than yourself to review

11   film and reach conclusions from that film?

12   A.      You know, that's a -- that's a tough question.  I

13   mean, the obvious answer to your question, of course, would

14   be yes.  But there are certainly times when I review a film

15   and I disagree with the radiologist and will act on it

16   accordingly.

17   Q.      Well, those disagreements aside, if somebody is

18   board certified and somebody specializes in a particular

19   field of medicine, you would agree with me that they're

20   more qualified to opine on things that fall within that

21   field of medicine?

22          MS. DEMUREN:  Objection, calls for speculation.

23          THE COURT:  Overruled.

24   A.      So, in general, yes.  Again, I would not always

25   defer to a radiologist.  But in general, sure.

1  Q.      (BY MR. LEVCHINSKY)  Dr. Cowen, isn't it true that

2  as of your meeting with Mr. Beam on August 18, 2021, Mr.

3  Beam had no residual symptoms in his wrist?

4          THE COURT:  What's the date, counsel?

5          MR. LEVCHINSKY:  August 18.

6  A.      I'm sorry, you kinda cut out for --

7          MR. LEVCHINSKY:  I apolo -- you know what?  Your

8  Honor, strike that question.  I misstated the date.

9  Q.      (BY MR. LEVCHINSKY)  Let me start again.  That was

10  a very poorly-phrased question.

11          Dr. Cowen, your last meeting on August 16th, 2018,

12  that was your last time you met with the plaintiff;

13  correct?

14  A.      August 6 of '18.

15  Q.      August 6th of '18?

16  A.      Yes, sir.

17  Q.      Okay.  And as of that August 6th, 2018, meeting,

18  you would agree with me that he had no residual symptoms in

19  his wrist?

20  A.      You know, I'm looking through my report to confirm

21  that, and bear with me.  (Pause.)  You know, it doesn't

22  look like we addressed the wrist on that visit.  So I, I

23  guess I don't know the answer to that.  It doesn't look

24  like we talked about it, unless I'm missing something.  We

25  were focusing on his spine and shoulder and so forth.

1    Q.      Well, Doctor, if he was experiencing pain in his

2    wrist, you would expect him to tell you about that, as his

3    life care planner, wouldn't you?

4    A.      Probably so, unless we just missed it.

5    Q.      Well, when you conduct a meeting with somebody as

6    their life care planner, do you ask them questions

7    regarding pain anywhere that they're feeling?

8    A.      I do.

9    Q.      And if pain in the wrist is not something that's

10   contained in your report from that August 6, 2018, meeting,

11   is it fair to assume that no pain in the wrist was

12   complained of by Mr. Beam?

13   A.      At least on that day, that's true.

14   Q.      Same for his rib.  Is it fair to say that, as of

15   your meeting on August 6, 2018, there were no residual

16   symptoms in Mr. Beam's rib?

17   A.      You know, I believe at that point -- by that point,

18   most of his rib pain had resolved.  I think that's true.

19   Q.      And what about his right elbow?  Is it fair to say

20   that --

21   A.      I don't --

22   Q.      Sorry, Doctor.  Let me just get the question on the

23   record.

24          Is it fair to say that, as of your meeting with Mr.

25   Beam August 6, 2018, that there were no residual symptoms

1    in his right elbow?

2    A.    At least on that date, that's true, we did not --

3    it looks like we didn't discuss his elbow, so at least on

4    that day.

5    Q.    And that is the last day, prior to a couple of days

6    ago, that you spoke or met with Mr. Beam?

7    A.    That is correct.

8    Q.    Doctor, I want to talk a little about the

9    methodology you used in assessing costs and formulating the

10   life care plan in this case.  Have you ever heard of

11   something called chargemaster?

12   A.    Vaguely familiar with it.

13   Q.    What do you know about chargemaster?

14   A.    Chargemaster can mean lot of things.  It can mean

15   just what a clinic or a facility has as a list of charges.

16   I'm not sure if you're referring to some entity?

17   Q.    In the scope of your work as a life care planner,

18   are you aware of an entity called chargemaster that's used

19   to get reasonable costs of medical care?

20   A.    I mean, it's vaguely familiar.  But I'm not

21   familiar with it, no, sir.

22   Q.    It's not something that you used in this case;

23   right?

24   A.    Correct.

25   Q.    You used something that's called Context 4?

1    A.       Context 4 Healthcare, yes.

2    Q.       I'm sorry.  It's -- just to be clear on the record,

3    it's Context 4 Healthcare?

4    A.       Yes.

5    Q.       Okay.  And the "4" in that name is actually a

6    numeric four; correct?

7    A.       Yes.

8    Q.       Okay.  Have you ever heard of using FAIR Health

9    benchmarks to assess future costs of life care plans?

10   A.       I have.

11   Q.       Do you know how Context 4 compares to FAIR Health

12   benchmarks?

13   A.       As far as actual numbers, I do not.

14   Q.       Do you know whether or not Context 4 is a

15   privately-held company or a public company?

16   A.       I do not know the status of that.  I know it's a,

17   it's a entity separate from us that we subscribe to.  But

18   as far as how it's classified, I don't know.

19   Q.       Do you know whether or not they're a nonprofit?

20            MS. DEMUREN:  Objection, calls for speculation and

21   irrelevant.

22            THE COURT:  What's the relevance, counsel?

23            MR. LEVCHINSKY:  Your Honor, I think the relevance

24   will be clear with Rebecca Reier's testimony.

25            THE COURT:  But I'm asking you the relevance now so

1    I can respond to the objection.

2         MR. LEVCHINSKY:  I understand.  I just want to make

3    a clear comparison of the two methodologies, the competing

4    methodologies that are used --

5         THE COURT:  You have an expert for that.  Objection

6    sustained.

7         MR. LEVCHINSKY:  Your Honor, I just didn't hear

8    your ruling -- I know it's sustained but I don't know the

9    reason for it.

10        THE COURT:  Sustained.

11        MR. LEVCHINSKY:  Okay.

12        THE COURT:  The reason was, you have an expert

13   that's going to testify on this.

14        MR. LEVCHINSKY:  Okay.  That's what I wanted, Your

15   Honor.  I just didn't hear you.  Thank you.

16   Q.    (BY MR. LEVCHINSKY)  Dr. Cowen, you testified and

17   your report reflects that for some of these charges you

18   used data from Context 4, and for some of the charges you

19   just went directly to the treater to get an estimate;

20   correct?

21   A.    Kind of.  In those instances where we had a quote

22   from the treater, that's what we utilized.  We didn't go to

23   the treater for a quote that were in the medical records.

24   Q.    So, you had medical records with a quote for a

25   future radiofrequency ablation without even asking for it?

A.      Yeah.  There were quotes in the medical records
that I received, yes.  And that's not uncommon, to see
quotes in a record.

Q.      Well, did you elicit quotes for the various other
items that are in your life care plan from Mr. Beam's
treaters?

A.      I did not.  Those were in the records.

Q.      Is it your testimony that a quote like that from,
from a treater is preferred over something you could get
from Context 4?

A.      I don't know if it's a matter of preferred.  It's
-- it's closer to reality.  That's where the individual is
going to receive their care, that provider, that facility.
So, we're going to default to where the person is actually
going to receive that care, if we have that quote.

Q.      Dr. Cowen, if that's the case, why didn't you
elicit quotes for everything from Mr. Beam's treaters?

        MS. DEMUREN:  Objection.  It mischaracterizes the
prior testimony.  And I think Dr. Cowen has made clear, he
did not elicit any quotes.

        THE COURT:  Same instruction to you, counsel.
Legal objections.  Whether it misstates the testimony or
not, I'm not a jury and I think I am a little bit more
capable --

        MS. DEMUREN:  Absolutely.

1    THE COURT:  -- of discerning that.  Objection

2    overruled, although, I think we're coming up on

3    argumentative, but overruled.

4          Go ahead.  It's cross-examination.  Inquire.

5    Q.    (BY MR. LEVCHINSKY)  Do you need me to repeat the

6    question, Dr. Cowen?

7    A.    Yeah, please do.

8    Q.    Sure.  If it is preferable to you to get a price

9    directly from a treater if that price is available, why did

10   you not elicit quotes for prices for the entire gamut of

11   your life care plan from Mr. Beam's treaters?

12   A.    Well, first of all, I did not elicit any quotes.

13   These were quotes that were already in the records for

14   specific procedures like we talked about, surgical

15   procedures, the radiofrequency ablation.  I'm not going to

16   solicit quotes from -- for individual doctor visits and

17   medications and so forth that are not in the record.  We go

18   to the database to get those costs in that person's area.

19   Q.    Did you do anything to ensure that the quotes that

20   you did get directly from Mr. Beam's treaters were

21   reasonable and customary for the Houston market?

22   A.    No, not -- again, that was not my role.  My role is

23   to follow the same methodology for all cases.  And when we

24   have a quote that's going to realistically be what that

25   person is going to incur, that's closer to reality, that's

1    what I use.

2    Q.      Did you talk to Mr. Beam and did you ask him if his

3    plan was to continue treating with Houston doctors well

4    after this case is over?

5    A.      It was my impression, yes, he was going to undergo

6    those procedures.  I don't think he's going to get his

7    routine care, pharmacy care, physical therapy, doctor

8    visits, he's going to travel to Houston for those types of

9    things.  But for these big procedures, yes, that was my

10   impression when speaking with him.

11   Q.      Well, you stated that's your impression.  Did you

12   ask him that question directly?

13   A.      Yes.  Yeah, he was going to receive care there,

14   absolutely.

15   Q.      You would agree with me then that for other care --

16   you mentioned routine treatment -- it would be more

17   appropriate to look at what's customary and reasonable in

18   Mr. Beam's home region, including Chester, Illinois,

19   Southern Illinois, and areas like that; correct?

20   A.      Yes.  And for those other items, we used his --

21   it's called a geozip -- the first three digits of his ZIP

22   code to localize most of that data.

23   Q.      Dr. Cowen, you testified to your assessment of Mr.

24   Beam, specifically, your assessment of Mr. Beam's spine

25   earlier; correct?

```
 1   A.      That was part of it, yes.

 2   Q.      How do you go about physically assessing a

 3   patient's spine?

 4   A.      On a physical exam?  Is that what you are referring

 5   to.

 6   Q.      Well, let me back up for a second because I think I

 7   forgot to ask you that question.  Did you perform a

 8   physical exam on Mr. Beam when you saw him?

 9   A.      I did.

10   Q.      And that physical exam included an exam of his

11   spine?

12   A.      It did.

13   Q.      Did you palpate his spine?

14   A.      I did.

15   Q.      Can you tell the Court what that means?

16   A.      Sure.  It means to touch, feel, probe, so forth.

17   Q.      And is it fair to say that since your testimony

18   noted stiffness, tenderness, and pain in his spine, that

19   Mr. Beam responded to you palpating his spine?

20   A.      For those items, yes.

21   Q.      He expressed -- he expressed pain in one way or

22   another, didn't he?  When you palpated his spine?

23   A.      He did.  Also noted some spasm on that exam, as

24   well.  But that's correct.

25   Q.      And you would expect somebody who has a spinal
```

1    injury to express some level of pain when their spine is

2    palpated at a physical exam?

3    A.    Typically.  I mean, it depends upon where the

4    palpation takes place and how vigorous and so forth.  But

5    typically, yes.

6    Q.    Dr. Cowen, are you familiar with a text called <u>Life</u>

7    <u>Care Planning and Case Management</u> by Weed and Berens?

8    A.    I am.

9    Q.    Would you consider that text to be a reliable

10   authority in the field of life care planning?

11   A.    I wouldn't use the word authoritative, but it is a

12   resource for life care planning, sure.

13   Q.    And I'm not asking you to say it's the authority,

14   but is it one of the authorities in your field?

15   A.    I mean, it's a resource.  I don't know if I'd use

16   the word authority.  But it's a resource, sure.

17   Q.    It's a resource that you have relied on in your

18   work as a life care planner?

19   A.    Yes.  Part of my training in life care planning,

20   sure.

21        MR. LEVCHINSKY:  I have no further questions, Your

22   Honor.  Thank you.

23        MS. DEMUREN:  Nothing further for this witness,

24   Your Honor.

25        THE COURT:  Thank you, Dr. Cowen.

1          THE WITNESS:  Thank you, all.

2          MS. DEMUREN:  Your Honor, our next witness we are

3     calling is Andrea Bradford.  She is just logging in, as we

4     speak.

5          THE COURT:  Okay.

6          (Witness sworn by courtroom deputy.)

7          COURTROOM DEPUTY:  Please state your name, and

8     spell your last name for the record.

9          THE WITNESS:  Yes.  My name is Andrea Beth

10    Bradford.  B-R-A-D-F-O-R-D.

11         MS. DEMUREN:  May I, Your Honor?

12         THE COURT:  You may.

13         MS. DEMUREN:  Thank you.

14                         *  *  *  *  *

15                      ANDREA BRADFORD,

16    having been first duly sworn, was examined and testified

17    via videoconference technology as follows:

18                      DIRECT EXAMINATION

19    BY MS. DEMUREN:

20    Q.    Good morning, Miss Bradford.

21    A.    Good morning.  How are you?

22    Q.    I'm great.  How about yourself?

23    A.    I'm good.  Thank you.

24    Q.    Miss Bradford, you are a bit softspoken.  If you

25    can try to keep your voice up, elevated for me a little

1  bit, or come forward towards the computer, that would be

2  fantastic.

3  A.      Yes.  I will do that.  Is this a little bit better?

4  Q.      Much better.  Thank you, ma'am.

5  A.      Okay.

6  Q.      Miss Bradford, what type of expert are you?

7  A.      I am a Vocational Rehabilitation Counselor.

8  Q.      Miss Bradford, could you please briefly explain for

9  the Court your education?

10  A.      Yes, ma'am.  I have an undergraduate degree from

11  Baylor University in Social Work, and a Master's Degree

12  from University of Texas in Austin as a Vocational

13  Rehabilitation Counselor.

14  Q.      Okay.  And as part of being a Vocational

15  Rehabilitation Counselor, do you work in the field of

16  vocational rehabilitation?

17  A.      Yes, ma'am.  I do.  I have my own practice and I

18  work with veterans that have disabilities that are

19  transitioning from the military.  I provide vocational

20  rehabilitation services to them, vocational testing and

21  counseling.  I also work with individuals going through

22  workers' compensation and provide other services as a

23  vocational rehabilitation counselor.

24  Q.      Okay.  Miss Bradford, we have your report and

25  that's been marked as Plaintiff's Exhibit 32.  Do you have

1    that in front of you, ma'am?

2    A.    Yes, ma'am, I do.

3    Q.    Miss Bradford, is Plaintiff's Exhibit 32 a true and

4    correct copy of your report that you authored in this case?

5    A.    Yes, ma'am, it is.

6    MS. DEMUREN:  Your Honor, plaintiffs will move

7    Exhibit 32 into evidence.

8    THE COURT:  Any objections?

9    MR. LEVCHINSKY:  No objection.

10    THE COURT:  Plaintiff's Exhibit 32 is admitted.

11    Q.    (BY MS. DEMUREN)  Now, Miss Bradford, because the

12    Court does have your report, we aren't going to go through

13    it line by line.  But I do want to keep it more to high

14    level and kind of talk about a few points, if you will.

15    Okay?

16    A.    That sounds good.  Thank you.

17    Q.    Excellent.  That being said, ma'am, could you

18    please briefly explain to the Court what you did in this

19    case to come up with your opinions?

20    A.    Yes, ma'am.  So, I was provided with medical

21    records as well as other records for Mr. Beam, including

22    physical therapy records, some Social Security statements.

23    I also had the opportunity to review the life care plan and

24    the other records that were provided.  So, I reviewed the

25    records and I considered what Mr. Beam's diagnosis and

1    limitations were.

2          I also had the opportunity to meet with Mr. Beam

3    and conduct a vocational analysis and comprehensive

4    vocational evaluation.  So, in that, I conducted an

5    interview with Mr. Beam.  I gathered information from him

6    in regards to his education, work history, and the injury,

7    as well.  I talked to him about how that was impacting his

8    capacities, his ability to work.  We talked about what his

9    goals were, his vocational goals, to have a better

10   understanding of those.

11         And I also administered some aptitude and interest

12   assessments for Mr. Beam to have an understanding of what

13   his capacities were in that area.

14         So, through then my review of the records that were

15   provided, my interview and assessment of Mr. Beam, I

16   provided an opinion of Mr. Beam's vocational assessment and

17   earning capacity.

18   Q.    Miss Bradford, I want to kind of parse that out a

19   little bit.  I have that you provided vocational analysis,

20   comprehensive -- by looking at records, reviewing records,

21   looking at Mr. Beam's capability in terms of what he can

22   do, interviewing him and administering aptitude tests; is

23   that correct?

24   A.    Yes, ma'am.  Through that -- I did, yes, thank you,

25   through that.  And I then considered through my methodology

1    and my education and training and experience what my

2    recommendations and opinions were in relation to Mr. Beam.

3    Q.      Okay.  And before we get to your opinions, can you

4    please briefly explain to Her Honor what your methodology

5    was in coming up with your opinions?

6    A.      Yes, ma'am.  Thank you.

7           So, my methodology -- or the methodology that I

8    utilize is called the RAPEL Methodology, and that is

9    considered a widely used and comprehensive and accepted

10   methodology within my profession.  And really, one of the

11   main reasons that I utilize this methodology is because I

12   feel that it's thorough; all the components of this

13   methodology are those that I was trained in and utilize in

14   my private practice, as well.

15          And through that methodology, I consider a

16   rehabilitation plan for the individual; consider their

17   vocational strengths and limitations; take a look and

18   consider what their access to the labor market is through

19   disabilities statistics or individual's experience; then I

20   consider placeability of that individual; if that person is

21   likely to be successfully placed on a job, their earning

22   capacity, and then their expected labor force

23   participation.

24   Q.      And this methodology that you just described, did

25   you utilize that in this particular case regarding Mr.

1    Kevin Beam?

2    A.      Yes, ma'am, I did.

3    Q.      And as part of that methodology, you mentioned

4    vocational limitations.  Did you identify any vocational

5    limitations with respect to Mr. Beam after you have

6    conducted your interview and the other steps you have

7    previously outlined for the Court?

8    A.      I did, yes.

9    Q.      And what are those limitations?

10   A.      So, my opinion is that Mr. Beam has significant

11   vocational limitations now in relation to his disabilities.

12   So, those include his physical limitations related to his

13   back and his spine and other injuries.  They also include

14   his limitations related to his mental health, anxiety

15   conditions, as well.

16   Q.      Now, Miss Bradford, yesterday the Court heard from

17   Dr. Small, an orthopedic surgeon, who testified in this

18   case that Mr. Beam would not be able to return to gainful

19   employment even at a sedentary level.  You understand that,

20   ma'am?

21   A.      Yes, ma'am, I do.

22   Q.      Okay.  And moments ago, the Court heard from Dr.

23   Cowen, who testified that he defers to Dr. Small on Mr.

24   Beam's current ability to return to work.  Do you

25   understand that, ma'am?

1  A.      Yes, ma'am, I do.

2  Q.      Now, understanding --

3          THE COURT:  Hold on for a second, counsel.

4          MS. DEMUREN:  Sure.

5          THE COURT:  Hold on for one second, please, Miss

6  Bradford.

7          This is the weekly emergency test.  It is going to

8  get louder in here before it gets quieter.  So, I would

9  suggest we just pause for about 60 seconds or so, let it

10 run its course, because there will come a time we won't be

11 able to hear each other.

12         MS. DEMUREN:  Thank you, Your Honor.

13         THE COURT:  So, I'm going to use it as a stretch

14 opportunity.

15         MS. DEMUREN:  Miss Bradford, bear with us.

16         THE WITNESS:  Absolutely.

17         (Off the record.)

18         THE COURT:  Okay, we're back on record.  You can

19 proceed, counsel.

20         MS. DEMUREN:  Thank you.

21 Q.      (BY MS. DEMUREN)  Thank you, Miss Bradford.

22         Miss Bradford, moments ago, we talked about Dr.

23 Small's testimony that he provided for the Court yesterday

24 regarding Mr. Beam's ability to return to gainful

25 employment -- or inability to return to gainful employment.

1  You recall that testimony --

2  A.      Yes, ma'am.  Thank you.

3  Q.      -- or that question?

4      MR. LEVCHINSKY:  Objection, Your Honor, lacks

5  foundation.

6      THE COURT:  Overruled.

7  Q.    (BY MS. DEMUREN)  Now, understanding Dr. Small's

8  testimony as well as Dr. Cowen, Miss Bradford, in your

9  opinion do you believe Mr. Beam will be able to return to

10 any type of gainful employment after the injuries he

11 sustained as a result of the November 12, 2017, incident

12 where he was struck by the cable?

13 A.    It is my opinion that he will not be successfully

14 employed at this time.

15 Q.      Okay.  And could you please briefly tell the Court

16 how you arrived at that opinion?

17 A.      Yes, ma'am.  I did.  I considered Mr. Beam's

18 injuries and his limitations.  I considered those through

19 the medical records that I had reviewed, and through the

20 life care plan, as well as all of the records that were

21 provided for my review.  I also provided my own interview

22 and consideration.

23      And then I, further, utilized my education and

24 training as a Vocational Rehabilitation Counselor to

25 consider how Mr. Beam's specific injuries would impact his

1    ability to be able to participate in the workforce.  And at

2    the time of my initial report, I had considered the

3    information that was available.  And then, I've had the

4    opportunity since then to review additional records and

5    information including the Social Security opinion -- or

6    Social Security that Mr. Beam is now on.

7            And it's my opinion that based on his limitations

8    and disabilities that he would not be successfully employed

9    in a competitive workforce.

10   Q.      Now, Miss Bradford, you mentioned Social Security

11   that Mr. Beam is now on.  Are you aware that Mr. Beam has

12   been found to be totally disabled by the Social Security

13   Administration?

14           MR. LEVCHINSKY:  Objection, Your Honor, relevance.

15   A.      Yes, ma'am.  I am aware of that and have had the

16   opportunity --

17           MS. DEMUREN:  Bear with me, Miss Bradford.

18           THE COURT:  Sustained.

19   Q.      (BY MS. DEMUREN)  All right.  Miss Bradford, when

20   you discussed or when you stated that the information and

21   Social Security that you took into consideration, what did

22   you mean by that?

23   A.      I had the opportunity to review his award for

24   Social Security and that he had found to be disabled in

25   relation to the Social Security Disability.  So, I had the

1    opportunity to review those documents and consider those,

2    as well.

3    Q.      And, Miss Bradford, I just have a couple more.  But

4    before I get to that, are you here today as a retained

5    expert paid by my firm Arnold and Itkin?

6    A.      Yes, ma'am, I am.

7    Q.      Now, Miss Bradford, is your opinion that Mr. Beam

8    is permanently and totally disabled consistent with what

9    you just testified to, regarding what you reviewed with

10   respect to Social Security?

11   A.      Yes, ma'am, I would say that it is.

12   Q.      Okay.  Miss Bradford, you also have some numbers

13   about pre-injury earning capacity in your report that I

14   want to talk about very briefly.  Okay?

15   A.      Yes, ma'am.  Thank you.

16   Q.      Do you understand we have an economist in this case

17   that actually reviewed Mr. Beam's pay stubs to calculate

18   his earnings at the time of the incident?

19   A.      Yes, ma'am, I do.

20   Q.      Okay.  And as far as what Mr. Beam's preincident

21   earning capacity was at the time of this incident, would

22   you defer to that economist Dr. McCoin?

23   A.      Yes, ma'am.  I would defer to him.

24   Q.      Miss Bradford, has all of your opinions that you

25   have provided here today for Her Honor been given to a

1    reasonable degree of certainty?

2    A.      Yes, ma'am.  I would say that they are.

3    Q.      Thank you, Miss Bradford.

4           MS. DEMUREN:  I offer for cross.

5           THE WITNESS:  Thank you.

6                        CROSS-EXAMINATION

7    BY MR. LEVCHINSKY:

8    Q.      Miss Bradford, good morning.

9    A.      Hi.  Good morning.  How are you?

10   Q.      I'm well.  Thank you.  You still okay?

11   A.      I'm doing well, too.  Thank you.

12   Q.      Great.  Miss Bradford, I want to ask you some

13   questions about the work you did in this case and some

14   questions about the testimony that you just gave.  Okay?

15   A.      Yes, sir.  Thank you.

16   Q.      Now, the work that you did in this case is

17   summarized in Plaintiff's Exhibit 32, which is your

18   vocational rehabilitation assessment and earning capacity

19   evaluation; correct?

20   A.      Yes, sir, it is.

21   Q.      And that is a report that is dated March 6, 2019?

22   A.      Yes, sir, that's correct.

23   Q.      And that report contains the opinions that you came

24   to as a retained expert in this case; correct?

25   A.      Yes, sir, they do.

1    Q.    And that report also contains a summary of records

2    that you reviewed that went into you forming that opinion;

3    correct?

4    A.    Yes, sir.

5    Q.    Has that report ever been supplemented?

6    A.    No, sir.  I do not have a supplement report.

7    Q.    You mentioned records that you reviewed that were

8    provided to you more recently.  When were additional

9    records provided to you regarding Mr. Beam?

10    A.    I have been provided additional records.  I'm

11    sorry, I don't know the exact date.  But there have been

12    records that were provided before my deposition in February

13    2020, and then there are also records since then that I

14    have had the opportunity review as of today.

15    Q.    Let me start with the records that were provided to

16    you before your deposition.  Did you feel the need to

17    supplement or update your report in any way prior to your

18    deposition?

19    A.    I did not have a supplemental report prior to my

20    deposition.

21    Q.    So, suffice it to say that whatever records you

22    received prior to your deposition, those did not influence

23    you to update the opinions in your report?

24    A.    Those records did not require an update or change

25    my opinion, that's correct.

1    Q.     Beyond the records that you received just prior to

2    your deposition -- and just for the record, that deposition

3    was February 10, 2020.  So, I want to ask you about any

4    records that you received after February 10 of 2020.

5          Can you tell the Court when it is that you received

6    records after February 10 of 2020?

7    A.     I had received -- I don't know the date on that.  I

8    know I have received some additional records related to

9    additional treatment that Mr. Beam has undergone.  Those

10   were provided within our system, but I don't know the exact

11   date that those were provided.

12   Q.     Was it sometime in the last month?

13         MS. DEMUREN:  Objection as to -- asked and answered

14   at this point.

15         THE COURT:  Overruled as to asked and answered, but

16   I'm struggling here with relevance.

17         MR. LEVCHINSKY:  I'm just trying to figure out when

18   it was that this witness was provided the records.

19         THE COURT:  Okay.  But I'm still struggling with

20   relevance, and you have some, some specific issue you want

21   to address with the witness about any additional records,

22   whether it affects her opinion?  I mean, we're not in

23   pretrial anymore, so this is not a pretrial motion.  This

24   is not a pretrial issue about supplementation.  If you have

25   that argument, you can make it.  But I'm not sure where

1    we're going with this.

2        MR. LEVCHINSKY:  The argument does go to

3    supplementation, Your Honor.  This expert has testified to

4    opinions that go outside the scope of her report, and I'm

5    trying to probe and understand the basis for those

6    opinions.

7        THE COURT:  Why don't you ask her?  That might be a

8    simple question.

9        MR. LEVCHINSKY:  Yes, Your Honor.

10       THE COURT:  Okay.

11   Q.    (BY MR. LEVCHINSKY)  Miss Bradford, the opinions

12   that you have given today that Mr. Beam cannot work in the

13   future at all, those opinions are not reflected in your

14   report, are they?

15   A.    During my initial report, I had provided some

16   different scenarios of -- related to Mr. Beam.  At the time

17   of my initial report, it was unclear if he would be cleared

18   to return to work from his treating physicians.  So, I had

19   provided some different scenarios based on the option -- or

20   based on the information that I had.  I provided the

21   scenario of, if he were to be able to return to work part

22   time or if he were to be able to return to work full time

23   in a sedentary position.  I also provided the scenario, if

24   he would be unable -- that he would be unable to return to

25   work at all.  At the time of my deposition, my opinion was

1   that, at that time, he would be unable to work.

2       And today, I have received and considered

3   additional information, I would say, that further supports

4   the scenario provided in my report that he would be unable

5   to return to work.

6   Q.     If your opinion at the time of writing your report

7   was that Mr. Beam could not work in the future, would there

8   be any reason to put in your report the scenarios of him

9   working either part time or full time?

10  A.     At the time of my initial report, there was still

11  some treatment that he was undergoing.  And from what my

12  understanding was, there was -- Dr. Cowen also at that time

13  thought that he may be able to return to work to some type

14  of sedentary position.  There was some different scenarios

15  that I felt were important to consider and for -- to be

16  outlined in my report.  There was still additional

17  information in my opinion that was being gathered.

18      Since then, I have had the opportunity to consider

19  that and -- as well as, you know, the time that has passed.

20  And I would say that current -- presently, my opinion falls

21  in line with the scenario as it is outlined in my report,

22  that he would be unable to return to work.

23  Q.     And just to be clear, Miss Bradford, that opinion

24  is based on records that are not referenced in your report;

25  correct?

1    A.      That is based on all of the records that are

2    included within my report, that are outlined in my report.

3    That scenario is outlined in my initial report, as well.

4    Q.      Well, your report indicates three possible

5    scenarios; correct?

6    A.      It does, yes.

7    Q.      And today, your testimony is that only one of those

8    scenarios is a reasonable possibility; correct?

9    A.      I would say based on the information that I have

10   today, that the scenario that he is unable to work, as is

11   outlined in my report, is my present opinion, yes.

12   Q.      And that present opinion was influenced by records

13   that you received that are not referenced in your report;

14   correct?

15          MS. DEMUREN:  Objection, asked --

16          THE COURT:  I get the point.  I get the point.  You

17   can argue -- you can.  You can argue that these witnesses,

18   if you believe their opinions are outside of the

19   disclosure, that's fine.  And -- but -- I mean, asked and

20   answered.  I get it.  I get what you're saying.  Make the

21   record.  But, sir, could you please make the record and

22   move on?  This is becoming tedious.

23          MR. LEVCHINSKY:  I understand, Your Honor.  I still

24   don't --

25          THE COURT:  You do understand there's a different

1  presentation when there is no jury here.  I am able to

2  discern relevance.  I'm able to discern form.  I -- you

3  know, I may have some limitations in that but, for the most

4  part, I am.  But I'm just saying, let's -- let's get there.

5  Let's go.

6          MR. LEVCHINSKY:  Your Honor, my line of questioning

7  is in no way a commentary on your ability or anybody else's

8  ability.  I still have no idea --

9          THE COURT:  And you know what?  I don't need to

10 hear your commentary right now.  Could you move on,

11 counsel?

12         MR. LEVCHINSKY:  All right.

13 Q.     (BY MR. LEVCHINSKY)  Miss Bradford, when is the

14 last time that you saw Mr. Beam?

15 A.     I had met with him during our evaluation March 4,

16 2019.

17 Q.     Have you met with him since?

18 A.     I met with him -- I have not seen him in person

19 since then.  I have spoken with him since then but that was

20 -- I have not seen him in person since then.

21 Q.     When have you spoken with Mr. Beam since then?

22 A.     I spoke with him before my deposition in February.

23 Q.     And that was February of 2020; correct?

24 A.     Yes, sir.  That's correct.

25 Q.     Have you spoken with Mr. Beam since February of

1   2020?

2   A.    I have not.  I have reached out to him for an

3   update but was not able to reach him.

4   Q.    Now, when you first -- when you saw Mr. Beam in

5   person, you spent several hours with him; correct?

6   A.    Yes, I did.

7   Q.    How much of that time was spent meeting with him

8   and speaking with him compared to supervising his taking an

9   aptitude test?

10   A.    Our overall time together was approximately three

11   hours, and a portion of that, he was completing the

12   aptitude assessment.  I don't know the exact time that was

13   spent on each, but our overall time together was three

14   hours.  And I want to say the aptitude test took about an

15   hour, maybe a little bit more than that.

16   Q.    And you also reviewed medical records.  You have

17   testified to that; correct?

18   A.    Yes, sir, I did.

19   Q.    Have you ever reviewed any medical records that

20   predate his work incident on November 12, 2017?

21   A.    Not that I recall.

22   Q.    And, Miss Bradford, you are not a qualified --

23   you're not qualified to give a medical opinion as to

24   diagnosis or medical causation in this case, are you?

25   A.    That's correct.  I am not.

1  Q.     In fact, you defer to physicians that have either

2  reviewed records or treated Mr. Beam for those opinions?

3  A.     Yes, sir.  I would defer to physicians for any

4  medical opinions or diagnosis.

5  Q.     However, when you did see Mr. Beam in person, you

6  did make a note in your report that Mr. Beam was in

7  constant back pain when you saw him; is that correct?

8  A.     Yes.  He reported to me that he was in pain during

9  the time of our interview.

10  Q.     And you also noted --

11  A.     And he was alter --

12  Q.     I apologize.  I didn't realize you weren't

13  finished.

14  A.     I'm so sorry.  I didn't mean to cut you off.  No,

15  sir.  That was my fault.  I apologize.

16         Yes.  I noted just that, when I met with him, he

17  had difficulty concentrating.  He was alternating between

18  sitting and standing, and had reported to be in pain during

19  that time.

20  Q.     And you also noted that he had difficulty

21  ambulating.  He had to use a cane for that; correct?

22  A.     He did, yes.

23  Q.     In laymen's terms, he couldn't walk without a cane;

24  correct?

25  A.     I can just speak to the fact that he did have a

1    cane at the time of our assessment -- at the time of our

2    meeting.

3    Q.      Is it your opinion that somebody -- that when

4    somebody is going through constant back pain and has a

5    difficult time concentrating, that that is a good time to

6    give them an aptitude test that lasts more than an hour?

7            MS. DEMUREN:  Objection, relevance.

8            THE COURT:  Sustained.

9    A.      I did provide an aptitude --

10           THE COURT:  Miss Bradford, I sustained the

11   objection.  You don't need to --

12           THE WITNESS:  Oh, Your Honor, I'm so sorry.

13           THE COURT:  That's okay.

14   Q.      (BY MR. LEVCHINSKY)  Miss Bradford, you performed

15   -- or, Mr. Beam flew to Houston so that he could meet with

16   you and take the aptitude test; correct?

17   A.      Yes, sir.  Mr. Beam came to -- oh, I'm sorry.  Mr.

18   Beam came to my office in Austin, and that was for the

19   purpose of the comprehensive evaluation which included the

20   testing.

21   Q.      How is the aptitude test administered?

22   A.      That is a computer-based assessment.

23   Q.      Fair to say, it involved Mr. Beam sitting in front

24   of a computer and typing in or clicking in his answers?

25   A.      Yes, sir.  It is done on the computer.

1    Q.      Was it necessary for Mr. Beam to fly to Texas to

2    take this test?

3    A.      The assessment was just one portion of my overall

4    evaluation.   And so, included in that was an interview with

5    Mr. Beam where I gathered information related to his work

6    history, education, background, employment, things like

7    that, as well.

8    Q.      Well, could the aptitude test have been

9    administered remotely?

10           MS. DEMUREN:  Objection, relevance.

11   A.      It's --

12           THE COURT:  Sustained.

13           That objection is sustained, Miss Bradford.

14           THE WITNESS:  Thank you.

15   Q.      (BY MR. LEVCHINSKY)  Miss Bradford, your only other

16   conversation with Mr. Beam which took place right before

17   your deposition in February of 2020, fair to say that

18   lasted about 15 to 20 minutes; correct?

19   A.      I don't recall the exact time of that.

20   Q.      Is there anything that is in your report -- well,

21   did you feel the need to supplement your report in any way

22   after that conversation with Mr. Beam?

23   A.      No, sir, I do not.

24   Q.      Have you spoken with Mr. Beam's attorneys since

25   February of 2020?

A.      Yes, sir, I have.

Q.      When is the last time you spoke to them?

A.      I spoke with Mr. Christiansen yesterday.

Q.      Can you tell us for how long?

A.      I don't recall the exact time.  I -- maybe 10, 15
minutes or so.

Q.      Did you speak to any of Mr. Beam's attorneys prior
to yesterday, but after February of 2020?

A.      Not that I recall.

Q.      Now, when Mr. Beam met with you, you informed him
that you would be preparing a report and giving that report
to his attorneys; correct?

A.      Yes, sir, I did.

Q.      Did he understand that his meeting with you was for
the purposes of this litigation?

        MS. DEMUREN:  Objection, speculation.

        THE COURT:  Sustained.

Q.      (BY MR. LEVCHINSKY)  At any given time after your
meeting with Mr. Beam, were you aware of him undergoing
additional surgical procedures?

A.      My understanding is that, yes, he has undergone
additional surgery.

Q.      And are you aware of testimony that's been given in
this case that each of those procedures was necessary and
provided Mr. Beam relief?

```
 1   A.      I am not aware of that specific testimony.

 2   Q.      Did you ever follow up with Mr. Beam after February

 3   of 2020 to see if he was feeling better or in less pain?

 4   A.      I have not spoken with him since then, no.

 5   Q.      Did you ever consider following up with him to see

 6   if he was in better shape, to better perform on the

 7   aptitude test that you gave him?

 8   A.      I didn't feel that additional aptitude testing was

 9   necessary based on my review of the records that I had the

10   opportunity to review, as well as the Social Security

11   Disability ruling.  I didn't feel that additional aptitude

12   testing would be relevant or necessary for the purposes of

13   my evaluation.

14   Q.      The Social Security Disability ruling, is any

15   reference to that made anywhere within your report?

16   A.      I did not have that during my initial report, no.

17   Q.      And you did not supplement your report once you got

18   that information?

19           THE COURT:  Counsel, the records reflects her

20   report has not been supplemented.  Can we move on?

21           MR. LEVCHINSKY:  Yes, Your Honor.

22   Q.      (BY MR. LEVCHINSKY)  When you did consider that Mr.

23   Beam had potentially -- had possibilities of seeking

24   employment, either part time or full time, did you ever

25   talk to him about specific sedentary or clerical
```

1    opportunities in his regional area?

2    A.      I did not speak with him about specific job

3    opportunities, no.

4    Q.      You didn't assist him in looking for a job that

5    could suit his, his physical needs?

6    A.      That's correct, I did not.

7    Q.      Have you ever -- I didn't ask you this, Miss

8    Bradford.  Have you ever spoken with any of Mr. Beam's

9    doctors?

10    A.      No, sir, I have not.

11    Q.      In your report, you estimate that the average wage

12    in Southern Illinois is just over 16 dollars an hour; is

13    that correct?

14    A.      Yes, that is correct.

15    Q.      And that estimation is based on data that you

16    obtained from the Department of Labor; correct?

17    A.      Yes, sir.  From the Bureau of Labor Statistics,

18    that's correct.

19    Q.      And you wouldn't put that in your report unless you

20    believed that that data was a reliable source as to the

21    average wage of somebody working in Southern Illinois?

22    A.      At the time of my report, yes, that was the

23    information, the average wage according to the Bureau of

24    Labor Statistics.

25    Q.      Do you have any idea, since you authoring your

1  report, if that average wage has gone up or down?

2  A.    I am not aware of that one way or the other what

3  that would be at this point.

4  Q.    Now, you also opine in your report about Mr. Beam's

5  annual loss if he can't return to full time employment as a

6  deckhand; correct?

7  A.    Yes, sir, that's correct.

8  Q.    You don't have any opinion that you could offer

9  this Court as to when -- as to how long the average

10  deckhand works; correct?

11  A.    I don't have that information.  That's correct.

12  Q.    And what -- and just to clarify.  When I say "how

13  long," I'm talking about when it is that they retire from

14  the deckhand position.  You don't have information on that;

15  correct?

16  A.    Oh, sir, I'm so sorry.  I had you frozen for a

17  minute.  Would you mind repeating that last question?

18  Q.    No, I don't mind.  Just to clarify.  You don't have

19  any information on how long a deckhand works until they

20  retire from being deckhand?

21  A.    That's correct.  I do not have that number.

22        MR. LEVCHINSKY:  I have no further questions.

23  Thank you.

24        MS. DEMUREN:  No redirect, Your Honor.

25        THE COURT:  Thank you.

1          Thank you, Miss Bradford.  You may sign off.  Thank

2     you.

3          THE WITNESS:  Okay.  Thank you so much.  I

4     appreciate it.

5          THE COURT:  Okay.  Counsel, we're going to go ahead

6     and take a break.  We'll be in recess until 10:45.

7          MS. DEMUREN:  Excellent.  And, Your Honor, before

8     we do that.  I just have one question.  Our next witness is

9     physically here.  Just in terms of how you would like that

10    logistically, where should we --

11         THE COURT:  You just bring them in and then Miss

12    Hurst will get them sworn in.  They'll be in the witness

13    box.  And you can swing that podium -- if you want it use

14    the podium for them?  You can swing it.  And then you can

15    swing it back and we'll -- you know, towards the camera.

16         MS. DEMUREN:  Excellent.  Thank you, Your Honor.

17         THE COURT:  Okay.

18         COURTROOM DEPUTY:  All rise.

19         (Court recessed from 10:30 a.m. to 10:45 a.m.)

20         THE COURT:  You may call your next witness.

21         MS. DEMUREN:  Yes.  Thank you, Your Honor.  The

22    plaintiff calls Helen Rinehart.

23         THE COURT:  Miss Rinehart, will you please step

24    forward and Miss Hurst will swear you in.

25         (Witness sworn by courtroom deputy.)

1        COURTROOM DEPUTY:  Please state your name and spell

2  your last name.

3        THE WITNESS:  Helen M. Rinehart.  R-I-N-E-H-A-R-T.

4        THE COURT:  You may proceed, counsel.

5        MS. DEMUREN:  Thank you.

6                    *  *  *  *  *

7                    HELEN RINEHART,

8  having been first duly sworn, was examined and testified as

9  follows:

10                 DIRECT EXAMINATION

11  BY MS. DEMUREN:

12  Q.      Good morning, Miss Rinehart.

13  A.      Good morning.

14  Q.      Miss Rinehart, I know you are hard of hearing a

15  little bit.  So, if for some reason you can't hear me,

16  please let me know.  Okay?

17  A.      Okay.

18  Q.      All right.  Miss Rinehart, do you know Kevin Beam?

19  A.      Yes, I do.

20  Q.      How do you know Mr. Beam?

21  A.      He's my son.

22  Q.      Miss Rinehart, are you aware that on November 12,

23  2017, Mr. Beam was struck by a cable while at work?

24  A.      Yes, ma'am.

25  Q.      I want to talk to you briefly about Kevin before

1  November 12, 2017, when he was struck at work by the cable.

2  Okay?  How was Kevin generally before this incident

3  happened?

4  A.     He was fine.  He lived a normal life and was able

5  to fish and hunt and do the things that he enjoyed in life.

6  Q.     And did you spend time with Kevin before this

7  incident happened on November 12, 2017?

8  A.     I'm sorry?

9  Q.     Did you spend time with Kevin, whether on a daily

10 or weekly basis, before this incident happened on November

11 12, 2017?

12 A.     Oh, yes.

13 Q.     Okay.  As a son, was Kevin helpful to you before

14 this incident happened on November 12, 2017?

15 A.     Yes, ma'am.

16 Q.     What are some things he did for you?

17 A.     I'm sorry?

18 Q.     What are some things that he used to do for you

19 before this incident happened on November 12, 2017?

20        THE COURT:  Hold on for one second, counsel.

21        Miss Rinehart?  You don't have to sit up in the

22 microphone.  It picks you up.  So, you can kinda sit back

23 and try to get yourself comfortable and the microphone will

24 pick you up.  You don't have to lean forward into it.

25 Okay?

1          THE WITNESS:  Thank you.

2          THE COURT:  You're welcome.

3    Q.     (BY MS. DEMUREN)  All right.  Miss Rinehart, I'll

4    ask you the question again:  What are some things that

5    Kevin used to do for you before this incident happened on

6    November 12, 2017?

7    A.     Anything that I wasn't able to do at my age.

8    Q.     Okay.  And how old are you, ma'am, respectfully?

9    A.     80.

10   Q.     Okay.  Now, I want to talk to you about Kevin after

11   November 12, 2017, when he was struck with a cable at work.

12   Okay, ma'am?

13   A.     Yes.

14   Q.     Okay.  Did things change with Kevin with respect to

15   how his mannerism or his behavior was generally after

16   November 12, 2017?

17   A.     He's not able to do what he used to be able to do,

18   and I can't call on him to help me if I need help.

19   Q.     And not to belabor -- I'm sorry, ma'am, were you

20   still talking?  Please go ahead.

21   A.     No.

22   Q.     Okay.  Thank you, Miss Rinehart.

23          You said he is not able to do the things he used to

24   do.  Can you provide some specifics for the Court about

25   what things he used to do before he was struck with a cable

1  at work, that he can no longer do since being struck with a

2  cable at work?

3  A.    He can't do any lifting, any fishing, any hunting

4  like he used to.

5  Q.    Do you have any grandchildren through Kevin?

6  A.    I'm sorry?

7  Q.    Do you have any grandchildren through Kevin?

8  A.    Yes, I have lots.

9  Q.    Okay.  That's fair.  Let me ask you it differently.

10  Does Kevin have any children?

11  A.    Yes.

12  Q.    How many?

13  A.    He has two sons.

14  Q.    Okay.  Does he have a daughter, as well?

15  A.    Yes, ma'am.

16  Q.    That's okay.  Do any of his sons live with him?

17  A.    I'm sorry?

18  Q.    You said he has two sons.  Do any of his sons live

19  with him?

20  A.    Yes.  He has a handicapped son.

21  Q.    What's Kevin's handicapped son's name?

22  A.    Randy Beam.

23  Q.    Are there any things that you observed before

24  November 12, 2017, with respect to what Kevin was able to

25  do for Randy, before he got hit by this incident, that he

1    can no longer do now?

2    A.      He can't help him do hardly anything.  He, you

3    know, is there for him.  But his other son, James, does any

4    of Randy's routine stuff and any lifting or helping him.

5    Q.      And before getting hit by a cable in November 2017,

6    was Kevin the individual that used to help Randy with his

7    routine daily living activities?

8    A.      Yes.  Yes.

9    Q.      Thank you, Miss Rinehart.  I really appreciate your

10   time, ma'am.

11         THE COURT:  Cross-examination.

12         MR. FOX:  Nothing, Your Honor.  Thank you.

13         THE COURT:  Thank you, Mr. Fox.

14         Thank you, ma'am.  You may step down.  Please watch

15   your step.

16         Okay.  Miss Demuren, please call your next witness.

17         MS. DEMUREN:  Yes, Your Honor.

18         Your Honor, the plaintiff is going to call Dr.

19   Swastik Sinha by video deposition.

20         THE COURT:  Okay.

21         MS. DEMUREN:  And, Your Honor, just briefly, so the

22   Court is aware, just because of how the deposition was

23   conducted.  Defense's cuts are going to be played first,

24   followed by plaintiffs's.

25         THE COURT:  Okay.  The cuts don't matter to me.  I

1    will consider it as a whole deposition.

2         MS. DEMUREN:  Certainly.

3         THE COURT:  But thank you.

4         MS. DEMUREN:  No problem.  Thank you, Your Honor.

5         (The videotaped deposition dated March 1, 2021, of

6    Swastik Sinha was played at this time.)

7         MS. DEMUREN:  Nothing further for this witness,

8    Your Honor.

9         THE COURT:  All right.  Let's take a recess for

10   lunch.  We will be in recess until 1:30.

11        And, Counsel, I will ask again to please don't have

12   your activated cell phones at the table.  We have a lot of

13   -- I just watched Mr. Levchinsky on his cell phone.

14        MR. LEVCHINSKY:  Oh, sorry.

15        THE COURT:  So, we have a lot of equipment.  It's a

16   lot of interference.  We're trying to do a lot of things.

17   So, please, turn it off, sir.

18        And then I will see you at 1:30.

19        (Court recessed 12:10 p.m. to 1:30 p.m.)

20        THE COURT:  Is the plaintiff ready to call their

21   next witness?

22        MS. DEMUREN:  Yes, Your Honor.  The plaintiff calls

23   Mr. Kevin Beam.

24        THE COURT:  Okay.  Mr. Beam, please step forward to

25   be sworn.

1          (Witness sworn by courtroom deputy.)

2          COURTROOM DEPUTY:  Please state your full name.

3          THE WITNESS:  Kevin Beam.

4          MS. DEMUREN:  May I, Your Honor?

5          THE COURT:  You may.

6          MS. DEMUREN:  Thank you.

7                         *  *  *  *  *

8                         KEVIN BEAM,

9    having been first duly sworn, was examined and testified as

10   follows:

11                    DIRECT EXAMINATION

12   BY MS. DEMUREN:

13   Q.     Good afternoon, Mr. Beam.  Can you hear me okay?

14   A.     Yes.

15   Q.     Mr. Beam, have you ever testified in court before?

16   A.     No, ma'am.

17   Q.     Are you a little nervous?

18   A.     Yes, ma'am.

19   Q.     Mr. Beam, aside from your nervousness, will you do

20   your best to answer my questions and Mr. Fox's questions

21   today?

22   A.     Yes, ma'am.

23   Q.     All right.  Thank you, sir.

24          Where were you born?

25   A.     When was I born?

1   Q.      Where.

2   A.      Oh, Chester, Illinois.

3   Q.      And where do you currently live?

4   A.      Chester.

5   Q.      Did you grow up in Chester?

6   A.      Yes.

7   Q.      Have you been there all your life?

8   A.      Yes.

9   Q.      Do you have any children, Mr. Beam?

10  A.      Yes.

11  Q.      How many?

12  A.      Three.

13  Q.      Okay.  What are their names and ages?

14  A.      James, 34; Randy, 27; and, Kristi, 26.

15  Q.      Do you have any grandchildren?

16  A.      Yes.

17  Q.      How many?

18  A.      Two.

19  Q.      And what are their names and ages?

20  A.      Paxton's 11 and Bryson's 3.

21  Q.      Okay.  In your current home that you live at in

22  Chester, Illinois, who lives there with you?

23  A.      My two boys and my grandson.

24  Q.      Okay.  So, that would be James and Randy, and which

25  of your two grandsons live with you?

1    A.       Paxton.

2    Q.       Why does James, Randy, and Paxton live with you?

3    A.       Randy's paralyzed.  And James lives there to help

4    us out now.

5    Q.       And I'll talk about Randy a little bit later, but

6    for now I want to get to know you and talk about your

7    education and experience.  Okay?  How far did you get in

8    school, Mr. Beam?

9    A.       What's that?

10   Q.       How far did you get in school?

11   A.       Oh, 12.

12   Q.       Did you graduate from high school?

13   A.       Yes, ma'am.

14   Q.       And where did you attend high school?

15   A.       Chester High School.

16   Q.       All right.  What was your first real job after

17   graduating from high school in Chester?

18   A.       I drove a semi truck for Gilster-Mary Lee.

19   Q.       And how long did you drive this semi truck for

20   Gilster?

21   A.       Almost 21 years.

22   Q.       After you stopped working for Gilster for almost 21

23   years, what did you do next?

24   A.       I got hired on at Kinder Morgan.

25   Q.       Let me take a step back for a moment, Mr. Beam.

1  Why did you stop driving for Gilster after 21 years?

2  A.      My wife wanted me to be home more.

3  Q.      Understandable.  All right.  Now, you said that you

4  started working for Kinder Morgan after you stopped working

5  for Gilster; is that correct?

6  A.      Yes, ma'am.

7  Q.      Initially, before you started at Kinder Morgan, did

8  you have to complete an application?

9  A.      I don't recall.

10 Q.      Okay.  Did anyone ever tell you that you suffer

11 from any health condition that could affect your ability to

12 perform your job at Kinder Morgan --

13 A.      No, ma'am.

14 Q.      -- before you started?  And what was your job title

15 or role at Kinder Morgan?

16 A.      Started out as Operating Engineer, and then it was

17 River Crew.

18 Q.      And, I'm sorry, what was the second part?

19 A.      River Crew.

20 Q.      And what does or what did your job as an Operating

21 Engineer consist of, meaning, what did you do on a daily

22 basis?

23 A.      Well, you either went to the river or you stayed on

24 landside and ran a dozer or a train or -- um -- changing

25 rollers, working on belts.  Stuff like that.

1  Q.      When you say you either stay on the landside or

2  riverside, if you were on the riverside, what would you do

3  on a daily basis?

4  A.      Move barges around, check the fleet, pump the tanks

5  out, take barges down to Gavalon grain bin, switch them

6  out.  Just mainly moving barges.

7  Q.      And that process of moving barges, did it entail

8  lifting heavy objects?

9  A.      Yes.

10 Q.      Can you briefly explain some of those heavy objects

11 that you would lift as part of moving barges, and

12 approximately how much they weighed?

13 A.      Well, the ratchets, I think they were like 70 to 80

14 pounds, some of them 100.  Then the wires are like 120

15 pounds.  And you did that most of the night.

16 Q.      Would you describe the job that you did for Kinder

17 Morgan as an Operating Engineer as manually intensive?

18 A.      As -- what?

19 Q.      As manually intensive?  So --

20 A.      Yes.

21 Q.      Thank you.  At some point, Mr. Beam, did Kinder

22 Morgan -- was Kinder Morgan bought out?

23 A.      Yes.

24 Q.      By whom?

25 A.      Watco.

1    Q.    Did you continue on working for Watco?

2    A.    Yes, ma'am.

3    Q.    Did your job duties change when Watco bought out

4    Kinder Morgan?

5    A.    No.

6    Q.    And what was your job title or role at Watco?

7    A.    It -- towards the end, I was the River Crew.

8    Q.    Now, Mr. Beam, while I understand your job is

9    manual -- or was manually intensive, did you like your job?

10   A.    Yes, I love my job.

11   Q.    Okay.  Prior to November 12, 2017, had you ever

12   been written up on the job by Watco?

13   A.    No, ma'am.

14   Q.    Prior to November 12, 2017, had you ever been

15   placed on light or restricted duty by Watco?

16   A.    No, ma'am.

17   Q.    All right.  Mr. Beam, I'm going to switch gears a

18   bit.  Now, you were present in court yesterday during the

19   testimony of your treating physicians; is that correct?

20   A.    Could you repeat that, please?

21   Q.    Sure, and I'll slow it down a bit.  All right.

22   Were you in court yesterday when the doctors that treated

23   you testified?

24   A.    Yes.

25   Q.    All right.  Do you recall Dr. Bashir, Dr. Foster,

1    Dr. Thakur, and Dr. Small discussing preexisting injuries?

2    A.    Yes.

3    Q.    Now, I want to talk to you about that for a bit.

4    Before November 12, 2017, Mr. Beam, did you have any

5    significant health problems?

6    A.    No.

7    Q.    All right.  Were you in the courtroom yesterday

8    when you heard -- when there was testimony about prior

9    motor vehicle accidents that you had?

10   A.    What about?

11   Q.    Sure.  Did you hear testimony yesterday by the

12   doctors that treated you about motor vehicle accidents that

13   you had before November 12, 2017?

14   A.    I still don't understand what you're --

15   Q.    That's okay.  All right.  Let me ask it a different

16   way.

17         Mr. Beam, were you involved in a motor vehicle

18   accident in June of 2017 where you were rear-ended?

19   A.    Yes.

20   Q.    After that motor vehicle accident where you were

21   rear-ended, did you seek medical care?

22   A.    Yes.

23   Q.    Where did you go?

24   A.    To the hospital.

25   Q.    And when you went to the hospital, did you get

1    checked out?

2    A.      Yes.

3    Q.      What did they do, briefly?

4    A.      They X-rayed my hand and my ribs.

5    Q.      And after you went to the hospital and got checked

6    out, did you go --

7    A.      Wait a minute.

8    Q.      I'm sorry.

9    A.      That was -- that was on the auto accident.  Right?

10   Q.      Correct.  June 2017.

11   A.      Okay.  I didn't go to the ambulance there.  I went

12   home and thought, "My back's getting tight," so I went back

13   to the hospital and told them I wanted an X-ray and MRI of

14   my back.

15   Q.      Why did you tell them that you wanted an X-ray --

16   you said an MRI, but I want to clarify.  Did you ask for an

17   MRI or an X-ray?

18   A.      Both.

19   Q.      Okay.  Did you get an MRI back then?

20   A.      Yes.

21   Q.      In the accident of June 2017, did you get an MRI?

22   A.      Yeah, on my back.

23           MR. FOX:  Objection, I think he's already answered

24   that he got an MRI in June of --

25           THE COURT:  Mr. Fox, don't start.  What's the --

1          MR. FOX:  Asked and answered, Your Honor.

2          THE COURT:  Overruled.

3   Q.     (BY MS. DEMUREN)  Now, Mr. Beam, we have medical

4   records that show that you got a CT scan and an X-ray for

5   that car accident where you were rear-ended in June 2017.

6   Is there any reason as you sit here today to dispute that,

7   sir?

8   A.     Is there -- what?

9   Q.     Is there any reason to think differently, that you

10  did not get an X-ray or CT scan back in June of 2017?

11  (Pause.)  Do you understand my question, sir?

12  A.     No, I -- apparently not.

13  Q.     That's all right.  I'll do my best.

14         So, we have records that show after you got into

15  the accident where you were rear-ended, you went to the

16  hospital and got CT scans and X-rays.  As you sit here

17  today, is there any reason that you would -- that you think

18  differently?  That you did not get X-rays or CT scans?

19  A.     No, I got 'em.

20  Q.     After you went to the hospital to get checked out

21  and got X-rays and CT scan, did you go back to work?

22  A.     Yes.

23  Q.     Okay.  Did you see a chiropractor as a result of

24  that June 2017 car accident where you were rear-ended?

25  A.     Yes.

Q.     Mr. Beam, from the day of the car accident in June
2017 to the November 12, 2017, accident where you were
struck by a cable at work, did you miss any days of work?

A.     No, ma'am.

Q.     Did you receive any additional treatment other than
the X-ray and the CT scan as a result of the June 2017
accident where you were rear-ended?

A.     Yes.  I was having a problem with my tailbone.  It
felt like it was bruised.  So, she gave me some kind of
shot in my tailbone and that was the end of it.  It cleared
up and I was fine.

Q.     So, did that injection that you got in the back of
your tailbone, as you testified to, did that provide you
relief?

A.     Yes.

Q.     Did you miss any work as a result of this car
accident in June of 2017?

A.     No, ma'am.

Q.     All right.  Did -- as a result of the car accident
where you were rear-ended in June of 2017, did that affect
your ability to do your job at Watco?

A.     No, ma'am.

Q.     Now, I want to switch gears and talk about another
incident that happened.  Do you recall falling down some
stairs sometime in 2015 in your home?

1    A.      Yes.  I tripped on the top step.

2    Q.      And did you seek any medical attention as a result

3    of tripping on the top step?

4    A.      Yes.  My ribs were -- my ribs and the back was

5    hurting, so I went to go get an X-ray to make sure nothing

6    was broke.

7    Q.      And were you ever informed that anything was

8    broken?

9    A.      No.  They said it was fine.  I was just bruised.

10   Q.      As a result of slipping on the top stairs of your

11   home, did you miss any days of work?

12   A.      No.

13   Q.      As a result of slipping on the top stairs of your

14   home back in 2015, did that affect your ability to do your

15   job?

16   A.      No, ma'am.

17   Q.      Mr. Beam, were you involved in another car accident

18   in 2011 where you hit a tree?

19   A.      Yes.

20   Q.      Did you seek any medical care as a result of that

21   car accident in 2011 where you hit a tree?

22   A.      Yes.  I went to the hospital and got checked out,

23   and they said I had a slight sprain on my right arm.

24   Q.      Did you require or get any surgery for that slight

25   sprain?

1    A.       No.

2    Q.       I know it's hard, but do me a favor.  Just to make

Miss LaBuwi -- and I might be pronouncing it wrong -- job

easier, let me finish my question and then you can answer.

okay?  But you're doing good.

6    A.       All right.

7    Q.       Did you miss any days of work as a result of the

2011 accident where you hit the tree?

9    A.       No, ma'am.

10   Q.       Did hitting the tree back in 2011 affect your

ability to do your job?

12   A.       No.

13   Q.       Mr. Beam, have you ever smoked cigarettes before?

14   A.       Yes.

15   Q.       Were you a cigarette smoker at the time of the

November 2017 incident where you were hit by a cable at

your job?

18   A.       No.

19   Q.       That was a poorly-worded question, let me -- well,

strike that or withdraw that.

21        How long before the November 12, 2017, incident

where you were struck by a cable at work, how long had you

stopped smoking cigarettes?

24   A.       I think it was two months before.

25   Q.       Do you use what's called a vape?

1    A.      Yeah, I used that for about, I think, three or four

2    months.  I'm not positive.  I think it was three or four

3    months.

4    Q.      You said you used that.  Are you currently using

5    it?

6    A.      No.

7    Q.      Mr. Beam, has any doctor ever diagnosed you with

8    COPD?

9    A.      No.

10   Q.      Has any doctor ever diagnosed you with

11   osteoporosis?

12   A.      No, ma'am.

13   Q.      Before the November 12, 2017, incident where you

14   were hit by a cable at work, had you ever fractured your

15   back?

16   A.      At work or anywhere?

17   Q.      Period.  So, before the incident at work on

18   November 12, 2017, had you ever fractured your back?

19   A.      No.  No.

20   Q.      Okay.  Before the incident at work on November 12,

21   2017, had you ever fractured your ribs?

22   A.      No.

23   Q.      Before the November 12, 2017, incident where you

24   were struck by a cable at work, had you ever been told by a

25   doctor that you needed to get a kyphoplasty?

1  A.      No.

2  Q.      Before the November 12, 2017, incident where you

3  were struck by a cable at work, had you ever been told by

4  any doctor you needed thoracic spine surgery?

5  A.      No.

6  Q.      Before the November 12, 2017, incident where you

7  were struck by a cable at work, had you ever been told by

8  any doctor that you needed an ablation?

9  A.      No, ma'am.

10  Q.      Before the November 12, 2017, incident where you

11  were hit by a cable at work, had you ever been told by any

12  doctor that you needed a cervical fusion?

13  A.      No, ma'am.

14  Q.      Before the November 12, 2017, incident at work, had

15  you ever been told by any doctor you needed wrist surgery?

16  A.      Needed what?

17  Q.      Wrist surgery.

18  A.      Oh, no.

19  Q.      Mr. Beam, before November 12, 2017, incident at

20  work, had you ever been told by any doctor that you needed

21  shoulder surgery?

22  A.      No, ma'am.

23  Q.      Now, in the course of undergoing medical treatment

24  as a result of being hit by the cable on November 12, 2017,

25  were you diagnosed with PTSD?

1    A.    No.

2    Q.    After --

3    A.    Oh.

4    Q.    It's okay.  After the November 12, 2017, incident

5    at work where the cable struck you, did anyone ever

6    diagnose you with anxiety?

7    A.    Yes.

8    Q.    After the November 12, 2017, incident where you

9    were struck by a cable at work, were you ever diagnosed

10   with depression?

11   A.    Yes.

12   Q.    And after the November 12, 2017, incident at work

13   where you were struck by a cable, had you ever been

14   diagnosed with PTSD?

15   A.    Yes.

16   Q.    All right.  Could you briefly explain for the Court

17   what things that you have gone through with respect to your

18   PTSD, anxiety, and depression?

19         MR. FOX:  Your Honor, if I may, just a moment.  I

20   have to lodge an objection.  There's no medical or

21   psychological opinion testimony linking the PTSD to this

22   incident and, therefore, this testimony is not relevant.

23         THE COURT:  Overruled.  I'll reserve once I review

24   the whole record, but I'm going to take the testimony.

25         MS. DEMUREN:  Okay.

1    Q.      (BY MS. DEMUREN)   Do you want me to ask that

2    question again?

3    A.      Yes.

4    Q.      Certainly, Mr. Beam.

5            Mr. Beam, could you briefly explain to Her Honor

6    kind of the sorts of things you have gone through or you

7    have experienced as a result of your PTSD, depression, and

8    anxiety you were diagnosed with after you got struck by the

9    cable on November 12, 2017?

10   A.      Mood changes, you know.  I have trouble sleeping at

11   night.  Dream -- I keep having dreams that I'm going to get

12   hit by something, and then I wake up and can't go back to

13   sleep.  It's been a big change.

14   Q.      Mr. Beam, before the November 12, 2017, incident

15   where you were hit by the cable at work, did you ever

16   suffer or experience anxiety before?

17   A.      Yes.

18   Q.      Okay.  Now, could you explain to the Court --

19   strike that.

20           The anxiety that you experienced before the

21   November 12, 2017, incident where you were hit by the

22   cable?  Was that different or is that different in any

23   respect than the anxiety, depression, and PTSD you have

24   suffered after the November 12, 2017, incident?

25   A.      It was a big difference.

1    Q.      And how is that a big difference?

2    A.      I mean, I'd have, you know, bad days being sad and

3    stuff like that.  And then when I got hit by the wire, then

4    it was like everything was done, you know.  Just the bad

5    nightmares and I still have them.

6    Q.      Mr. Beam, I want to kinda talk to you just about

7    your normal day to day when you were working for Watco

8    before this incident on November 12, 2017 happened.  Okay?

9    So, before you got struck by the cable, Mr. Beam, did you,

10   while working at Watco, ever complain about your back

11   hurting while working, at work?

12   A.      I might have, but it's something everybody

13   complains about when you work on the river.

14   Q.      And before the November 12, 2017, incident where

15   you were hit by the cable at work, did other workers

16   complain about their backs hurting while at work, that you

17   heard?

18   A.      Yes.

19   Q.      Okay.  Now, despite the complaints that you may

20   have had at work about your back hurting, did you continue

21   to do your job as normal?

22   A.      Yes.

23   Q.      Despite the complaints that other coworkers had

24   that you personally have heard while at work about their

25   backs, did they do their jobs as normal?

1    A.    Yes.

2    Q.    Mr. Beam, before you were hit by this cable on

3    November 12, 2017, did you have any hobbies or things that

4    you enjoy doing?

5    A.    Yes.

6    Q.    What were some of those things?

7    A.    I love to fish, hunt, exercise, yard work and

8    gardening, stuff like that.

9    Q.    Now, since November 12, 2017, since you got hit by

10   this cable at work, have you been able to fish, exercise,

11   yard work --

12   A.    No.

13   Q.    -- the things that you enjoy doing?  I'm sorry, is

14   that a no?

15   A.    No.

16   Q.    Thank you, Mr. Beam.

17         Now, Mr. Beam, I want to switch gears again and

18   talk to you about the actual date of incident, November 12,

19   2017.  And when I say "incident," do you understand that to

20   be when you were struck by a cable at work, sir?

21   A.    Yes.

22   Q.    Were you employed that day, November 12, 2017?

23   A.    Yes.

24   Q.    Who was your employer?

25   A.    Watco.

1    Q.      Okay.  And what position did you have on that date,

2    November 12, 2017?

3    A.      River Crew.

4    Q.      And as part of being the River Crew, were you

5    required to physically be out on the barge?

6    A.      Yes.

7    Q.      And did you have to physically be out on the barge

8    to do your job?

9    A.      Yes, ma'am.

10   Q.      Now, in your normal job at Watco, what were some

11   things that you had to do that were physically demanding?

12   A.      Carrying the ratchets and the wires, laying, then

13   attach the barges together.  Carrying the pumps, you know,

14   for the wing tanks down the sides of the barges.  It was

15   like that, you know, all night long.  It was just...

16   Q.      And when you say ratchets, were those different in

17   terms of the size of the 70- to 80-pound ratchets that you

18   testified earlier that you carried when you were at Kinder

19   Morgan?

20   A.      Same thing.

21   Q.      Okay.  In terms of the pumps that you had to carry,

22   approximately how much did those weigh?

23   A.      Probably 120 pounds.

24   Q.      So, Mr. Beam, when you did work for Watco, is it

25   fair to say that you would regularly have to lift

1  heavyweight objects every shift?

2  A.      Yes.

3  Q.      Would you ever have to bend over or twist your back

4  while working on the barge?

5  A.      Yes.

6  Q.      And would that be something that you did every

7  shift?

8  A.      Yes.

9  Q.      And on November 12, 2017, were you doing your job

10 for Watco as a deckhand?

11 A.      Yes.

12 Q.      All right.  Can you walk me through briefly what

13 happened as you were doing your job as a deckhand on

14 November 12, 2017?

15 A.      Well, we drop the string down.  Load five -- we

16 load five barges at a time.  We put it behind the mule.  We

17 started loading.  I can't remember how many barges we

18 loaded.  And it was my turn to go to -- step up on the dock

19 to give the dock readings, how far the barge sinks down.

20          And you look in between -- you gotta get kinda

21 under the wire, no matter how high it is, to give a draft

22 reading.  Then you step back.  I gave her a reading.  I

23 stepped back.  And as soon as I stepped back, that was the

24 last thing I remember.

25 Q.      I want to parse that out a little bit.  So, to take

1    the draft readings, Mr. Beam, do you have to stand on the

2    dock itself?

3    A.    Yes.

4    Q.    And as you were out on the dock taking the readings

5    back on November 12, 2017, did the cable come down on you?

6    A.    Yes.

7    Q.    And where were you struck?

8    MR. FOX:  Objection, Your Honor.  He has not

9    testified that he knows that, and what he said was, he --

10    THE COURT:  You have cross-examination, sir.

11    Overruled.  I'm trying to get the --

12    MR. FOX:  All right.

13    THE COURT:  -- the evidence.

14    Q.    (BY MS. DEMUREN)  Mr. Beam, back on November 12,

15    2017, when the cable came down on you, where physically on

16    your body were you struck?

17    A.    On the side of my hard hat, the right side, and

18    then my shoulder and my back.  There was -- it peeled the

19    stickers off my hard hat.  And the vest, you can see where

20    the cable -- there's a mark across it.

21    Q.    So, to be clear, let me break that down a little

22    bit.  How do you know you were struck on your right side?

23    A.    By the -- by my hard hat and the cable marks on my

24    vest.

25    Q.    Mr. Beam, back on November 12, 2017, when you were

1    hit by this cable, do you know if any of your coworkers saw

2    you get hit?

3    A.    Could you repeat it -- ask it again?

4    Q.    Sure.  Back on November 12, 2017, when the cable

5    came down and struck you, do you personally know if any of

6    your coworkers saw you get hit by the cable?

7    A.    Yes, just the one.

8    Q.    Okay.  And who was that coworker?

9    A.    Jackie Robertson -- or Roberts.

10   Q.    You are struggling with the last name a little bit.

11   Did you call Jackie Robbins something different?

12   A.    Yeah, everybody called him Tennessee.

13   Q.    So, if I refer to him as Tennessee, do you

14   understand that to be Jackie Robbins?

15   A.    Yes.

16   Q.    And how do you know Tennessee or Jackie Robbins saw

17   the cable hit you?

18   A.    He called me a few days after and asked me if I was

19   doing okay, and just checked on me and started telling me

20   about the accident.

21         MR. FOX:  Objection, Your Honor, hearsay.

22         THE COURT:  Sustained.

23   Q.    (BY MS. DEMUREN)  Okay.  At the time that Mr.

24   Robbins or Tennessee called you, was he employed by Watco?

25   A.    Yes.

Q.      Okay.

        MS. DEMUREN:  And, Your Honor, if I may?  Because

I'm going to ask that testimony again, if I may, I'm just

laying the foundation for it because he was an employee of

the defendants and thus would be a opposing party admission

and not hearsay.

        THE COURT:  No.  No.  No.  It's not any old

employee.  Is he in management?

        MS. DEMUREN:  I'll ask that question.  I don't

believe so.

        THE COURT:  No.  Move on, counsel.  It's hearsay.

Sustained.  Any evidence as to what somebody else told him

he saw is hearsay, irrelevant, and that objection is

sustained.

Q.      (BY MS. DEMUREN)  To your knowledge, Mr. Beam, did

anyone or any other Watco employees physically see you get

hit by the wires?

A.      I -- just, just that one.

Q.      Okay.  And that's Tennessee?

A.      Yes.

Q.      Okay.  On November 12, 2017, were you transported

to a hospital after being struck by the wires?

A.      Yes.

Q.      How were you transported to the hospital?

A.      By ambulance.

1    Q.      Mr. Beam, I want to discuss with you for a moment

2    your basic living expenses.  Okay?

3    A.      Okay.

4    Q.      Prior to the November 12, 2017, incident, did you

5    live with your son Randy?

6    A.      Yes.

7    Q.      Let me ask it again.  Did Randy live with you?

8    A.      Yes.

9    Q.      And is Randy your son that's disabled?

10   A.      Yes.

11   Q.      Before you got hit by this wire, did Randy help you

12   pay for anything in the house?

13   A.      No.

14   Q.      Before you got struck by this wire, did Randy

15   assist paying any bills -- assist you in paying any bills?

16   A.      No.

17   Q.      Okay.  Before you got hit by the wire, did Randy

18   financially support you in any shape, manner, or form?

19   A.      No.

20   Q.      Now, after you got hit by the wire -- the cable,

21   rather, on November 12, 2017, did your disabled son Randy

22   help you with any household expenses?

23   A.      Yes.

24   Q.      Okay.  And how was he able to help you?  Meaning,

25   where did he get the money from?

```
1    A.       Disability.
2    Q.       And why did Randy have to help you with household
3    expenses by using his disability funds?
4    A.       I was only getting 35 dollars a day, and it wasn't
5    enough to pay, you know, the bills.
6    Q.       Now, after the November 12, 2017, incident where
7    you were hit by the cable, did anybody else move into your
8    home?
9    A.       Repeat that?
10   Q.       Sure.  So, right before the November 12, 2017,
11   incident, was it -- it was -- was there anybody else that
12   lived with you, other than yourself and Randy?
13   A.       Just me and Randy.
14   Q.       After -- sometime after you got hit by this cable,
15   did anybody else move into your home?
16   A.       Yes, my oldest boy did, and my grandson.
17   Q.       Okay.  And your oldest boy, that's James; right?
18   A.       Yes.
19   Q.       Why did James move in with you after this incident
20   happened on November 12, 2017?
21   A.       To help take care of Randy and do chores I couldn't
22   do anymore.
23   Q.       Why did James have to help take care of Randy?
24   A.       Because I couldn't.
25   Q.       Now, after the November 12, 2017, incident where
```

1  you were struck by the cable, did James help you

2  financially with any of your bills or household expenses?

3  A.      Yeah, he helped out here and there.

4  Q.      Before you got hit by the cable, did James ever

5  help you financially with your household expenses or bills?

6  A.      No.

7  Q.      Now, why did James have to help you after you got

8  struck by this cable with your household expenses and

9  bills?

10  A.      Because I couldn't make it off 35 dollars a day.

11  Q.      Mr. Beam, in addition to getting financial

12  assistance from your sons Randy and James, after the

13  November 12, 2017, incident, did you take out any loans to

14  further assist you in your living expenses?

15  A.      Yes.

16      MR. FOX:  Your Honor, I --

17      THE COURT:  Hold on.

18      MR. FOX:  I object to this, Your Honor, on the

19  basis of relevance.  And before you rule on this, I want

20  you to know that Judge Sison has already ruled --

21      THE COURT:  Don't tell me what another judge has

22  done.

23      MR. FOX:  All right.  All right.  We moved to

24  receive in discovery the information regarding the loan.

25  It was objected to by plaintiff.  And we were told that we

1    could not have it due to relevance.

2         THE COURT:  Did you disclose -- Miss Demuren, has

3    the plaintiff disclosed any information about this loan

4    that you are now trying to get evidence in, in discovery?

5         MS. DEMUREN:  Your Honor, Mr. Beam specifically

6    testified during his deposition that he was receiving

7    loans.  He was asked by Mr. Fox how much he received.  He

8    testified to that, as well.

9         THE COURT:  Did you submit any written

10   documentation or discovery regarding the loans?

11        MS. DEMUREN:  I don't believe we did.

12        THE COURT:  Was there a discovery request for it?

13        MS. DEMUREN:  Not to my knowledge, there was not.

14        THE COURT:  Okay.  So, here's what we're going to

15   do.  We're going to take the evidence.  You can address

16   this in your closing argument.  If it is something that was

17   not -- that was subject to disclosure that was not

18   disclosed, then the Court will not consider it.

19        I'm going to take the evidence, Mr. Fox.

20        MR. FOX:  If I may.  I just don't want Miss Demuren

21   to be in a situation here, Your Honor.  I think if we ask

22   Roland, he will admit that we did send discovery asking for

23   this.  And I don't want her telling you something that's

24   not right.

25        THE COURT:  She said, not to her knowledge, so she

1    couldn't tell me --

2         MR. FOX:  Well --

3         THE COURT:  Mr. Christiansen, was this a discovery

4    issue?

5         MR. CHRISTENSEN:  There was, and that's what the

6    magistrate ruled on.

7         THE COURT:  And he indicated what?

8         MR. CHRISTENSEN:  That we did not need to produce

9    it.  He didn't believe it was relevant.

10        THE COURT:  Okay.  And so -- and what would be the

11   relevancy of the loan, anyway?

12        MR. CHRISTENSEN:  The only relevancy, Your Honor,

13   was just -- there's a claim for maintenance of -- it was 35

14   dollars a day, enough to cover his expenses.  And it was

15   asked in his deposition by Mr. Fox about it. "How are you

16   covering your expenses?"  And that was the answer.  So,

17   that's pretty much the extent of it.

18        THE COURT:  So, the relevancy would be to establish

19   that 35 dollars a day is not enough to live on?

20        MR. CHRISTENSEN:  Yes.  And that's it.

21        THE COURT:  I think the Court can almost take

22   judicial notice of that, but -- so I'm going to rule that

23   any information or evidence about a loan is irrelevant and

24   sustain the objection.

25        MS. DEMUREN:  Certainly, Your Honor.

1          MR. FOX:  Thank you, Your Honor.

2          MS. DEMUREN:  We'll move forward.

3   Q.     (BY MS. DEMUREN)  Mr. Beam, did we, your attorneys,

4   provide with you options for medical group to get care from

5   in Houston, after you were unsatisfied with the treatment

6   that you received in Illinois and St. Louis?

7          MR. FOX:  Your Honor, that's really leading

8   about --

9          THE COURT:  Mr. Fox, okay, could you not be so

10  demonstrative?  State your objection.

11         MR. FOX:  Objection, leading.

12         THE COURT:  Sustained.

13         MS. DEMUREN:  All right.

14         THE COURT:  And, let me say this.  I'm going to say

15  it one more time to all counsel.  I really don't want to

16  say this again.  State your legal objections.  Don't

17  speechify.  Don't give me speaking objections.  And let's

18  keep this moving along.

19         Okay, Mr. Fox?

20         MR. FOX:  Yes, Your Honor.  I apologize.

21         THE COURT:  Okay, Miss Demuren?

22         MS. DEMUREN:  Yes, Your Honor.

23         THE COURT:  Okay, Mr. Christiansen?

24         MR. CHRISTENSEN:  Yes, Your Honor.

25         THE COURT:  All right.  Let's move on.

1    Q.      (BY MS. DEMUREN)  Mr. Beam, as a result of the

2    injuries you sustained on November 12, 2017, after you got

3    struck by the cable at work, did you seek any medical care

4    in Illinois?

5    A.      After I got struck?

6    Q.      That's correct.

7    A.      Yes.  I went to Carbondale through workmen's comp.

8    Q.      And were you satisfied with the care that you

9    received in Carbondale through workers' comp?

10   A.      No.

11   Q.      Did you seek medical care outside of Illinois after

12   you were unsatisfied with the medical care you received in

13   Carbondale, Illinois?

14   A.      Yes.

15   Q.      Are you familiar with a Dr. Victoria Do?

16   A.      Yes, ma'am.

17   Q.      Who is she?

18   A.      A primary doctor in Houston.

19   Q.      Was Dr. Do one of several doctors that you

20   considered in Houston?

21   A.      What was that?

22   Q.      Sure.  I'll break it down a little bit.

23           Was Dr. Do one of several doctors or a doctor in

24   medical groups that you considered in Houston after going

25   to Carbondale?

1    A.    Yes.

2    Q.    And in terms of finding Dr. Do -- bear with me a

3    bit.  Was Dr. Do one of several options you received

4    through your attorneys?

5    A.    I don't remember who gave me her number.

6    Q.    Mr. Beam, I don't mean this in any disrespectful

7    term, but do you have any medical training yourself, sir?

8    A.    No.

9    Q.    Do you understand all of the medical terminology

10   and things that you have been diagnosed with in this case?

11   A.    No.

12   Q.    Mr. Beam, you had a kyphoplasty -- did you have a

13   kyphoplasty that was performed by Dr. Thakur?

14   A.    Yes.

15   Q.    Did that kyphoplasty provide you with relief?

16   A.    A little bit.

17   Q.    And when you say "a little bit," did the pain

18   eventually come back?

19   A.    Yes.

20   Q.    Did you have neck surgery with Dr. Bashir?

21   A.    Yes.

22   Q.    Did that provide you with any relief?

23   A.    Yes.

24   Q.    Did you have shoulder surgery with Dr. Foster?

25   A.    Yes.

1    Q.      Did that provide you with any relief?

2    A.      Yes.

3    Q.      Did you have a thoracic surgery with Dr. Small?

4    A.      Yes.

5    Q.      And did that provide you with any relief?

6    A.      Yes, it did.

7    Q.      And then specifically the shoulder surgery -- I'm

8    sorry -- the thoracic surgery that was performed by Dr.

9    Small, in addition to providing you relief, did it increase

10   your function?

11   A.      Yes.

12   Q.      Now, yesterday's testimony.  Did you hear Dr.

13   Thakur discussing your medical bills?

14   A.      Yes.

15   Q.      Mr. Beam, who is responsible for paying those

16   medical bills?

17   A.      I --

18          MR. FOX:  Objection, Your Honor, calls for a legal

19   conclusion.

20          THE COURT:  Overruled.

21   Q.      (BY MS. DEMUREN)  Go ahead, sir.  Who is

22   responsible for paying your medical bills?

23   A.      I am.

24   Q.      Mr. Beam, how were you feeling after the November

25   12, 2017, accident?

1    A.       How do I feel?

2    Q.       No.  How did you feel then, after you got struck by

3    the cable.

4    A.       Very bad.

5    Q.       In terms of whether the prior motor vehicle or just

6    pain you have experienced over your lifetime, how does that

7    compare to how you were feeling on November 12, 2017?

8    A.       A whole lot worse.  It was terrible.

9    Q.       I want to discuss with you some things that you can

10   physically do for a moment.  Okay?

11   A.       Okay.

12   Q.       Mr. Beam, are you able to drive?

13   A.       Yes.

14   Q.       Do you have difficulties driving?

15   A.       No.

16   Q.       In terms of physically getting in and out of your

17   vehicle to drive, do you have any issues doing that?

18   A.       Sometimes in the wintertime when it's cold.

19           THE COURT:  I'm sorry, I didn't understand you,

20   sir.

21           THE WITNESS:  Sometimes in the wintertime when it's

22   cold out.

23   Q.       (BY MS. DEMUREN)  And when you say "sometimes when

24   it's hot or when it's cold in the wintertime," physically

25   what are your limitations or what issues do you have

1  getting in and out of your vehicle?

2  A.      Just being stiff, and worry about slipping on the

3  ice or -- um -- it seems like -- um -- just wintertime, it

4  makes your muscles hurt and your bones hurt worse, you

5  know.

6  Q.      And before this November 12, 2017, incident where

7  you were struck by the cable, did you have any difficulties

8  getting in and out of your vehicle or driving your vehicle?

9  A.      No.

10  Q.      Mr. Beam, at some point after your accident did you

11  submit a claim for Social Security Disability?

12  A.      Yes.

13  Q.      And what did you claim as an injury?

14  A.      My shoulder, my back, my neck.  My wrist was

15  bothering me again.  I think that's it.

16  Q.      After you applied for Social Security Disability,

17  what did you find out?

18  A.      He said he made it through -- halfway through -- or

19  a quarter's way through the paperwork and said I was

20  disabled 100 percent.

21  Q.      And do you now presently receive checks from Social

22  Security Disability?

23  A.      Yes.

24  Q.      Mr. Beam, after Dr. Small performed the thoracic

25  surgery on your back, did it help you?

1    A.      Yes.

2    Q.      Presently, meaning today, do you still experience

3  back pain?

4    A.      Do I -- what?

5    Q.      Presently, as of today, do you still -- does your

6  back still hurt?

7    A.      Yes.

8    Q.      Mr. Beam, are you physically working today, earning

9  a living?

10   A.      Am I working?

11   Q.      Yes, sir.

12   A.      No, ma'am.

13   Q.      Mr. Beam, if there was a job that you could

14  physically do right now that did not cause you a lot of

15  pain, would you be happy to work again?

16   A.      Yes, I sure would.

17   Q.      Do you wish you could work again?

18   A.      Yes.

19   Q.      Do you miss working?

20   A.      Yes, I do.

21   Q.      Mr. Beam, do you know of any jobs in the Chester,

22  Illinois, area where you live that you could do with

23  physical -- with the physical issues and limitations that

24  you have today?

25   A.      No.

1    Q.      Thank you, Mr. Beam.

2            MS. DEMUREN:  I offer for cross.

3            THE COURT:  Mr. Fox?

4            MR. FOX:  Thank you, Your Honor.  (Pause.)  I

5    apologize, it took me so long to get up here.  Sorry.

6                        CROSS-EXAMINATION

7    BY MR. FOX:

8    Q.      Mr. Beam, we met before at the time of your

9    deposition.  Do you remember, sir?

10   A.      Yes.

11   Q.      All right.  I'm going to say the same thing I did

12   then.  If I ask you something that confuses you in any way,

13   please tell me.  Okay?

14   A.      Okay.  Thank you.

15   Q.      Nobody here is going to make you answer a question

16   you don't understand.

17   A.      Okay.

18   Q.      And if you don't hear me, I'm happy to speak up or

19   rephrase it.  Okay?

20   A.      Okay.  Thank you.

21   Q.      Good.  Let's -- let's see if there's some things

22   that we can agree on.  Shortly before the dock incident

23   happened -- excuse me.

24           Shortly after the dock incident happened, you

25   received payments from the company, from Watco; correct?

A.      I got paid I think -- I think it was for like two months, I think.  A month or two.

Q.      Yeah.  If the records indicate that you were receiving payment from the date of accident all the way until about March 21st of 2018, does that sound about right to you?

A.      I don't remember.

Q.      Okay.  Would you argue with the records, if that's what they show?

A.      No.

Q.      Okay.  Fair enough.  And during that time -- you won't know what this means -- but you were classified a different way than a River Crew guy and you were receiving about 750 dollars a week.  Do you remember that?

A.      No, I don't.

Q.      Okay.  Again, if that's what you were getting, you're not arguing with it --

A.      No.

Q.      Fair enough.  And then later, you started to receive a check every week of 245 dollars a week; correct?

A.      Yeah, somewhere in there.

Q.      Yeah, and that's what you are even getting as of today?

A.      Yes.

Q.      And that's for the 35 dollars a day in maintenance

1  that you are receiving; correct?

2  A.    (Nonverbal response.)

3  Q.    Please say "yes" as opposed --

4  A.    Yes.  Yes.

5  Q.    All right.  You have told us that you have a house

6  in Chester, Illinois; correct?

7  A.    Yes.

8  Q.    Could you tell the Court the address of that house?

9  A.    1801 High Street.

10  Q.    Very good.  And your son Randy has lived there

11  pretty much from the date of the accident to -- and even

12  before the date of your accident; correct?

13  A.    Yes.

14  Q.    Ever since he was disabled in that motorcycle

15  accident?

16  A.    Right.

17  Q.    Okay.  And then after the accident, you said James

18  moved in with you?

19  A.    Yeah, it was -- I think -- eight months later.

20  Q.    Okay.  On the date of your accident, Randy was

21  already disabled; correct?

22  A.    Yes.

23  Q.    And he was receiving Social Security Disability?

24  A.    Yes.

25  Q.    Do you -- can you tell the Court how much he

1   receives?

2   A.      I think it's 1600 a month.

3   Q.      All right.  So, he has income to pay for his living

4   expenses and his -- a roof over his head; correct?

5   A.      Yes.

6   Q.      Okay.  And he has been doing that with you ever

7   since the date of the accident?

8   A.      Yeah.

9   Q.      Okay.

10  A.      Yes.

11  Q.      In fact, you and Randy have been splitting the

12  utility bills, the gas, electric, trash, all that; correct?

13  A.      Yes.

14  Q.      And Randy has also -- because he lives in your

15  house with you -- has been paying, I guess, 50 percent of

16  the mortgage payments, as well.  Is that fair?

17  A.      No.

18  Q.      No, he's not?

19  A.      No.

20  Q.      Has he paid any of the mortgage payments, sir?

21  A.      No.  He pays the electric bill and, I think, his

22  cable bill.

23  Q.      Okay.  If -- if the bank records indicate that

24  there were times when Randy paid your mortgage, would you

25  argue with that, sir?

1    A.      He -- he went -- went up there and paid 'em or had

2    them taken out of his checking, and then I just gave him

3    money back.

4    Q.      Oh, I see.  So, you repaid him whenever he would

5    have done that?

6    A.      Right.

7    Q.      Okay.  And since December of 2018 when you were

8    determined to be disabled by Social Security, you have been

9    receiving 2,825 dollars per month; correct?

10   A.      They lowered it to 2713.

11   Q.      All right.  But you have been getting that every

12   month?

13   A.      Yes.

14   Q.      And it goes all the way back to December of 2018;

15   correct?

16   A.      Um --

17   Q.      And I know this can be kind of confusing.  Let me

18   try a different --

19          MS. DEMUREN:  I object --

20          THE COURT:  Mr. Fox, could you let him answer --

21   you didn't give him a chance to answer the question.

22          MR. FOX:  I think he was confused.  I was just

23   trying to make it --

24          THE COURT:  Mr. Fox, you did not allow him to

25   answer.

1          MR. FOX:  I apologize.

2          THE COURT:  You asked him to let you know if he

3    didn't understand the question.

4          MR. FOX:  Okay.

5          THE COURT:  You've given him opportunity to do

6    that, so please stop talking over the witness.

7    A.     I believe it was June of 2000 when I started

8    receiving the checks.

9    Q.     (BY MR. FOX)  In June of 2000, was that when you --

10   or -- I think it's 2020 -- is that when you were determined

11   to be disabled?

12   A.     That's when they said I was disabled and they

13   started giving me the checks.

14   Q.     Yes, sir.  And they sent you a check for over

15   50,000 dollars for the period of time you were disabled

16   before; isn't that true?

17   A.     Yes.

18   Q.     And the period that you were disabled before, when

19   the determination was made, goes back to December of 2018.

20   Does that sound right to you?

21   A.     Yeah, something like that.  I don't --

22   Q.     Okay.

23   A.     -- remember.

24   Q.     Very good.  Mr. Beam, did you ever contact anybody

25   at Watco and say that your maintenance payments were

```
1    insufficient for you to live on?

2    A.      No.

3    Q.      Do you still maintain your friendship with Miss

4    Vasquez?

5    A.      With who?

6    Q.      Miss Vasquez?  Jennifer Vasquez?

7    A.      Oh, yeah.

8    Q.      Okay.  She's your lady friend?

9    A.      Yeah.

10   Q.      Okay.

11   A.      We're just friends now.

12   Q.      Does she live in Whittington?

13   A.      Yes.

14   Q.      Do you still visit her?

15   A.      No.

16   Q.      There was a period of time in, I guess, 2019, 2020,

17   and even in 2021, part of the year, where you were spending

18   evenings with her and staying overnight?

19   A.      Yeah.

20   Q.      Okay.  And the drive from Chester to Whittington is

21   over an hour one way?

22   A.      Yeah, right around an hour, something like that.

23   Q.      All right.  So, there were some nights that you did

24   not live on High Street with Randy and James; correct?

25   A.      Yeah, that was my address.  But sometimes I didn't
```

stay there, yeah.

Q.      Right.  Right.  And I assume that Jennifer was not charging you rent for the nights you stayed there; right?

A.      Sometimes I'd help her out if I, you know -- excuse me -- sometimes I'd help her out.

Q.      But my question was, she wasn't charging you for staying the night, was she?

A.      (Nonverbal response.)

Q.      Is that a no?

A.      No.

Q.      Okay.  Let's talk about your job at Watco for a moment, if we may.

A.      Okay.

Q.      Did you ever weigh one of those ratchets that you testified you carry?

A.      No, I haven't.

Q.      Okay.  So, your estimate as to how much they weighed was, was just that, an estimate?  A guess?

A.      70 or 80 pounds.  I'm not for sure.

Q.      Right.  That's what you guess they weigh?

A.      Yes.

Q.      Okay.  And the wires that you said was 120 pounds, is that a guess, too?

A.      Yes.

Q.      Okay.  Same thing with the pumps; correct?

1    A.    Yes.

2    Q.    Okay.  Are you aware of the fact that the Watco job

3    description for a deckhand in the River Crew indicates that

4    you are not required to lift more than 50 pounds?

5    A.    No, I --

6    Q.    Didn't know that?

7    A.    No.

8    Q.    Okay.  And you have told us, of course, that there

9    were times when you would complain about back pain to your

10   fellow workers at Watco?

11   A.    Yes.

12   Q.    Okay.  And were there times when your back pain

13   made it difficult for you to do heavy lifting at Watco?

14   A.    No.  I still did my job.

15   Q.    It would just hurt your back when you did it?

16   A.    Sometimes.

17   Q.    Okay.  With regard to working at Watco, all of your

18   time was spent at the Cora coal facility; correct?

19   A.    Yes.

20   Q.    The sole purpose of that facility is to put coal

21   into barges; correct?

22   A.    Yes.

23   Q.    Coal may come in on railcars or it may come in by

24   truck, it gets dumped in a yard, and then the workers there

25   put it on a conveyer that takes it out to the river and

1    dumps it into barges?

2    A.      Yes.

3    Q.      If there's no coal, there's not much to do at Cora.

4    Is that fair?

5    A.      Well, we started doing tow work for Gavalon.

6    Q.      Yes, sir.

7    A.      And so that's quite a bit of work out there.

8    Q.      Gavalon was a grain dock just south of there?

9    A.      Yes.

10   Q.      Okay.  But in terms of what Cora was doing, if

11   there wasn't much demand for coal, then you weren't loading

12   many barges and there was a lot of standing around going

13   on?

14   A.      Not so much, because you still get the fleet to

15   take care of.  On our shift, we took care of most of the

16   Gavalon, you know, moving their barges.

17   Q.      Right.

18   A.      There's always work to do on the river.

19   Q.      Okay.  What I'm asking about is just the Cora

20   facility.  I'm not asking about going to Gavalon.  For what

21   right now what I'm asking is:  At Cora, in terms -- if you

22   are not loading coal, there's not much going on at that

23   facility.  Setting aside what you might have done on the

24   Idle L.

25          MS. DEMUREN:  Objection, asked and answered.

1      THE COURT:  Overruled.

2  Q.    (BY MS. DEMUREN)  Is that fair?

3  A.    There's always work to do when you're not loading.

4  You have repairs.

5  Q.    Oh.

6  A.    You might be welding, painting.

7  Q.    I see.  Okay.

8  A.    Cleaning the yard up.  Cleaning the dumpers.

9  There's a lot of odds and ends work to do.

10  Q.    Okay.  Do you know whether or not some men have

11  lost their jobs at Cora because of the downturn in the coal

12  industry?

13      MS. DEMUREN:  Objection, relevance.

14      THE COURT:  Sustained.

15  Q.    (BY MR. FOX)  Let's talk about the occurrences at

16  the time of your accident, sir.  Okay?

17  A.    Okay.

18  Q.    And I'm going to try to do this as clearly as I

19  can.  You all came in, in the evening, and you were loading

20  barges through the night; correct?

21  A.    The night of the accident?

22  Q.    The night going into the morning of your accident.

23  A.    Right.

24  Q.    Right.  And your accident happened at about 6:00

25  a.m.

1    A.      6:45, I believe.

2    Q.      6:45?

3    A.      I believe so.

4    Q.      All right.  It was in November, obviously; right?

5    A.      Yes.

6    Q.      Cold outside?

7    A.      Yeah.

8    Q.      You were wearing multiple -- a lot of heavy layers

9    to stay warm?

10   A.      Yes.

11   Q.      You also had a hard hat on?

12   A.      Yes.

13   Q.      And a work vest?

14   A.      Yes.

15   Q.      And for the benefit of the Court, a work vest

16   essentially is like a life preserver or a personal

17   flotation device?

18   A.      Yes.

19   Q.      And that's something that's fairly thick; right?

20   A.      Yeah.

21   Q.      It's got the flotation stuff in it, front and back?

22   A.      Right.

23   Q.      Okay.  And you were standing towards the downriver

24   end of the dock getting a draft reading off the lower end

25   of the barge that was being loaded with coal?

```
 1    A.      Yes.

 2            MR. FOX:  Your Honor, I would direct you to Exhibit

 3    125 -- Defendant's Exhibit 125.

 4            May I approach the witness, Your Honor, just

 5    briefly, to show him a document.

 6            THE COURT:  Could you use the doc cam?

 7            MR. FOX:  I sure could, yes.  He's got a screen

 8    there, good.

 9    Q.      (BY MR. FOX)  Do you see on your TV monitor a

10    picture there?

11    A.      Yes.

12    Q.      Is that a picture of the lower end of the watco

13    dock where you were working?

14    A.      Yes, it is.

15    Q.      And that red X, do you see that there, with a

16    marker?

17    A.      Yes.

18    Q.      Is that approximately where you were standing when

19    you got hit?

20    A.      Yes.

21    Q.      Very good.

22            MR. FOX:  I'd move the admission of Exhibit 125,

23    Your Honor.

24            THE COURT:  Any objections?

25            MS. DEMUREN:  No objections, Your Honor.
```

1          THE COURT:  Defendant's Exhibit 125 is admitted.

2    Q.      (BY MR. FOX)  And when you were getting that draft

3    reading off the lower end of that barge, you were -- your

4    face and the front of your body was pointed towards the

5    river; correct?

6    A.      Well, I leaned -- leaned -- you gotta lean over and

7    shine your light down in between the dock and the barge.

8    Q.      I see.

9    A.      I seen the draft.  I backed off, you know, get out

10   from underneath the wire --

11   Q.      Uh-huh.

12   A.      -- and, you know, gave my draft, and that's when I

13   got hit.

14   Q.      Okay.  So, just before you got hit, your last

15   position was, you were still facing the river and the

16   barge; correct?

17   A.      Yes.

18   Q.      And maybe turned a little bit downriver?

19   A.      Yes.

20   Q.      Okay.  Meaning that on -- to use this thing again.

21   Meaning that on this photograph -- and I'll just try to use

22   my pen -- you would have been sort of looking say this

23   direction -- (indicating) -- the way my pen is pointed?

24   A.      I was probably looking the same -- walking away the

25   same direction of the dock, the length of the dock.

Q.      Okay.  So, is my pen pointed the right direction now?  (Indicating.)

A.      No.

Q.      The opposite way?  This way?  (Indicating.)

        THE COURT:  Mr. Fox?

        MR. FOX:  Yes, ma'am?

        THE COURT:  You can have him mark on the screen from where he is sitting.

        MR. FOX:  Okay.  Well, may I approach him then, Your Honor?

        THE COURT:  No.  I'm saying you could have him -- from where he is sitting?  He can place a mark with his finger.

        MR. FOX:  Okay.

        THE COURT:  You get what I'm saying?

        MR. FOX:  I do, Your Honor.  Thank you.

A.      This way, you know, towards the length of the dock. I was walking down.

Q.      (BY MR. FOX)  So, you were walking down towards the cell?

        THE COURT:  Hold on --

A.      Yeah, to get out of the way of the wire.

        THE COURT:  Hold on.  Is it on, Stacie?

        COURTROOM DEPUTY:  You can actually touch the screen.

```
 1              THE WITNESS:  Okay.  I see what you mean.
 2   A.     I gave the draft at the red mark where it is shown,
     turned and went like this, and that's when I got hit.
 3
 4   Q.     (BY MR. FOX)  All right.  So, you were walking down
 5   the dock, downriver, so to speak.
 6   A.     Right.  Trying to get away.  You know, always try
 7   to stay clear.
 8   Q.     Yes, sir.  And you understand that nobody's saying
 9   that you have any fault, when you got hit.  You understand
10   that, right?
11              THE COURT:  Mr. Fox?  That's kinda -- could you
12   just ask him a question, please?
13              MR. FOX:  Okay.
14   Q.     (BY MR. FOX)  Do you understand that nobody is
15   claiming that you have any fault here?
16   A.     Yeah, and thank you.
17   Q.     Okay.  All right.  And then, just so we're clear,
18   this -- this big item here that's underneath my finger?
19   (Indicating.) What's that called, sir?
20   A.     A cell.
21   Q.     A cell?  Is that a big round metal tower that, that
22   goes all the way down into the river bottom?
23   A.     Yes.
24   Q.     And is there a pulley on top of that cell?
25   A.     Yes.
```

```
1    Q.      And does the wire -- does a wire go from the

2    control booth out to that pulley and then run back up the

3    dock?

4    A.      Yes, sir.

5    Q.      And is that the wire that fell on you?

6    A.      Yeah, I'm -- I suppose so.  I'm not for sure.  I

7    couldn't see it hit me.

8    Q.      Well, that's -- that's the one that was overhead --

9    A.      Right.

10   Q.      -- before you got hit?

11   A.      Right.

12   Q.      And after you got hit, it was no longer up there;

13   right?

14   A.      Yeah.

15   Q.      Okay.

16   A.      Right.

17           MR. FOX:  I guess then it -- I suppose that I would

18   then ask for a designation of his drawing to be 125-A, Your

19   Honor?

20           THE COURT:  Well, it's not going to --

21   Q.      (BY MR. FOX)  Well, let's try to do it again.

22           THE COURT:  You'll have to have him draw on the

23   exhibit.

24           MR. FOX:  On this exhibit?

25           THE COURT:  If that's what you -- if you want to
```

1    preserve it, that's what you have to do.  It's not going to

2    be preserved on the screen.

3            MR. FOX:  I see.

4            THE COURT:  He's just making markings on the actual

5    screen.

6            MR. FOX:  Yeah, okay.

7            THE COURT:  So, if you want him to draw that on

8    your exhibit...

9            MR. FOX:  Let me just try to do it verbally.

10   Q.    (BY MR. FOX)  Just so we're clear, what you were

11   doing just before you got hit from the wire was, is, you

12   were walking downriver on the dock in the area of the red X

13   when you got hit?

14   A.    I walked up there, looked down, seen what the draft

15   was, turned like this -- (demonstrating) -- and was giving

16   the draft as I'm walking away.  And that's when I got hit.

17   Q.    Okay.  And which -- which way were you facing when,

18   when you last remember?

19   A.    I believe I had -- on the dock, you know, straight

20   down.

21   Q.    You were looking down?

22   A.    Yeah, south.

23   Q.    South?

24   A.    Which way was I looking?

25   Q.    Yeah.  Were you looking down towards the cell, in

1    other words?

2    A.      Yeah, just looking that ways, you know, seeing

3    where you're going.

4    Q.      Fair enough.  So, you would have been in the area

5    of the red X, looking down to the cell, which is the big

6    dark object, to the upper left-hand --

7    A.      Right.

8    Q.      -- corner of the photo?

9    A.      Right.

10   Q.      Thank you.  And so we're clear, you do not know

11   yourself where the wire contacted you; correct?

12   A.      Just by my hard hat and my vest.

13   Q.      Just by what somebody told you?

14   A.      Well, I mean, I could see all my stickers were

15   ripped off my hard hat.  And my vest had a big mark, you

16   know, scraped across my vest.

17   Q.      Do you remember giving your deposition, sir?

18   A.      Some of it.  Not all of it.

19   Q.      All right.  And in your deposition, you made the --

20   did your best to try to tell us the truth; correct?

21   A.      (Nonverbal response.)

22   Q.      And if in your deposition I asked you the

23   question --

24           THE COURT:  I'm sorry, Mr. Fox.

25           THE REPORTER:  I need a verbal answer.

```
 1            MR. FOX:  Oh.
 2    Q.      (BY MR. FOX)  You did your best to answer honestly
 3    during your deposition?
 4    A.      Yes.
 5            MR. FOX:  Okay.  Sorry.
 6    Q.      (BY MR. FOX) I'm referring to the plaintiff's
 7    deposition, page 110, line 10.
 8            MR. FOX:  You all right?
 9            MS. DEMUREN:  Yes.  I'm just trying to get to it,
10    that's all.
11            MR. FOX:  Let me know when you're there.
12            MS. DEMUREN:  Okay.
13            MR. FOX:  Okay?
14            MS. DEMUREN:  Sure.
15            MR. FOX:  Okay.
16    Q.      (BY MR. FOX)  Line 10.  I asked you this question,
17    sir:
18            "And do you remember where the cable made contact
19            with you?"
20            And your answer was:  "I remember -- well, no.
21            They said I had marks on my helmet, on my hard
22            hat."
23            Was that true when you told us that?
24    A.      Yes, they told me that and then I looked at my vest
25    and seen it.  And my hard hat.
```

1    Q.      And then I said:  "Okay."

2            And you said:  "So, it must have hit my head and

3            hit my back."

4            And I said:  "You are indicating the right side of

5            your head and the right side of your body."

6            And your answer was:  "I believe it was the right

7            side."

8            Correct?

9    A.      Right.

10   Q.      Okay.  So then -- so we're clear then, you got hit

11   on the right side of your hard hat?

12   A.      Right.

13   Q.      And sort of on the right side of your work vest, up

14   here?  (Indicating.)

15   A.      Yes.

16   Q.      Not in the middle of your back?

17   A.      I don't believe so.  Not that I remember.

18   Q.      Okay.

19   A.      It's been awhile since I seen it, you know.

20   Q.      Yeah.  The only marks you say were on the helmet

21   and here on the vest?

22   A.      Somewhere on my vest, going down.

23   Q.      Right.  You were knocked down by the wire?

24   A.      Yes.

25   Q.      You were not thrown in the river or onto the barge?

```
 1    A.      No.

 2    Q.      And you did not lose consciousness at the time?

 3    A.      I think I did for a short period.

 4    Q.      Well --

 5    A.      I don't remember hitting the dock.

 6    Q.      The reason I'm asking is, is, you were asked by the

 7    ambulance attendants if you had any pain in your head or

 8    whether or not you had any loss of consciousness, and you

 9    said you did not.

10            MS. DEMUREN:  Objection to the hearsay.

11            THE COURT:  Yeah, that's not -- yeah, that's not

12    proper impeachment.  It is hearsay.  You're not confronting

13    him with a sworn statement of his.

14            MR. FOX:  Well, it's --

15            THE COURT:  You can ask him if he told the

16    ambulance that.

17            MR. FOX:  Did you -- all right.

18            THE COURT:  But, but -- you know, Mr. Fox --

19            MR. FOX:  Okay.

20            THE COURT:  -- you're not -- I mean, you are

21    confronting him with a -- with that report as if it were

22    his deposition transcript and that's not appropriate and

23    you know that.

24            MR. FOX:  Well, Your Honor, I --

25            THE COURT:  So, would you ask him a proper
```

1    question?  That's fine.

2          MR. FOX:  Yes, Your Honor.

3    Q.    (BY MR. FOX)  Did you tell the ambulance crew that

4    you did not lose consciousness?

5    A.    I don't recall.  It's been too long.

6    Q.    Fine.  Did you tell the ambulance crew that you did

7    not have an injury or any pain in your head?

8    A.    No.  I don't remember what I told them.

9    Q.    Okay.  Did you tell the ambulance crew that you

10   didn't have any pain in your neck or your back?

11         THE COURT:  Mr. Fox, he just indicated he doesn't

12   remember what he told them.  I think he answered that

13   question.

14         MR. FOX:  Okay.

15   Q.    (BY MR. FOX)  Do you remember them palpating your

16   spine -- that is, tapping on your spine -- in the

17   ambulance?

18   A.    No, I don't.  I don't remember anything in the

19   ambulance.

20   Q.    Okay.  Do you remember that you had pain when you

21   would breathe?

22   A.    Yes.

23   Q.    Okay.  And do you remember complaining of pain in

24   your right upper -- upper back?

25   A.    I --

```
1              THE COURT:  Which point are we talking about, Mr.
2    Fox?
3              MR. FOX:  Right after the accident, Your Honor.
4    A.      I don't remember too much right after the accident.
5    Q.      (BY MR. FOX)  Okay.  When you got to the hospital,
6    they did X-rays on you.  Do you remember that?
7    A.      On my ribs and my wrist.
8    Q.      Okay.  And you were followed to the hospital by Mr.
9    Cheatham.  Do you remember that?
10   A.      I don't -- no, I don't.
11   Q.      Do you remember talking to Mr. Cheatham when you
12   got discharged from the hospital that day and talking to
13   him at that time?
14   A.      No, I don't.
15   Q.      Okay.  You did get discharged from the hospital
16   that day.  You didn't get admitted.  Correct?
17   A.      No, I didn't get admitted.  No.
18   Q.      Okay.  Now, your -- the fracture of your rib has
19   healed?
20   A.      Yes.
21   Q.      And you are not having really any problems with
22   that at all; correct?
23   A.      No.
24   Q.      Is that true?
25   A.      Yes.
```

1  Q.      Okay.  And your wrist, the pain went away by, say,

2  early 2018; correct?

3  A.      I don't know how long it took.  I don't remember.

4  I was in a lot of pain for about six months, really bad

5  pain, so I...

6  Q.      And then it subsided?

7  A.      Pardon me?

8  Q.      And then it went away?

9  A.      I -- I don't remember.  I know it's been a good

10 while.

11 Q.      Did you see Dr. Krieg in Chester?

12 A.      Dr. Krieg.

13 Q.      Yes.  And he was kind of your family doctor, so to

14 speak?

15 A.      Yes.

16 Q.      Right.  And you saw him a number of times after

17 this cable incident?

18 A.      Yes.

19 Q.      Do you remember telling him that your wrist was

20 feeling better?

21 A.      I don't remember.

22 Q.      You also had surgery on your right shoulder;

23 correct?

24 A.      Yes.

25 Q.      That was by Dr. Foster down in Houston; correct?

1   A.      Yes.

2   Q.      And since that surgery, you went through physical

3   therapy?

4   A.      Yes.

5   Q.      And your shoulder has gotten better?

6   A.      Yes.

7   Q.      You have pretty much full range of motion in your

8   shoulder?

9   A.      Yes.

10   Q.      And it's pain-free?

11   A.      Yeah, I'd say -- yeah.

12   Q.      Okay.  And that was pretty much your circumstance

13   by, say, the fall of 2019, after you had your physical

14   therapy, et cetera.

15   A.      Probably.

16   Q.      Okay.  Good.  You are able to use your right arm to

17   do whatever it is you need to do with it?

18   A.      Well, it's not as strong as my left arm.

19   Q.      Okay.

20   A.      It's probably about half as strong -- I got half --

21   half my strength back in it.

22   Q.      I see.  Okay.  And there have been periods of time

23   when you've had really no problems with your lower back,

24   correct, since the cable incident?

25   A.      Well, I've been on that Norco.  That's pretty

1    strong, you know, to take the pain away and so -- my lower

2    back has, has gotten better, but then the injections start

3    to wear off so now the pain starts to come back in my lower

4    back.

5    Q.    Okay.  The reason -- do you remember --

6         MR. FOX:  And I am now going to be referring to 123

7    of his deposition.

8         THE COURT:  When was his deposition taken, Mr.

9    Fox?

10        MR. FOX:  When was it taken?

11        THE COURT:  What is the date of the deposition?

12        MR. FOX:  The date of the deposition was September

13    24, 2019, Your Honor.

14        THE COURT:  Thank you.

15   Q.    (BY MR. FOX)  So, page 124 -- I said 123.  That's a

16   mistake.

17        MR. FOX:  Is it all right if I put it on the

18   projector so you can see it?

19        THE COURT:  I don't need to see it.

20        MR. FOX:  I'm sorry?

21        THE COURT:  I don't need to see it.

22        MR. FOX:  Okay.

23   Q.    (BY MR. FOX)  Sir, if you testified --

24        MS. DEMUREN:  And, Your Honor, I'm just going to --

25   apologize, Mr. Fox -- object on the basis of improper

1    impeachment.

2         THE COURT:  What's the question that you asked?

3         MR. FOX:  Yeah, the question that I asked him was

4    whether or not he had gotten to a place where his lower

5    back was pain-free after the accident.

6         THE COURT:  That's not the same question -- that's

7    not the same question you just asked him --

8         MR. FOX:  Okay, well, let me try --

9         THE COURT:  -- and that's not the same answer he

10   gave you.  He gave you an answer -- I clearly heard him --

11   where he said that there were times when, after he got the

12   injection, where he didn't have any problems, but then the

13   injection starts wearing off and he's having pain and it

14   comes back.

15        That is not the same question that you just

16   referred to in the deposition.  That's improper

17   impeachment.  Objection sustained.

18        MR. FOX:  Okay.

19   Q.    (BY MR. FOX)  Sir, have there been times when you

20   have been pain-free in your lower back?

21   A.    I really don't recall because it, you know, taking

22   the Norcos, it pretty -- it takes, you know, takes a lot of

23   -- some of the pain away, enough where it's -- I don't know

24   if there's really any day where I was completely pain-free.

25   Q.    Now, in the years before the dock incident, sir,

1    that you had on November 12, 2017, you were involved in two

2    car accidents and you fell down the stairs to your basement

3    at home; correct?

4    A.      Yes.

5    Q.      Okay.  And after each one of those accidents, you

6    went to the hospital?

7    A.      Yes.

8    Q.      And after each one of those accidents, you also

9    received care from Dr. Krieg's office; correct?

10   A.      On what I -- on the stairs, I just went to the

11   emergency room and they said it -- I think they did an

12   X-ray, if I remember right, and said I didn't have any

13   broken bones.  It was probably just bruised, so -- I don't

14   believe I went back to Dr. Krieg.  I don't remember.

15          And the other, hitting the tree and getting

16   rear-ended.  I felt fine after I got rear-ended.  But then

17   once I got home, I started getting stiff, so I thought I

18   better get checked out and make sure I don't have any --

19   Q.      Yes, sir.

20   A.      And so they did a CAT scan and X-ray and everything

21   come back normal.

22   Q.      Okay.  Let me break that down a little bit, if I

23   may.

24   A.      Okay.

25   Q.      On May 3rd, 2011, you lost control of your car, ran

1    head-on into a tree at about 30 miles an hour; correct?

2    A.    Well, I wasn't for sure how fast I was going.  I

3    hit the corner -- right corner of the car.  It didn't

4    deploy the airbags or anything.

5    Q.    Okay.  But do you remember telling me that it was

6    about 30 miles an hour that you were going when you hit the

7    tree?

8    A.    No.  I don't remember telling any speed.

9    Q.    Okay.

10         MR. FOX:  This would be page 28, line 6.

11    Q.    (BY MR. FOX)  Sir, do you remember me asking you

12    this question and you giving this answer?

13         Question:  "You were driving your car, lost control

14         of it and hit a tree at about 45 miles an hour?"

15         Answer:  "No, it was about 30.  But, yes, I hit a

16         tree."

17         Do you remember --

18    A.    I don't remember.

19    Q.    But do you remember giving that testimony at the

20    time of your deposition?

21    A.    I remember something about it.  I just don't

22    remember exactly what.

23    Q.    Okay.  You -- I'm assuming that you were telling me

24    the truth at the time of your deposition?

25    A.    Yes.

1  Q.      Okay.  And after that incident, you went to the

2  hospital and had CT scans of your cervical and your

3  thoracic spine, that is, your neck and your mid-back.  Do

4  you remember that?

5  A.      I don't remember what, what X-rays I got.

6  Q.      Okay.  Do you remember complaining of pain in your

7  right shoulder, your right arm, and in your neck at that

8  time?

9  A.      Just my right arm.  That's the only thing I

10  remember having pain in.

11  Q.      Okay.  And do you remember following with Dr. Krieg

12  and seeing a chiropractor after you ran into the tree?

13  A.      No, I don't remember that either.

14  Q.      Okay.  Then, on July 25, 2015, when you fell down

15  your basement stairs, your back landed on the edge of one

16  of the steps; is that correct?

17  A.      Top step.

18  Q.      Okay.  You went to the hospital for that; right?

19  A.      Yes, make sure I didn't have any broken ribs.

20  Q.      Right.  And do you remember complaining of severe

21  pain in your back at that time?

22  A.      I don't remember that either.  It's been too long.

23  Q.      Do you remember going to see a chiropractor by the

24  name of Jodi Buskohl for back pain beginning shortly after

25  that incident?

A.      I remember going to her, I just don't remember when it was.

Q.      Okay.  When you first went to Dr. Buskohl, do you remember filling out a form at her office?

A.      I don't think I have ever filled out a form.

Q.      Okay.

        MR. FOX:  Your Honor, I would direct your attention to Exhibit 88, which has already been admitted.

        THE COURT:  Defendant's or Plaintiff's?

        MR. FOX:  Defendant's, Your Honor.  I apologize.

        THE COURT:  Okay.

Q.      (BY MR. FOX)  Page two.  Mr. Beam, look on your screen there.  This form is a Confidential Patient Information form.  Is that your handwriting on that form?  Does that appear to be your handwriting?

        MS. DEMUREN:  And, your Honor, I'm going to object to the basis of improper impeachment.  The witness has already testified he does not recall anything with respect to the chiropractor's records.

        THE COURT:  Overruled.

Q.      (BY MR. FOX)  My question, sir, is:  Is that your handwriting?

A.      I believe it -- yes, it is.

Q.      Okay.  So, this would be a form you filled out.  The date says January 15, 2016.  Do you see that date?

1    A.       Yes.

2    Q.       Okay.  And here it says "Health complaints in order

3    of priority" and you wrote "back."  Is that your

4    handwriting?

5    A.       Yes.

6    Q.       And you said -- "For how long?"  And you said, "35

7    years."  Is that your handwriting?

8    A.       Yes.

9    Q.       Okay.  And then it says, "What aggravates your

10   condition?"  And there's a check in the box that says

11   "lifting."  Do you remember checking that box?

12   A.       No, I don't.

13   Q.       Does that look like your handwriting?

14   A.       The handwriting on top does.  I don't -- I don't

15   remember even filling the paper out.

16   Q.       Okay.  You have seen Dr. Buskohl a number of times

17   in 2016 and 2017; correct?

18   A.       I don't know how many times.

19   Q.       Well, if the records indicate you have seen her 23

20   times during that period, from when you fell down the

21   stairs to where you had the automobile accident where you

22   got rear-ended, and even after that, do you have any reason

23   to think that that's incorrect?

24   A.       I sure don't remember going that many times.

25   Q.       Okay.

A.      I thought it was three or four times.

Q.      Okay.  Do you remember going to Dr. Buskohl at any time after your dock accident?

A.      No, I didn't go to her.

Q.      Okay.  So, all of times that you saw Dr. Buskohl was before you had the incident at work; correct?

A.      Yes.

Q.      Okay.  Do you remember --

THE COURT:  Mr. Fox?  It seems like you are segueing into something else, so this would be good time for a break.  We're going to go ahead and take 15 minutes.  So, we will be in recess until 3:05.

(Court recessed from 2:50 p.m. to 3:05 p.m.)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  You may.

Q.      (BY MR. FOX)  Sir, we were talking about the period of time prior to when you had your accident at Watco.  Do you remember?

A.      Yes.

Q.      Okay.  And we were talking about the fact that you had been to see Dr. Buskohl after you fell down the stairs at your house; correct?

A.      Yes.

Q.      Okay.  Then, on June 29, 2017, about four and a half months before the dock accident, you were in a car and

1    stopped at some railroad tracks; correct?

2    A.    Yes.

3    Q.    And you -- what kind of car were you in, sir?

4    A.    A Ford Escape.

5    Q.    A Ford Escape.  Is that -- what size car is that?

6    A.    Pretty small.

7    Q.    Pretty small, okay.  And your car was rear-ended by

8    a large pickup truck?

9    A.    Yes.

10   Q.    And the impact was such that both vehicles had to

11   be towed from the scene?

12   A.    Yeah, it busted his radiator but --

13   Q.    Right.

14   A.    -- I don't -- I don't remember it really being that

15   hard of a hit.  But then again, it happened so quick, you

16   know.

17   Q.    Yes.  Your car was totaled.

18   A.    Yes.  It was a old car.

19   Q.    Okay.  And you went to the emergency room at

20   Chester.  Not by ambulance, by your own choice; correct?

21   A.    Right.  Right.

22   Q.    Yes.  And you had CT scans of your cervical,

23   thoracic, and lumbar spine?

24   A.    Yes.

25   Q.    Okay.  I guess, in all of this, you have learned

1  where the cervical and the thoracic and the lumbar is?

2  A.    Yeah.

3  Q.    Okay.  And do you remember that you did complain of

4  pain in both your back and in your neck when you were at

5  Chester Memorial Hospital?

6  A.    My back was getting tight, so I thought I better

7  get checked out.

8  Q.    Right.  But you complained of pain in your neck and

9  back at that time?

10  A.    No.

11  Q.    You don't think so?

12  A.    No.

13  Q.    And are you going to argue -- would you argue with

14  what the medical records say from the hospital there?

15        MS. DEMUREN:  Objection.

16  A.    I don't know what they put down.  I just remember

17  telling 'em my back was getting tight, so I better get

18  checked out.

19  Q.    (BY MR. FOX)  Okay.  But you are not suggesting

20  that the medical personnel at the hospital, you know, wrote

21  down something that was -- you didn't say, are you?

22  A.    I don't -- I'm not saying they did, but I don't --

23  Q.    Okay.  That's --

24  A.    I don't remember.

25  Q.    Fair enough.  You remember also going to Dr.

1   Buskohl after that rear-ender?

2   A.     Yes.

3   Q.     And do you remember that you had pretty significant

4   pain for a period of time after that automobile accident?

5   A.     Um -- I remember going to her, but I don't

6   remember, you know, how much pain I was in.  I just don't

7   remember.

8   Q.     That accident, as I said, was on June 29th of 2017.

9   Didn't you tell Dr. Buskohl on July 10th, 2017, that your

10  lower back was killing you, that it was worse than ever

11  yesterday, that you were -- wasn't sure that you would be

12  able to perform work?

13  A.     No, I don't remember telling her that.

14  Q.     Okay.  If that's in her records, you are not saying

15  that she wrote down that incorrectly?

16         MS. DEMUREN:  Objection.

17  A.     I don't know --

18         THE COURT:  Sorry.

19         MS. DEMUREN:  Objection, speculation,

20  argumentative.

21         THE COURT:  Sustained.

22  Q.     (BY MR. FOX)  You remember telling Dr. Buskohl that

23  you had severe pain going from your neck down your right

24  arm --

25  A.     I don't remember what I told her.

1    Q.      -- after that rear-ender accident?

2            THE COURT:  Hold on for a second, Mr. Beam.  You

3    need to let him finish his question before you start your

4    answer.

5            THE WITNESS:  Oh, I'm sorry.

6            MR. FOX:  I'll ask it again, if I may, Your Honor.

7            THE COURT:  Go ahead.

8    Q.      (BY MR. FOX)  Do you remember having pain shooting

9    like an electric shock from your neck down your right arm,

10   after that accident where you were rear-ended?

11   A.      I don't remember.

12   Q.      Do you remember telling Dr. Buskohl that that was

13   your situation?

14   A.      I don't remember.

15   Q.      Do you remember telling Dr. Buskohl -- or isn't it

16   true that you told Dr. Buskohl that you were on informal

17   light duty at Watco because of the pain that you were

18   having in your back?

19   A.      No, I don't remember.

20   Q.      Do you remember telling -- or isn't it in fact true

21   that you told Dr. Buskohl that you were taking pain

22   medicine at work because of the pain you were experiencing

23   after that automobile accident?

24   A.      I don't remember that either.

25   Q.      All right.  But you did wind up having steroid

1    injections in your back; correct?

2    A.    I -- the doctor at the clinic gave me one in my

3    tailbone, and then it was fine and I went back to work.

4    Q.    All right.  Did you tell Dr. Buskohl, after your

5    automobile accident where you were rear-ended, that you

6    probably shouldn't have gone into work even though you did?

7    A.    No, I don't.

8    Q.    You don't remember telling her that?

9    A.    I don't remember.

10    Q.    Okay.  I want to ask you some questions about your

11    physical condition after the dock accident.  Okay?  So,

12    this is after the accident at Watco.  Okay?

13    A.    Okay.

14    Q.    You, first, saw Dr. Krieg for your condition after

15    the accident; correct?  (Pause.)  Let me back up --

16    A.    Yeah, I think so.

17    Q.    Yes.  Okay.  Make it a little easier.  You have the

18    accident.  You're in an ambulance.  You go to Memorial

19    Hospital.  They discharge you.

20         And then for a period of time in November and

21    December, you see Dr. Krieg for care and treatment after

22    the accident; correct?

23    A.    Yes.  Yes, I believe so.

24    Q.    Okay.  And during that time, you were complaining

25    of rib pain because you had a fracture in your rib in front

1    here; right?

2    A.    I don't -- I think so.

3    Q.    You were having trouble breathing?

4    A.    Yeah, a little bit.

5    Q.    Yeah, it hurt to breathe.  Right.  And then you

6    were complaining of some pain in your right wrist?

7    A.    Yes.

8    Q.    And you were complaining of some pain in your

9    shoulder.

10   A.    Yes.

11   Q.    And -- and up here where you got contacted by the

12   wire?  That fair?

13   A.    Yes.

14   Q.    Okay.  But you did not complain of back pain to Dr.

15   Krieg in November or December.  Do you remember that?

16   A.    I -- I just -- it's hard to remember back, you

17   know, that long ago.

18   Q.    Fair enough.  Fair enough.  But if it's in the

19   records, you're not going to argue with Dr. Krieg's

20   records?

21   A.    No.

22         MS. DEMUREN:  Objection.

23         THE COURT:  Sustained.  I sustained that objection

24   before.

25         MR. FOX:  All right.

```
 1            THE COURT:  I'm sure Dr. Krieg will testify as to

 2   his records.

 3            MR. FOX:  Yes, Your Honor.

 4   Q.      (BY MR. FOX)  You were ultimately diagnosed with

 5   having a compression fracture in your Thoracic-7 vertebrae.

 6   You remember that?

 7   A.      Yes.

 8   Q.      And you went to see a Dr. Sinha down there in

 9   Carbondale; correct?

10   A.      Yes.

11   Q.      And you went to his office twice; correct?

12   A.      Yes.

13   Q.      And Dr. Sinha told you that the proper treatment

14   for your compression fracture was to wear a brace on your

15   back to take the pressure off?

16   A.      Yes.  He told me, if I wore that brace six months

17   to a yeah, I'd be fine.

18   Q.      Okay.  You were not satisfied with that advice?

19   A.      No.

20   Q.      You wanted to do something else?

21   A.      I was hurting pretty bad.

22   Q.      Okay.  He did prescribe pain medicine for you,

23   though, didn't he, sir?

24   A.      I think so.

25   Q.      Yes.  He gave you Oxycodone?
```

1    A.    I don't remember which one it was.

2    Q.    Fair enough.  And then you hired your counsel

3    Arnold and Itkin down in Houston; correct?

4    A.    Yes.

5    Q.    And they gave you the name of Dr. Do in Houston;

6    correct?

7    A.    I don't remember who gave me her name.

8         MR. FOX:  Page 119.

9    Q.    (BY MR. FOX)  See if I can refresh your

10   recollection, sir.

11        MR. FOX:  It's line 4.

12   Q.    (BY MR. FOX)  I asked you at the time of your

13   deposition the following question and you gave the

14   following answer:

15        "Did you get Dr. Do's name from your lawyer?"

16        Answer:  "Yes."

17   A.    Well, that was closer to the accident, so

18   apparently so.

19   Q.    Okay.

20   A.    I --

21   Q.    That was a true answer at the time?

22   A.    Yes.

23   Q.    Okay.  And then once you got to Dr. Do, she

24   referred you to a variety of other doctors to see down

25   there in Houston?

1    A.      Yes.

2    Q.      All of them at that Advanced Diagnostics Group?

3    A.      Yes.

4    Q.      Each time you go down there, you have to drive to

5    St. Louis, go to the airport, fly to Houston, and then to

6    the Advanced Diagnostics facility.  I guess, do you stay in

7    a hotel room that night?

8            MS. DEMUREN:  Objection, compound and irrelevant.

9            THE COURT:  What is the relevance?

10           MR. FOX:  Well, I was about to ask him about it,

11   Your Honor.

12           THE COURT:  What's the relevance?

13           MR. FOX:  Relevance is, I wonder if it hurts his

14   back.

15           THE COURT:  To go to the doctor?

16           MR. FOX:  To fly and to travel.

17           THE COURT:  Well, why don't you ask that question.

18           MR. FOX:  I was about to, Your Honor.  I'm getting

19   there.  I'm sorry.

20           THE COURT:  No.  No.  No.  We don't get there.  You

21   need to ask a proper question.  What you were asking before

22   you get there is irrelevant.  I'm trying to give you an

23   opportunity to ask something that is relevant.

24           MR. FOX:  Thank you.

25   Q.      (BY MR. FOX)  Mr. Beam, does it --

1          THE COURT:  Mr. Fox, you need to stay at the

2    microphone because --

3          MR. FOX:  I'm sorry.

4          THE COURT:  -- the court reporter can't hear you.

5          MR. FOX:  I apologize.

6    Q.     (BY MR. FOX)  Mr. Beam, does it hurt your back to

7    do all that travelling back and forth from Houston?

8    A.     Usually, I take a pain pill.

9    Q.     Okay.

10   A.     Going to St. -- like the airport, it's like an hour

11   and ten minutes or something like that, and I'll stop

12   halfway there and walk around the car.

13   Q.     Okay.  So, the travel from Chester to Houston can

14   cause you some back pain or discomfort?

15   A.     If I didn't stop, it would, yeah.

16   Q.     Right.  And if you didn't take the pain medicine,

17   it would?

18   A.     Well, yeah.

19   Q.     Right.  Okay.  And of course, when you got to

20   Houston, you were reporting of having pain when you saw the

21   doctors; correct?

22   A.     Right.

23   Q.     Did you tell Dr. Do in October of 2020 that your

24   neck pain was pretty much fully relieved by the surgery

25   that you had by Dr. Bashir?

1    A.      After the surgery, yes.

2    Q.      Okay.  And do you remember telling Dr. Do around

3    that time that essentially your mid-back and your low back

4    were just mildly discomfortable or uncomfortable?

5    A.      No, I don't remember saying that.

6    Q.      Okay.

7    A.      I don't remember telling her that.

8    Q.      All right.  But you are not suggesting that --

9    well, never mind.

10           At the time that you worked at the Cora coal

11   facility, sir, were there occasions when your fellow

12   workers would tell you that their back was bothering them?

13   A.      Yes.

14   Q.      And would you pitch in for them and try to do

15   whatever lifting had to be done that day while they were

16   suffering from back problems?

17           MS. DEMUREN:  Objection, relevance.

18           THE COURT:  Sustained.

19   Q.      (BY MR. FOX)  Would anybody ever pitch in for you,

20   when you had back problems, to see whether or not they

21   could give -- spare your back?

22   A.      I would just --

23           MS. DEMUREN:  Objection.

24           THE COURT:  I'm sorry.  Hold on.  At what point in

25   time are we talking about?  Before the incident?

1          MR. FOX:  Yes, ma'am.

2          THE COURT:  Ask the question again.  Overruled.

3    Ask the question again.  Overruled.

4          You can answer.

5    Q.    (BY MR. FOX)  Let me start again, Mr. Beam.  And to

6    set the time frame, before you had your incident at the

7    Cora coal facility on the dock, were there times when you

8    worked and had pain in your back?

9    A.    Sometimes, you did.

10   Q.    Okay.  And were there times when you might ask one

11   of your working buddies to, to do the heavy lifting for you

12   instead of you having to do it, when your back was hurting?

13   A.    No.  You had your own job to do and you did it.

14   Q.    Okay.  So that never happened?

15   A.    Not that I remember.

16   Q.    Okay.  And I want to understand something, sir.

17   Are there no occasions when you are called upon to do some

18   things to help Randy?

19   A.    What was the question?

20   Q.    Yes.  It was a terrible question.  Let me start

21   again.

22         Are there occasions in which you try to help your

23   son Randy at home?

24         THE COURT:  Now?  Are we talking about now?

25         MR. FOX:  Yes, ma'am.

1    A.       Yeah, but it's -- he usually don't ask me.

2    Q.       (BY MR. FOX)  Are there times when you lift Randy

3    in and out of his chair?

4    A.       No, I couldn't.  Not now.

5    Q.       Okay.  Did you ever do that after the time that you

6    had your dock accident?

7    A.       No.

8    Q.       Okay.  You told us about the fact that you were

9    diagnosed with having some anxiety and depression when you

10   were answering Miss Demuren's questions.  Do you remember

11   that?

12   A.       Yes.

13   Q.       You had some anxiety and depression before your

14   dock accident.  Isn't that true, sir?

15   A.       Yes.

16   Q.       And that was related to the fact that you broke up,

17   I guess, with a girlfriend?  Is that right?

18   A.       Yes.

19            MS. DEMUREN:  Objection, relevance.

20            THE COURT:  Overruled.

21   Q.       (BY MR. FOX)  What was your answer, sir?

22   A.       Yes.

23   Q.       Okay.  And you talked to the nurse practitioner,

24   Nurse Hess, at Dr. Krieg's office about that.  Do you

25   remember?

```
1    A.      I don't remember which one I talked to.

2    Q.      Okay.  Do you remember them prescribing some

3    medications for you at that time, like Xanax?

4    A.      I don't believe -- he tried a couple different ones

5    and nothing was doing anything for me.

6    Q.      Okay.

7    A.      So -- and then I think it was the first part of

8    December, if I remember right, that's when I tried the

9    Xanax and it, it -- it worked.

10   Q.      Okay.  Now, with regard to this diagnosis of PTSD.

11   Who diagnosed you with that?

12   A.      I can't -- I can't remember which, which doctor it

13   was.

14   Q.      You have not received any, any extended counseling

15   for PTSD --

16   A.      Yes.

17   Q.      -- have you, sir?

18   A.      Yes, I have had -- I've seen two people down there

19   in Houston.  And then the rest has all been, you know, on

20   the -- like that video over -- and then on my phone.

21   Q.      Okay.  But my understanding at the time that I took

22   your deposition was that you had only seen a counselor

23   maybe once or twice in -- from the time of your accident

24   until the date of your deposition, which again was on

25   September 24th, 2019.  Is that fair?
```

```
 1              MS. DEMUREN:  Objection, improper impeachment.

 2              MR. FOX:  I'm not impeaching him at all.  Not

 3    trying to.

 4              THE COURT:  And if you are not impeaching him, then

 5    why refer -- you are referring --

 6              MR. FOX:  Let me rephrase the question.

 7              THE COURT:  Just rephrase the question.

 8              MR. FOX:  Thank you.

 9    Q.     (BY MR. FOX)  Mr. Beam, from the time of your

10    accident until, say, September of 2019, is it true that you

11    only saw a counselor maybe once or twice for any types of

12    emotional or psychological issues?

13    A.     I believe it was more than that.  I'm not for sure,

14    you know, exactly, but I know I seen 'em down there twice.

15    And then I had phone calls.  I just don't remember the

16    dates --

17    Q.     Okay.

18    A.     -- you know.

19    Q.     And what sort of counseling are you receiving now?

20    A.     On the phone.

21    Q.     Okay.  And how often is that?

22    A.     Just different times.  I don't have the dates -- or

23    days.

24    Q.     All right.  Is it true that you don't have a set

25    appointment when you receive counseling, say, every week or
```

1    every two weeks or --

2    A.      No.

3    Q.      Okay.  And is it also true that you had problems

4    sleeping before your accident at the Watco facility?

5    A.      Yes, because I was working third shift and it's

6    hard sleeping during the daytime.

7            MR. FOX:  Okay.  That's all I have, Your Honor.

8    Thank you.

9            THE COURT:  Anything else for this witness?

10           MS. DEMUREN:  Nothing further for this witness,

11   Your Honor.

12           THE COURT:  You may step down, Mr. Beam.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  You may call your next witness.

15           MS. DEMUREN:  Your Honor, plaintiff will call Dr.

16   Kenneth McCoin.  We're just trying to give him a minute to

17   get onto the Zoom link.

18           THE COURT:  Okay.

19           MS. DEMUREN:  Thank you.

20           THE COURT:  Is he scheduled to pop on at a certain

21   time?

22           MR. CHRISTENSEN:  We've had him -- he knew he was

23   this afternoon, and I just let him know that it finished.

24   So, he should be here momentarily.

25           THE COURT:  Okay.

1              (Off the record.)

2              THE COURT:  While we're waiting on the next

3     witness.  Mr. Fox?  Assuming this will be the last witness

4     today --

5              MS. DEMUREN:  The last live witness, Your Honor.

6              THE COURT:  Do you have other witnesses after this

7     one?

8              MS. DEMUREN:  Oh, no, today.  It's already almost

9     4:00, Your Honor, so --

10             THE COURT:  No, it's okay.  But I'm saying, do you

11    have additional evidence after this doctor?

12             MS. DEMUREN:  Yes, Your Honor.

13             THE COURT:  How many other witnesses do you have?

14             MS. DEMUREN:  Just one, by video deposition -- oh,

15    I'm sorry, the corporate rep.  So, one live witness which I

16    anticipate, after we had a conversation with Mr. Fox, would

17    be tomorrow morning.

18             THE COURT:  Okay.  So, you will finish your case up

19    tomorrow morning?

20             MS. DEMUREN:  That's correct, Your Honor.

21             THE COURT:  And how many live witnesses are you

22    planning on bringing in?

23             MR. FOX:  When you say live, you are meaning in

24    person?

25             THE COURT:  I mean, in the courtroom.

1    MR. FOX:  Yes, and the answer to that is one, Your

2 Honor.

3    THE COURT:  And the rest are video depositions and

4 by Zoom?

5    MR. FOX:  By Zoom, and then there are some video

6 depositions as well, and I'm trying to get from this

7 gentleman over here --

8    THE COURT:  I thought we went through all of those.

9 We didn't?  No, we didn't.

10    MR. FOX:  No, Your Honor.

11    THE COURT:  Just the one that they had designations

12 for?

13    MR. FOX:  Yeah, we've got more.

14    THE COURT:  That's fine.

15    MR. FOX:  Okay.

16    THE COURT:  But they're ones that I have already

17 ruled on the designations?

18    MR. FOX:  Yes, ma'am.

19    THE COURT:  Okay.  So, you have one live witness,

20 you have witnesses by Zoom, and then we have the deposition

21 designations.

22    MR. FOX:  Correct.

23    THE COURT:  Okay.

24    MR. FOX:  And I'm -- you haven't asked me but it's

25 sort of the -- or the elephant in the room.  I'm hoping to

1   be done sometime Friday morning.

2           THE COURT:  Not an elephant.

3           MR. FOX:  Everybody wants to know when we're

4   getting out of here, Your Honor.

5           THE COURT:  I know when I'm getting out of here.

6           (Off the record.)

7           THE COURT:  While we're waiting, in the meantime,

8   can you just point me to what exhibit numbers are relevant

9   to him?

10          MS. DEMUREN:  It's going to be Exhibits 30 and 31,

11  Your Honor.

12          THE COURT:  Thank you.

13          (Off the record.)

14          MS. DEMUREN:  And, Your Honor, as Dr. McCoin is

15  doing that, even though there are two exhibits, for the

16  most part we'll be simply concentrating on Exhibit 31

17  because that's the later report that supersedes the prior.

18          (Witness sworn by courtroom deputy.)

19          COURTROOM DEPUTY:  Please state your name and spell

20  your last name.

21          THE WITNESS:  My name is Kenneth McCoin.  And it's

22  spelled M-C-C-O-I-N.

23          MS. DEMUREN:  May I, Your Honor?

24          THE COURT:  You may.

25          MS. DEMUREN:  Thank you.

```
  1                              *  *  *  *  *

  2                        KENNETH McCOIN,

  3     having been first duly sworn, was examined and testified

  4     via videoconference technology as follows:

  5                        DIRECT EXAMINATION

  6     BY MS. DEMUREN:

  7     Q.      Good afternoon, Dr. McCoin.  How are you?

  8     A.      Good afternoon.  Thank you.  I'm okay now that I

  9     got my computer working.  Thank you.

 10     Q.      I'm happy to hear that, Dr. McCoin.

 11             Dr. McCoin, could you please explain for the Court

 12     what type of expert you are?

 13     A.      I'm an economist.

 14     Q.      And could you briefly explain to us or describe

 15     your education, sir?

 16     A.      I have two academic degrees, both of which are from

 17     the University of Houston.  One is a Bachelor's Degree in

 18     Economics and Finance, and that was followed in the same

 19     institution, from University of Houston.  And I have a Ph.D

 20     in Economics, as well.

 21     Q.      Now, do you work as a forensic economist?

 22     A.      Yes, ma'am, I do.

 23     Q.      Can you tell the Court what your work entails?

 24     A.      Well, basically, it entails what we are doing here

 25     today.  My focus is working on the calculation of earning
```

1    capacity and loss of support.

2    Q.    And, Dr. McCoin, are you here today as an expert

3    that was hired by my firm Arnold and Itkin?

4    A.    Yes, that's correct.

5    Q.    Dr. McCoin, it's my understanding we have two

6    reports in this case.  One is Plaintiff's Exhibit No. 30,

7    which is dated July 17, 2018, and a second exhibit,

8    Plaintiff's Exhibit 31, which is dated November 4, 2020; is

9    that right?

10   A.    That's correct.

11   Q.    Does the November 4th, 2020, report which is dated

12   -- which is marked Exhibit 31, rather, does that supersede

13   the previous report?

14   A.    Yes, it does.

15   Q.    And is Exhibit 31 which is dated November 4, 2020,

16   a true and correct copy of your report that shows your

17   opinions in this case?

18   A.    It does.

19        MS. DEMUREN:  Your Honor, plaintiff moves Exhibit

20   31 into evidence.

21        THE COURT:  Any objections?

22        MR. LEVCHINSKY:  No, Your Honor.

23        THE COURT:  Plaintiff's Exhibit 31 is admitted.

24   Q.    (BY MS. DEMUREN)  Dr. McCoin, because this is a

25   bench trial and not a jury trial, and because the judge

1    already has a copy of your report, I want us to try to be

2    as concise as possible in terms of just explanations of

3    your opinions.  Is that all right, sir?

4    A.      Absolutely.

5    Q.      What did you calculate for Mr. Beam in this case?

6    A.      I calculated his earnings capacity, offset by an

7    assumed post injury wage.

8    Q.      Could you please briefly explain the methodology

9    that you used in performing these calculations?

10   A.      The methodologies is captured by the *Pfeifer*

11   decision out of the Supreme Court.  It's called a below

12   market discount rate methodology.  There's a similar case

13   in the Fifth Circuit called *Culver II*, but that's the

14   methodology that was used.

15   Q.      All right.  And, Dr. McCoin, bear with me for one

16   moment.  (Pause.)  I'm going to refer you to the summary

17   chart that's called Table One in your report.  Let me know

18   when you are there.

19          MS. DEMUREN:  It's page two, for Your Honor.

20   A.      I have it.

21   Q.      (BY MS. DEMUREN)  Okay.  Can you explain --

22          MS. DEMUREN:  Your Honor, are you there?

23          THE COURT:  I am.

24          MS. DEMUREN:  Thank you.

25   Q.      (BY MS. DEMUREN)  Can you please explain to the

1    Court what each of these numbers mean that's represented on

2    page two of your report?

3    A.      Sure.  Let me start with just the overall term,

4    earning capacity.  In its simplest form, it just means the

5    ability of a person to earn a wage income.  We come into

6    this world able-bodied and able-minded, and one of God's

7    gifts it the ability to earn a paycheck.  And what we do is

8    calculate the value of that skillset that the person has

9    been given.

10          There's two other terms, past and future, where the

11   past is defined as the time period from the onset of loss

12   of earning capacity or the interruption of earning capacity

13   to a future date, that normally being a trial date.  The

14   future refers to earnings after or earning capacity after a

15   trial date.  That earning capacity is discounted for the

16   time value of money.

17          And there's a pre-injury earning capacity.  That is

18   his earning capacity before some interruption to it.  And

19   post injury earning capacity is earning capacity in his

20   capacity as it existed today or assume exists today.  Those

21   are the four terms used here for earning capacity.

22   Q.      And in explaining those terms and applying the

23   numbers that are contained within your chart on Table No.

24   1, just for the record, can you briefly tell us which

25   numbers go with what, in terms of total?

1    A.      Yes.  With regard to the pre-injury past earning

2    capacity measured at today's date, that present day value,

3    net of all the appropriate deductions, is 203,422 dollars.

4            THE COURT:  Let me stop you for one second and just

5    make sure I understand, and ask a question for

6    clarification from Mr. McCoin.

7            The past pre-injury earning capacity, did you say

8    that was calculated up to today's date, as the trial date?

9    Or what trial date or what date did you use?

10           THE WITNESS:  I used December 6.  Excuse me.

11           THE COURT:  Okay.  December 6 -- so, yesterday.

12           THE WITNESS:  Yes.  Correct.  Start of a trial.

13           THE COURT:  Okay.  Thank you.  I'm sorry.  Go

14   ahead, counsel.

15           MS. DEMUREN:  That's quite all right.

16   Q.      (BY MS. DEMUREN)  Dr. McCoin, you were explaining

17   to the Court with respect to what each amount was for.  If

18   you could just continue, sir.

19   A.      Yes.  In the next column, under pre-injury earning

20   capacity, it's labeled future.  And that's the present day

21   value of his expected future wages, again, adjusted

22   appropriately for work probability, taxes, and so on.  And

23   that sum is 563,756 dollars.

24           And the past and future together sum to 767,178

25   dollars.

1        Below that is an earning capacity calculation with

2   respect to the future on the assumption he could be -- Mr.

3   Beam could return to employment at the first of next year

4   at 20,000 a year.  Now, that's just an arbitrary place

5   marker that I have assumed.  It could be adjusted as the

6   facts require.

7        But in that event, his post injury earning capacity

8   is 163,431 dollars.  And so, the loss of earning capacity,

9   since he's not worked in the past, is 203,422 dollars in

10  the past.  And netting out the future pre-injury and post

11  injury, that amount is 400,325 dollars, for a total loss of

12  earning capacity of 603,747 dollars.

13  Q.      So, let me make sure I have this clear, Dr. McCoin.

14  Mr. Beam's total economic loss in this case, if he can go

15  back to work full time at $9.62 an hour, did you calculate

16  that to be 603,747 dollars?

17  A.      That's correct.  That's -- I'm sorry.  That's

18  correct.  That's his loss of earning capacity under those

19  assumptions.

20  Q.      And, Dr. McCoin, just to clarify, what is Mr.

21  Beam's total economic loss in this case, if the Court

22  determines that Mr. Beam is totally disabled and cannot go

23  back to work?

24  A.      Well, in terms of earning capacity, it's 603,747.

25  But he may have lost household services, and those are the

1    value of chores we typically do around the house.  And I

2    have used a study out of the Labor Department to measure

3    the time spent in household chores.  And I have also

4    assumed, rightly or wrongly, that he's lost 20 percent of

5    his ability to do those chores.  Meaning, he can do 80

6    percent, but he can't do 20 percent.

7            Now, those are just an estimate by me or a

8    benchmark by me as to his losses.  But the value of his

9    past lost household services is 5,416 dollars under those

10   assumptions, and in the future, would amount to 29,283

11   dollars, for a total past and future household services,

12   34,699.

13           Now, that sum is added to his earning capacity

14   loss, and the two together would add up to 638,466 dollars.

15   Q.      And, Dr. McCoin, I see 767,178 dollars.  That

16   amount, does that consist of past and future without

17   reduction of post injury capacity?

18   A.      That's correct.

19   Q.      And, Dr. McCoin, for any additional explanation of

20   your methodology and opinions, would you refer the Court to

21   your report, Plaintiff's Exhibit No. 31?

22   A.      I would.

23   Q.      And, Dr. McCoin, have all of your opinions that you

24   have provided here today been given to a reasonable degree

25   of economic certainty?

1    A.      Yes, ma'am.

2    Q.      Thank you, Dr. McCoin.

3            MS. DEMUREN:  I offer for cross.

4                        CROSS-EXAMINATION

5    BY MR. LEVCHINSKY:

6    Q.      Dr. McCoin, good afternoon.  Can you hear me?

7    A.      I can.  Thank you.  Good afternoon.

8    Q.      Great.  Dr. McCoin, Plaintiff's Exhibit 31, your

9    report dated November 4, 2020, that was not the first

10   report you did in this case; correct?

11   A.      No, sir, it's not.  And let me apologize.  I

12   labeled that November the 4th, 2020, and it should be 2021.

13   And you'll see that error in the first paragraph of the

14   report, but let me draw everyone's attention to that error.

15   But it is 2020.

16   Q.      I'm sorry.  Can you clarify for the Court when it

17   is that you made this report?

18   A.      When did I do it?

19   Q.      Yes.

20   A.      November the 4th, 2021.

21   Q.      Okay.  That would be November the 4th, this year?

22   A.      That's correct.

23   Q.      Which is -- just doing it in my head, I'm sure I'm

24   getting this right -- was that the Friday before trial?

25   A.      No.  I'm sorry.  You're right.  It was done in

1  2020.  My apology.

2          THE COURT:  I'm sorry.  I'm confused now.  What is

3  the answer?

4  Q.      (BY MR. LEVCHINSKY)  Dr. McCoin, can you say with

5  certainty when it is that you authored your report that's

6  been referred to as Exhibit 31?

7  A.      Yes.  I can.  I apologize.  I corrected the report

8  but it was -- the report was done November the 4th, 2021.

9  Q.      2021?

10 A.      Yes, sir.

11 Q.      Of this year?

12 A.      Correct.

13 Q.      And when did you send the report to plaintiff's

14 counsel?

15         MS. DEMUREN:  Objection, relevance.

16 A.      On that day.

17         THE COURT:  Overruled.

18         Go ahead and answer, Doctor.

19 A.      That day.

20 Q.      (BY MR. LEVCHINSKY)  Did you -- did you initially

21 complete a report dated July 17, 2018?

22 A.      I did.

23 Q.      And do you have access to that report, Doctor?

24 A.      Yes, sir.  Yes, sir, I do.

25 Q.      I believe that's Plaintiff's Exhibit 30.  Is that

1    a --

2    A.    I have it.

3    Q.    Okay.  And then did you supplement or did you

4    adjust that report in March of 2020?

5    A.    I did, March 5th.

6    Q.    Okay.  And that was the day before your deposition

7    on March 6th; correct?

8    A.    That's correct.

9    Q.    Why did you adjust the report in March of 2020?

10   A.    The trial date changes and additional information

11   becomes available.

12   Q.    And was that additional information in the form of

13   actual tax returns related to how much Mr. Beam actually

14   earned at Watco?

15   A.    Yes.  Among others.  I think there was a pay stub

16   that came in, as well.

17   Q.    And based on that additional information, you

18   updated your March report to reflect a final economic loss

19   figure less than 705,225; correct?

20   A.    Yes, that's correct.

21   Q.    Is it fair to say that that figure, 705,225,

22   representing Mr. Beam's economic losses, does not have any

23   sound basis -- any sound economic basis?

24   A.    No.

25   Q.    That is fair to say?  You agree with that?  Or are

1    you disagreeing with me?

2    A.     Well, let's make sure we're on the same page.  Give

3    me your question again?

4    Q.     Your initial figure for Mr. Beam's economic losses,

5    before you had his tax returns from Watco, was that his

6    final economic loss figure -- and that's the number at the

7    bottom right corner of the graph on page two of your July

8    17 report -- your initial figure was 705,225; correct?

9    A.     Correct.

10   Q.     And you then adjusted that figure after you

11   received evidence of Mr. Beam's actual earnings in form of

12   tax returns; correct?

13   A.     Yes, and pay stub.

14   Q.     So, knowing what you know from those tax returns,

15   does 705,225 have any economically sound basis for Mr.

16   Beam's economic losses?

17   A.     No.  I don't -- I don't think that would be a

18   measure that you would use for his earning capacity.

19   Q.     Which is why you adjusted your report; correct?

20   A.     Yes, sir.  And we also have -- the trial date is

21   moving on us.

22   Q.     Understood.  And it's your testimony today that you

23   adjusted your report again in November of 2021; correct?

24   A.     That's correct.

25   Q.     Dr. McCoin, at the time of your deposition, were

```
1   you an expert that had been retained by Arnold and Itkin

2   about 20 times annually?

3   A.      Yes.

4   Q.      Is it fair to say that that's still the case?

5   A.      I think so.

6   Q.      And you don't present yourself as any kind of an

7   expert in any field of medicine; correct?

8   A.      Not at all.

9   Q.      Or vocational rehabilitation?

10  A.      That's correct.

11          THE COURT:  I think it's clear he is an economist.

12          MR. LEVCHINSKY:  Yes, Your Honor.

13          THE COURT:  And he hasn't given any opinions that

14  are medical in nature, or of a voc rehab nature.

15          MR. LEVCHINSKY:  Yes, Your Honor.  I'll move on.

16          THE COURT:  Thank you.

17  Q.      (BY MR. LEVCHINSKY)  Now, Dr. McCoin, you do

18  contain metrics in your report for post injury earning

19  capacity; correct?

20  A.      That's correct.

21  Q.      Are you qualified at all to comment on Mr. Beam's

22  job prospects going forward?

23  A.      No.

24  Q.      The numbers that you have in your post injury

25  earning capacity, those are just based on assumptions that
```

1    you applied to your calculations; correct?

2    A.     Yes.  It's -- it's intended to serve as a

3    placeholder, so that anyone who has an interest can form

4    their own judgments about what it would be if he went to

5    work at certain post injury wage rates.  I have chosen

6    largely as a matter out of convenience 20,000 a year.  But

7    with the understanding, that can be scaled up and scaled

8    down.

9          In other words, if he -- if he makes 40,000 instead

10   of 20, then his post injury wage earning capacity is twice

11   what it would be at 20 and then you can make the proper

12   adjustments.  But that's -- that's the only purpose that it

13   serves, is, it's an aid to those who have an interest.

14   Q.     Dr. McCoin, in your report it states that that

15   20,000-dollar-a-year number is based on an hourly wage of

16   about $9.62 an hour; correct?

17   A.     That's correct.

18   Q.     Are you aware that the minimum wage in Illinois

19   where Mr. Beam lives is 11 dollars an hour?

20   A.     I am not.  But he may not work full time.

21   Q.     Are you aware that Jessica Bradford has testified

22   in this case that the average wage of somebody working in

23   Southern Illinois is over 16 dollars an hour?

24   A.     I'm not aware of that.  I am aware of her report.

25   And again, that's why a report is done this way.  It can be

1    scaled up as needs require.

2    Q.     Well, you said you are aware of Miss Bradford's

3    report?

4    A.     Yes.

5    Q.     Do you recall in that report where it states that

6    the average wage in some -- for someone in Southern

7    Illinois is over 16 dollars an hour?

8    A.     I do not.  What I gathered was her expression as to

9    what she thought he could do, and I think it's somewhere in

10   the role of 19,000 or something like that.

11   Q.     Let me just ask this, Dr. McCoin:  Is Ms.

12   Bradford's report one of the documents that was accessible

13   to you when you were doing these calculations?

14          MS. DEMUREN:  Objection, relevance.

15   A.     No, I received --

16          THE COURT:  Hold on for a second, Doctor.

17          MS. DEMUREN:  Relevance.

18          THE COURT:  Sustained.

19          You have to establish he relied on it.  Whether it

20   was accessible is irrelevant.  The question is what he

21   relied upon.

22          MR. LEVCHINSKY:  Okay.

23   Q.     (BY MR. LEVCHINSKY)  Dr. McCoin, did you rely on --

24          THE COURT:  Excuse me, counsel.  Why do you find my

25   rulings funny?

1          MR. LEVCHINSKY:  I don't find them funny, Your

2    Honor.  I apologize.  I'm just a little bit -- I'm just a

3    little bit taken aback by the process here because I think

4    that I need to ask him if he had access to it before I can

5    ask him if he relied on it.  But --

6          THE COURT:  Not necessarily.  If he relied upon it,

7    he obviously had access to it.

8          MR. LEVCHINSKY:  Understood, Your Honor.  I'll ask

9    that question.

10   Q.     (BY MR. LEVCHINSKY)  Dr. McCoin, did you rely on

11   Miss Bradford's report as part of your calculations in this

12   case?

13   A.     No.  I did not have it.

14   Q.     Of course, if you were to put in a higher number

15   for post accident earning capacity that reflected the

16   Illinois minimum wage or reflected 16 dollars an hour, that

17   would increase Mr. Beam's post accident earning capacity in

18   your calculations; correct?

19   A.     It would.

20   Q.     And in turn, that would decrease the total economic

21   loss per your calculations; correct?

22   A.     That's correct.

23   Q.     And just to be clear, have you ever spoken or met

24   with Mr. Beam?

25   A.     No, sir, I have not.

1    Q.      Have you ever spoken or met with any of his

2    doctors?

3    A.      No.

4    Q.      Have you ever reviewed any of his academic records?

5    A.      No, sir.

6    Q.      We mentioned Miss Bradford's work.  Are you aware

7    of Dr. Cowen's work in this case?

8    A.      Yes.

9    Q.      Is that something that you relied on in forming

10   your opinions in this case?

11   A.      No, sir, it's not.

12   Q.      Your report is based on a number of assumptions

13   that you applied to a formula that you used to calculate

14   economic losses.

15   A.      Yes, that's right.  These are parametric studies

16   and we're applying the parameters to, to make a

17   calculation.

18   Q.      One of those assumptions, Dr. McCoin, is that Mr.

19   Beam could work as a deckhand at Watco but for his

20   employment injury, that he could do that job until he was

21   67.3 years old; correct?

22   A.      That is to age 67.  In other words, what we're

23   saying, he would have that earning capacity over that time

24   period.  That doesn't mean he's going to work 100 percent

25   of that time.  So, there will be interruptions to work as

1    captured by the work life statistic.

2    Q.    Dr. McCoin, do you know of any deckhands who are

3    allowed to work part time?

4         MS. DEMUREN:  Objection, calls for speculation.

5    A.    I do not.

6         THE COURT:  I'm sorry?

7         MS. DEMUREN:  Calls for speculation and irrelevant.

8         THE COURT:  I'm not sure it's relevant but it's

9    overruled.  We'll give him some latitude here.

10   Q.    (BY MR. LEVCHINSKY)  Dr. McCoin, do you know of any

11   deckhands that are allowed to work part time?

12   A.    I -- I -- offhand, I do not.  There may be some.

13   But let me make sure you are clear on this point.  We're

14   saying -- these work life statistics does not necessarily

15   mean part-time work.  What it means is, you may be between

16   jobs, for all the reasons that confront all of us, you may

17   have an injury, you may have a family situation, you may

18   have -- in between jobs.  You got a better job but it took

19   you a time to find a new job.

20        So, there are interruptions to work and we're just

21   applying that statistic to these calculations.

22   Q.    Dr. McCoin, are you aware of the labor

23   classification of the job of deckhand, that is, whether it

24   is light, medium, or heavy manual labor?

25   A.    I can't hold myself out as an expert in that, but

1    if you -- if I put a gun to my head and said, *Take a guess*,

2    I would say it's heavy duty.

3    Q.    I didn't hear that last answer.  What would you

4    say?

5    A.    I would say it was heavy duty.  Heavy work.

6    Q.    And do you have any data or statistics on how --

7    what percentage of heavy manual laborers work into their

8    60s or even -- or their late 60s?

9    A.    No, I don't.  But I know of some that do.  Now,

10    bear in mind, also, you move up the chain of command here.

11    You start out as a deckhand but you may like move up to a

12    foreman of a deckhand.  Where your knowledge expands, your

13    skillset expands, but you are not burdened with the initial

14    labor that, say, an entry level apprentice dockhand would

15    require.  So, it's a little bit more complicated than

16    summarily subjecting him to extrapolate it out to the

17    future.

18    Q.    Dr. McCoin, do you know how long Mr. Beam was

19    working in that same position as deckhand for Watco?

20    A.    In that position, not very long, as I understand.

21    Q.    Do you know how long he had gone in that same

22    position without getting a promotion?

23    A.    I do not.

24    Q.    Do you have information about his prospects of

25    being promoted to a lighter labor position at Watco if he

1  hadn't been injured at work?

2  A.      No, I'm just saying that that -- it's a promoted

3  position.  With experience comes more responsibility, and

4  generally more responsibility is associated with a

5  supervisory role.

6  Q.      Do you have any information on how often positions

7  like that, those supervisor positions, were even available

8  at Watco?

9  A.      No, I just think it comes about in circumstance.

10 Peoples retire and they're replaced by those below them.

11 Q.      Are you aware, Dr. McCoin, of Watco's overall need

12 for labor following 2017?

13 A.      No, I do not know.  I suspect it's pretty brisk

14 today.

15 Q.      Dr. McCoin, are you aware just generally in the

16 area of Chester, Illinois, where Mr. Beam is from, of other

17 companies that employ deckhands?

18 A.      Anyone along the river is going to require

19 deckhands.

20 Q.      Are you aware of any specific companies near

21 Chester, other than Watco?

22 A.      No, I'm not.

23 Q.      Fair to say that, since you have never met or

24 spoken with Mr. Beam, you have never gotten information

25 from him on when he was planning to retire before this

1    incident; correct?

2    A.    Yes.  But I have not -- and I don't know the

3    relevance of that.  Peoples -- I'm supposed to be retired a

4    long time ago and here I am, 75 years old, still working.

5    So, I'm somewhat disappointed in that.

6    Q.    Dr. McCoin, you wouldn't represent to this court

7    that your work as an economist is one of heavy manual

8    labor, would you?

9         MS. DEMUREN:  Objection, relevance.

10   A.    No, it's heavy -- THE COURT:  Hold on.  I'm sorry.

11   It is argumentative.  Sustained.  Move on, counsel.

12   Q.    (BY MR. LEVCHINSKY)  Dr. McCoin, is it fair to say

13   that if you decrease the assumed retirement age in your

14   calculations, that also decreases the total economic loss?

15   A.    No, it does not.  You have to -- you'd have to

16   change his work life statistic, and that's independent of

17   when he retires.  In other words, he's only working 75

18   percent of the time in these calculations, which allows for

19   all the interruptions to work.  He changes jobs; he has

20   family situations; all of those things are relevant to the

21   calculation.  But just don't assume that he -- just because

22   he works to age 67, which is, is taken because he has a

23   full Social Security pension at that age, that he's going

24   to work all the time.  The unemployment is already built

25   into these figures.  He's only working 75 percent of the

1  time.  So, each year, he's losing 25 percent.

2  Q.    So, just to get this straight.  If you assume that

3  he retired earlier than 67, let's say 62 or even 65, your

4  figures for economic loss would not change?

5  A.    Probably not, because he's going to work more

6  intensely.  In other words, his work life expectancy --

7  hang with me a second.

8        His work life expectancy is 11 years.  He's under

9  no obligation to work 11.6 years -- in the next 11.6 years.

10 It may take him 15 years to work.  That's all we're saying.

11 Q.    Well, if his work life expectancy goes down, that

12 would decrease the total figure for economic loss, would it

13 not?

14       MS. DEMUREN:  Objection, asked and answered.

15 A.    That's true.

16       THE COURT:  Overruled.

17       You can answer, Doctor.

18 A.    That's true, but you're going to have to physically

19 adjust his statistical work life.  There's some reason to

20 believe that he will work less than average.

21 Q.    (BY MR. LEVCHINSKY)  Dr. McCoin, you mentioned

22 household services in your testimony and it also appears in

23 your reports; correct?

24 A.    Yes, sir.

25 Q.    And that's another figure that you calculated based

1  on assumptions; correct?

2  A.      That's correct.

3  Q.      You did not talk to Mr. Beam about how much time he

4  spends doing what around the house; correct?

5  A.      That's correct.

6  Q.      And you did not get any information from any of Mr.

7  Beam's family members about anything that they do around

8  his house to help him out?

9  A.      No, I did not.

10       MR. LEVCHINSKY:  I have nothing further, Your

11  Honor.  Thank you.

12       MS. DEMUREN:  Nothing further for this witness,

13  Your Honor.

14       THE COURT:  Thank you so much, Dr. McCoin.  You may

15  sign off, sir.  Thank you.

16       THE WITNESS:  Thank you, Your Honor.

17       MS. DEMUREN:  If I may?  We do have one witness we

18  can call via video testimony today.  The only reason why I

19  do bring it up?  We did hear your advice, and Mr.

20  Christiansen does not want to win anymore awards, so it's

21  significantly trimmed down.  It is total 17 minutes for

22  both sides for that video deposition.

23       THE COURT:  17 minutes each?

24       MS. DEMUREN:  No, in total -- oh, I'm sorry, 18

25  minutes and 32 seconds.

1      MR. FOX:  It's 4:00, Your Honor.  You told us we
2  were shutting down at 4:00, which, I'm not arguing with
3  you --
4      THE COURT:  Mr. Fox, I said 4:30.
5      MR. FOX:  Oh, you said 4:30?
6      MS. DEMUREN:  Correct.
7      MR. FOX:  Oh, my mistake.
8      THE COURT:  Let's go ahead and take care of this
9  one.
10      MS. DEMUREN:  Thank you, Your Honor.
11      Plaintiff will call Karen Splane via video
12  deposition.
13      (The videotaped deposition dated March 5, 2021, of
14  Karen Splane was played at this time.)
15      MS. DEMUREN:  That's all, Your Honor.
16      THE COURT:  I'll have to think of an appropriate
17  consequence, counsel, for your misrepresentation of 17
18  minutes.
19      MS. DEMUREN:  It was 18 minutes, 13 seconds, Your
20  Honor.
21      THE COURT:  At this point of the day, it's
22  important to be precise.
23      MS. DEMUREN:  Yes, Your Honor.  I'll remember that.
24      THE COURT:  Everybody have a good evening.  Be safe
25  -- be well and stay safe and we'll reconvene at 9:00 a.m.

1          You still have one more live witness and then --

2          MS. DEMUREN:  Yes, Your Honor.

3          THE COURT:  All right.

4          (Court adjourned at 4:23 p.m.)

5

6

7

8

9

10

11                   REPORTER'S CERTIFICATE

12          I, Christine Dohack LaBuwi, RDR, CRR, Official

13   Court Reporter for the U.S. District Court, Southern

14   District of Illinois, do hereby certify that I reported

15   with mechanical stenography the proceedings contained in

16   pages 169-354; and that the same is a full, true, correct

17   and complete transcript from the record of proceedings in

18   the above-entitled matter.

19

20          DATED this 17th day of December, 2021,

21

22                   s/Christine Dohack LaBuwi, RDR, CRR
                     _____
23                   Christine Dohack LaBuwi, RDR, CRR

24

25