IN THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| KEVIN BEAM, | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 3:18-cv-2018-SMY-DGW |
| WATCO TRANSLOADING, LLC, | § § § | |
| *Defendant*. | § | In Admiralty under Rule 9(h) |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Kevin Beam filed this personal injury case after he was injured on November 12, 2017, while working as a deckhand for Defendant Watco Transloading, LLC. Watco admitted fault and that Plaintiff was a Jones Act Seaman. Watco challenged Plaintiff's injuries and damages. The Court conducted a bench trial (*see* Docs. 173-77).

### FINDINGS OF FACT

### *The Incident*

On November 12, 2017, Plaintiff was employed by Watco and working as a deckhand with the river crew. (Tr. Vol. II, at 260:22-261:9; 262:9-11). Plaintiff's job was physically demanding and often required him to lift and carry heavy objects up to 120 pounds. *Id.* at 261:10-23. When the incident occurred, Plaintiff was standing towards the downriver end of the dock facing the river and the barge. *Id.* at 291:14-19. He stepped up on the dock to give a dock reading to document how far the barge sank while being loaded with coal. *Id.* at 262:15-19; 289:23-290:1. He gave the reading, stepped back, and was hit by a large wire cable that was used to pull the barges along the loading area. *Id.* at 262:20-24. The cable struck Plaintiff on the right side of his hard hat, shoulder, and back. *Id.* at 263:14-20. The cable that broke and hit Plaintiff weighed 3.5 pounds per foot. (Tr.

1

Vol. III, at 505:16-19). In total, the cable was 1545 feet long. *Id.* at 505:20-22. Thus, the total weight of the cable was 5407.5 pounds. *Id.* at 505:23-506:2.

Due to the injuries he sustained from the cable, Plaintiff was transported to the hospital by ambulance. (Tr. Vol. II, at 265:21-25).

### *Plaintiff's Medical History*

Prior to the incident on November 12, 2017, Plaintiff had never been placed on light or restricted duty by Watco. *Id.* at 248:14-16. And Plaintiff did not have any significant health problems that affected his ability to work. *Id.* at 249:3-6.

In June 2017, Plaintiff was involved in a motor vehicle accident where he was rear-ended. *Id.* at 249:17-19. Following the June 2017 accident, Plaintiff received medical care that included an X-ray of his hand and ribs. *Id.* at 249:25-250:4. He later obtained an X-ray and CT scan of his back. *Id.* at 250:11-22. From the day of the June car accident until the November cable incident, Plaintiff did not miss any workdays. *Id.* at 252:1-4. After the X-ray and CT scan, the only treatment Plaintiff received for the accident was chiropractic care and a corticosteroid injection that cleared up any residual pain. *Id.* at 252:5-15; *see also* Hess Dep., at 80:12-21.

In 2015, Plaintiff slipped on a set of stairs and fell. *Id.* at 252:23-253:1. After he fell, Plaintiff sought medical treatment. *Id.* at 253:2-6. During treatment doctors determined that nothing was broken, and the only injuries Plaintiff sustained during the fall was some bruising. *Id.* at 253:7-9. Plaintiff did not miss any days of work due to the minor injuries he suffered during the fall. *Id.* at 253:10-16. The stair fall did not affect Kevin's ability to work in any way. *Id.* at 253:13-16.

In 2011 Plaintiff was involved in a car accident that resulted in Plaintiff hitting into a tree. *Id.* at 253:17-19. Plaintiff received medical treatment for his injuries. As a result of the crash,

Plaintiff suffered a slight sprain on his right arm that required no surgery or additional treatment. *Id.* at 253:20-254:1. Plaintiff did not miss any workdays because of the 2011 car accident. *Id.* at 254:7-9. And the accident did not affect his ability to do his job. *Id.* at 254:10-12.

Plaintiff also quit smoking two months before the November 2017 incident. *Id.* at 254:21-24. And Plaintiff has never been diagnosed with osteoporosis. *Id.* at 255:10-12.

Before the November 2017 incident, Plaintiff had never fractured his back or his ribs (*id.* at 255:13-22), been told that he needed a cervical fusion, wrist surgery, or shoulder surgery (*id.* at 256:10-22), and had never been diagnosed with ongoing PTSD, anxiety,[1] or depression. *Id.* at 256:23-257:15. And all of Plaintiff's pre-incident treating doctors testified that Plaintiff did not have any unresolved medical issues from these previous incidents leading up to the November 12 cable incident. *See* Hess Dep., at 79:3-17; Buskohl Dep., at 76:14-18; Krieg Dep., at 71:12-73:23.

There is no evidence that Plaintiff missed work because of injury for the two years prior to the November 12, 2017, cable incident. (Tr. Vol. III, at 389:14-19; Pl.'s Exhibit 10). The only days Plaintiff missed in the months leading up to the November 12, 2017, cable incident were vacation days. *Id.* at 390:3-8; Pl.'s Exhibit 10. There is no evidence in either the Crew Shift Report or the daily supervisor logs that Plaintiff was unable to do his job due to injury. *Id.* at 390:23-391:2. There is no evidence that Plaintiff or one of his coworkers ever reported that Plaintiff was unfit for duty prior to the November 12, 2017, cable incident. *Id.* at 391:9-14. In fact, all of Plaintiff's co-workers agreed that Plaintiff was always able to do his job and not a single fellow employee could remember a time where Plaintiff was placed on "light duty" before the November 12 incident. *See* Korando Dep., at 81:2-8; 84:15-18; Wingerter Dep., at 19:1-20; Spear Dep., at 89:16-19; Williams

---

[1] Plaintiff testified that before the incident he occasionally suffered from anxiety but explained that his levels of anxiety increased significantly after the November 2017 incident. *See* (Tr. Vol. II, at 258:14-259:5). The medical records are consistent with Plaintiff's testimony.

3

Dep., at 11:23-12:1. Watco failed to provide any evidence that Plaintiff was unfit for duty or unable to physically complete the demands of his work at Watco prior to the November 12, 2017, cable incident. *Id.* at 391:15-20. Instead, the evidence is to the contrary—Plaintiff was able to meet the physical demands of his work prior to the cable incident.

Before the cable incident, Plaintiff lived and enjoyed a normal life. (Tr. Vol. II, at 238:2-5). But since the cable incident, Plaintiff has been unable to enjoy many of the activities that he participated in before the cable incident like fishing and hunting. *Id.* at 240:3-4. Moreover, because of the incident, Plaintiff has trouble sleeping, experiences mood changes, and suffers from anxiety much more significant than he did previously. *Id.* at 258:10-17.

In addition to those challenges, Plaintiff has a handicapped son that lives with him. Plaintiff has traditionally acted as his son's caretaker, but because of the incident, Plaintiff has difficulty performing those duties and has had to enlist the help of another son to carry the load. *Id.* at 240:23-241:8.

**Dr. Ruben Bashir:** The Court first heard testimony from Dr. Ruben Bashir. Dr. Bashir is a board-certified spine surgeon. (Tr. Vol. I, at 12:19-23). He first started seeing Plaintiff on April 12, 2018. *Id.* at 13:21-25. Dr. Bashir met with Plaintiff a total of eleven times. *Id.* at 14:1-4.

Dr. Bashir treated Plaintiff's neck injuries. That treatment included several attempts to resolve the issues using conservative treatments including nonsteroidal medications, behavioral modifications, physical therapy, and rest. *Id.* at 14:10-15. Dr. Bashir then recommended that Plaintiff undergo a cervical epidural injection. *Id.* at 14:16-19. None of those conservative treatments resolved Plaintiff's neck issues. *Id.* at 14:20-24.

In March 2020, Dr. Bashir performed an anterior cervical discectomy and fusion of the C5-6 and C6-7 levels on Plaintiff. The procedure involved removal of the discs between the C5-6 and

4

C6-7 cervical bones and replacing them with a part bone, part titanium spacer. The spacers restored the height between the bones and facilitated decompression. The procedure was done from the front of Plaintiff's neck. The replacement spacers facilitated fusion of the cervical bones at the affected levels. *Id.* at 15:4-22. According to Dr. Bashir, the surgery was medically necessary and provided Plaintiff excellent relief. *Id.* at 16:18-25.

Dr. Bashir also testified that Plaintiff suffered from a thoracic fracture. *Id.* at 17:1-3; 17:23-24. To diagnose these injuries and determine their cause, Dr. Bashir examined Plaintiff, took a history from him, and reviewed his medical records. *Id.* at 18:1-22. Dr. Bashir also reviewed Plaintiff's X-rays, CT scans, and MRIs in conjunction with his treatment and care. *Id.* at 20:9-16.

Dr. Bashir opined that Plaintiff's injuries were caused by the cable incident. *Id.* at 20:17-21:6. Dr. Bashir formed those opinions during his normal course of treatment. *Id.* at 21:7-10. Dr. Bashir further opined that to a reasonable degree of medical certainty, Plaintiff's cervical spine and thoracic spine injuries at T7 were sustained on November 12, 2017, during the cable incident as described to him by Plaintiff. *Id.* 23:5-13. During the course of his treatment, Dr. Bashir also found no evidence that Plaintiff had osteoporosis. *Id.* at 24:3-5. Dr. Bashir, as one who actually performed surgery on Plaintiff, found that Plaintiff had excellent bone density. *Id.* at 24:10-14.

Dr. Bashir further opined that in his medical opinion, Plaintiff's injuries were the result of a high-energy event. *Id.* at 25:15-21. He explained fractures like the ones Plaintiff sustained do not normally present in a healthy male with normal bone density without a high-energy impact such as a severe car accident, a fall from height, or being struck by a fast-moving object such as the cable as described by Plaintiff. *Id*. Dr. Bashir testified that all the treatment he provided Plaintiff was medically necessary because of the incident where Plaintiff was struck by the cable. *Id.* at 26:3-10.

***Dr. Rajiv Thakur:*** Dr. Thakur is a board-certified vascular and interventional radiology specialist. (Tr. Vol. I, at 63:1-13). Dr. Thakur first saw Plaintiff in March 2018. *Id.* at 63:25-64:1. Plaintiff presented with severe pain and indicated that he could not perform normal daily tasks. *Id.* at 68:1-8. Dr. Thakur reviewed Plaintiff's medical history and concluded that there was nothing from his history that was pertinent to the symptoms that he was currently experiencing. *Id.* at 68:18-25. Dr. Thakur considered other potential causes for Plaintiff's injuries, including the fact that Plaintiff was in a car accident several months before the incident. *Id.* at 70:9-17.

Dr. Thakur then reviewed Plaintiff's MRI that was taken in March 2018 and found that the spine fracture that he sustained in the incident had not healed. *Id.* at 66:6-14. To relieve the Plaintiff's pain from the fracture, Dr. Thakur performed a kyphoplasty on Plaintiff. *Id.* at 66:15-21. Kyphoplasty is a minimally invasive treatment of the spine meant to stabilize fractures. *Id.* at 64:7-13.

During the surgery, Dr. Thakur observed that Plaintiff's vertebra was extremely hard for a person of his age. *Id.* at 66:24-67:12. He explained that according to his medical opinion, Plaintiff's bone density was normal. *Id.* at 74:8-11. Dr. Thakur testified the kyphoplasty was medically necessary. *Id.* at 67:13-15.

During the course of treatment, Dr. Thakur concluded that Plaintiff's injuries were caused by the cable incident. *Id.* at 71:19-72:15. Dr. Thakur also testified that during the course of his treatment of Plaintiff, he found no evidence that Plaintiff had weak bones. *Id.* at 72:24-73:7. Dr. Thakur also testified that there was no evidence that Plaintiff suffered from osteoporosis. *Id.* at 73:8-11.

Dr. Thakur is also the CEO of the Advanced Medical Group hospital system. *Id.* at 74:23-75:2. Dr. Thakur testified that the hospital's chargemaster rates fall in line with other large

hospitals in the Houston area. *Id.* at 79:23-25. Through Advanced Medical Group (and associated entities), Plaintiff has incurred $1,544,261.76 in medical bills. *Id.* at 82:1-5. As of trial, Watco had paid $313,333.68 towards the bills. *Id.* at 82:6-8.

Approximately $45,000 had been paid by Plaintiff via loans he obtained. *Id.* at 82:9-11. As of the day of trial, approximately $91,688.08 of the total charges from Advanced Medical Group had been adjusted or written off. *Id.* at 82:12-15. The remaining balance owed to Advanced Medical Group at the time of trial was $1,094,240.00. *Id.* at 82:16-21.

Dr. Thakur testified that based on the American Medical Association's definition of usual, customary, and reasonable, the charges from Advanced Medical Group (and associated entities) for Plaintiff's medical care are usual, customary, and reasonable. *Id.* at 86:9-13.

**Dr. Lynanne Foster:** Dr. Foster is an orthopedic surgeon who treated Plaintiff. (Tr. Vol. I, at 119:1-5). Dr. Foster started treating Plaintiff in April 2018. *Id.* at 122:9-14. Dr. Foster took Plaintiff's medical history (*id.* at 125:13-15), asked Plaintiff about his prior medical issues (*id.* at 126:4-8), assessed Plaintiff's injuries and his prior medical conditions, and determined that Plaintiff's injuries were a direct result of the cable incident. *Id.* at 126:19-127:7.

Dr. Foster opined that Plaintiff would not have been able to perform his job prior to the incident with the same injuries he presented with after the incident. *Id.* at 139:17-25. Dr. Foster tried to treat Plaintiff's shoulder surgery using conservative methods such as medication, therapy, heat and cold applications, etc., but none of those treatments resolved Plaintiff's pain. *Id.* at 123:5-16.

Dr. Foster performed an arthroscopic rotator cuff repair, labral repair, and long head biceps tenotomy with subacromial decompression and distal clavicle resection on Plaintiff. *Id.* at 123:20-24. The surgery repaired (1) a section of torn cartilage on the socket side of Plaintiff's shoulder

that had torn away from the bone; (2) a torn bicep tendon; and (3) several torn rotator cuff tendons that had torn and pulled away from the bone. *Id.* at 124:4-23. Dr. Foster testified that these procedures were medically necessary. *Id.* at 125:6-9. Dr. Foster further testified that the procedures provided Plaintiff relief from his shoulder injuries. *Id.* at 125:10-12.

Dr. Foster formulated her medical and causation opinions that the shoulder injuries were caused by the cable incident during the course of her treatment of Plaintiff. *Id.* at 127:8-11; 127:14-17. All of Dr. Foster's care and treatment of Plaintiff was necessitated by the 2017 cable incident. *Id.* at 127:22-25. And all Dr. Foster's opinions were based on a reasonable degree of medical certainty. *Id.* at 128:1-4.

**Dr. Henry Small:** Dr. Small is a board-certified orthopedic surgeon who treated Plaintiff starting in November 2020. (Tr. Vol. I, at 142:9-14; 144:7-8. Dr. Small saw Plaintiff approximately six or seven times total. *Id.* at 145:16-21.

Dr. Small testified that he has performed kyphoplasty procedures on patients as long as 10 years after the patient sustained a fracture. *Id.* at 146:11-23. Accordingly, it was not unusual for Plaintiff to receive a second kyphoplasty. *Id.* at 147:3-12. Dr. Small performed the second kyphoplasty on Plaintiff to place additional cement in Plaintiff's fracture to reduce the pain Plaintiff was experiencing. *Id.* at 147:5-12. Dr. Small testified that the first kyphoplasty performed by Dr. Thakur was done properly and constituted a more conservative procedure. *Id.* at 147:13-17. Dr. Small testified that the kyphoplasty that he performed on Plaintiff was medically necessary. *Id.* at 147:18-21.

Dr. Small also performed a thoracic fusion surgery on Plaintiff. *Id.* at 147:22-148:2. The surgery fixed a large herniation at T11-12 that was compressing his spinal cord. *Id.* at 148:9-10. Dr. Small accessed Plaintiff's spine from his back, took some bone and ligament out to take the

8

pressure off Plaintiff's spinal cord, and then put screws in at T-11 and T-12, inserted some metal rods and connected them together, and added bone at the sides of the spine. *Id.* 148:10-15.

Dr. Small testified that this type of surgery is very rare and only performed when absolutely necessary. *Id.* at 148:16-20. Dr. Small explained that the damage to Plaintiff's spine went far beyond what was shown by the T7 fracture. *Id.* at 149:1-4. In addition to the fracture, Plaintiff was suffering from a six-millimeter herniation of the T11-12 disc. *Id.* at 149:4-6. Dr. Small and Plaintiff testified that the final thoracic fusion surgery performed by Dr. Small provided Plaintiff the most relief from his ongoing pain since the cable incident. *Id.* at 149:11-14; Tr. Vol. II, at 274-3-6.

Dr. Small also performed a wrist surgery on Plaintiff. *Id.* at 149:15-18; 150:12-15. Plaintiff was suffering from a torn ligament in his wrist that was located between the scaphoid and the lunate bones which was causing the scaphoid to rotate abnormally. *Id.* at 150:18-25. Dr. Small performed the wrist surgery on August 18, 2021. *Id.* at 151:1-4. Dr. Small testified that the tear in Kevin's wrist was an older injury. *Id.* at 152:15-19. Dr. Small became aware of Plaintiff's wrist injury in his initial treatment of Plaintiff but chose to address his back injuries—that were causing him the most pain—first. *Id.* at 152:8-14. Dr. Small testified that the wrist surgery was medically necessary. *Id.* at 153:1-3.

Dr. Small did not find any evidence during his treatment of Plaintiff that he had weak bone density or that Plaintiff suffered from osteoporosis. *Id.* at 153:25-154:5. Dr. Small also testified that based on Plaintiff's injuries he would not be able to work even at a light-duty job. *Id.* at 153:16-20. Dr. Small testified that all his opinions were given to a reasonable degree of medical certainty. *Id.* at 154:7-11.

**Dr. Todd Cowen:** Dr. Todd Cowen is a physical medicine rehabilitation, pain management, and life care planning expert. (Tr. Vol. II, at 173:16-19). Dr. Cowen is board certified in physical medicine and rehabilitation. *Id.* at 175:24-176:1. Dr. Cowen reviewed Plaintiff's medical records and conducted a physical examination of him. *Id.* at 178:9-17. Dr. Cowen testified that nothing in Plaintiff's medical records that predated the incident caused him to believe that Plaintiff's injuries were caused by any preexisting condition. *Id.* at 178:18-22.

When Dr. Cowen assessed Plaintiff, he found that Plaintiff had stiffness in his spine, difficulty moving his right shoulder, limited rotation of the cervical spine, limitation of forward flexion of the cervical spine, tenderness in the cervical spine, tenderness in the parathoracic spine, and difficulty flexing in his thoracic and lumbar spine. *Id.* at 179:14-180:9. Dr. Cowen made recommendations for Plaintiff's care based on a reasonable degree of medical certainty. *Id.* at 180:19-22.

After Dr. Cowen reviewed the medical records, assessed Plaintiff, performed a physical evaluation of him, and ran costs for care, Dr. Cowen generated a life care plan for Plaintiff. *Id.* at 182:19-183:1; Pl.'s Exhibits 26, 27. When creating the life care plan, Dr. Cowen focused on four goals: (1) to minimize pain; (2) to improve function; (3) to prevent complications; and (4) to improve the quality of the patient's life. *Id.* at 183:4-12. According to his report and testimony, Dr. Cowen estimates that Plaintiff's future medical care will cost $789,531.26. *Id.* at 186:15-25.

Dr. Cowen's future care estimates are based on the reasonable and necessary medical care Plaintiff will require in the future as a result of the injuries he sustained on November 12, 2017, due to the cable incident. *Id.* at 187:1-4.

Dr. Cowen testified that in his opinion, and to a reasonable degree of medical probability, Plaintiff will need additional surgeries in the future to care for his injuries. *Id.* at 188:13-17. Dr.

Cowen explained that due to Plaintiff's injuries, he will have limitations on his ability to work. *Id.* at 189:15-19.

All the treatment listed in Dr. Cowen's report is linked to the injuries Plaintiff sustained during the incident. *Id.* at 192:13-24. Dr. Cowen opined that based on a reasonable degree of medical certainty: Plaintiff's injuries to his cervical spine were caused by the November 12 cable incident (*id.* at 192:25-193:3), Plaintiff's T7 vertebrae injury was caused by the November 12 cable incident (*id.* at 193:25-194:4), Plaintiff's shoulder injuries were caused by the November 12 cable incident (*id.* at 194:5-8), Plaintiff's T11-T12 disc herniations were caused by the November 12 cable incident (*id.* at 194:9-12), Plaintiff's anxiety, depression, and PTSD were caused by the November 12 cable incident (*id.* at 194:13-16), and Plaintiff's injuries to his lumbar spine were caused by the November 12 cable incident (*id.* at 194:17-20).

**Andrea Bradford:** Andrea Bradford is a vocational rehabilitation counselor. (Tr. Vol. II, at 212:7). Ms. Bradford reviewed Plaintiff's medical records, met with him, interviewed him, and conducted several aptitude and interest tests. *Id.* at 213:20-214:17. Ms. Bradford uses the RAPEL methodology that is a widely used, comprehensive, and accepted methodology within the vocational counseling profession. *Id.* at 215:7-23. Using that methodology, Ms. Bradford was able to determine that Plaintiff has several work limitations resulting from the injuries he sustained in the November 12 cable incident. *Id.* at 216:3-8; Pl.'s Exhibit 32.

Plaintiff has physical limitations related to his back, spine, and other parts of his body. He also has limitations related to his mental health and anxiety. *Id.* at 216:10-15. Due to those limitations, Plaintiff will not be able to be successfully employed in a competitive workforce anytime soon. *Id.* at 218:13-14. Due to his injuries, Plaintiff is permanently and totally disabled. *Id.* at 220:7-11.

***Dr. Swastik Sinha:*** Dr. Sinha treated Plaintiff from January 17, 2018, until February 14, 2018. (*See* Sinha Dep., at 40:17-21). From his examination of Plaintiff, and to a reasonable degree of medical certainty, Dr. Sinha believes that Plaintiff's injuries were the result of Plaintiff being struck by the cable. *Id.* at 47:23-48:9. Dr. Sinha testified that the type of impact Plaintiff sustained (being struck by a heavy wire cable), was enough to throw Plaintiff to the ground, break a rib, cause a shoulder injury, and cause a compression fracture in his spine. *Id.* at 48:21-49:2. In his treatment of Plaintiff, Dr. Sinha found no evidence that Plaintiff had osteoporosis. *Id.* at 72:3-5. Dr. Sinha had not seen Plaintiff since February 14, 2018. *Id.* at 40:17-21. Dr. Sinha limited his testimony to that limited treatment window. *Id.* at 41:15-20.

***Dr. Kenneth McCoin:*** Dr. McCoin is an economist. (Tr. Vol. II, at 331:11-13). Dr. McCoin calculates wage and loss using a below market discount rate methodology. *Id.* at 333:10-14. Plaintiff's past and future earning loss as of December 6, 2021, is $767,178 (without reduction of post-injury capacity) and $638,466 (factoring in post-injury capacity reduction). *Id.* at 335:16-25; 336:20-337:18; Pl.'s Exhibits 30, 31.

***Dr. Victoria Do:*** As one of Plaintiff's treating physicians, Dr. Do testified that in her opinion, to a reasonable degree of medical certainty, Plaintiff's injuries were caused by the metal cable that struck him in the back, head, neck, and shoulder. *See* Dr. Do Dep., at 91:4-12. Dr. Do took a full medical history from Plaintiff and testified that his prior accidents were not the cause of his current injuries as evidenced by the fact that Plaintiff was able to return to work with his pain resolved. *Id.* at 93:19-94:2. She also noted that in his current condition, Plaintiff will be unable to return to his job as a dock worker. *Id.* at 94:3-7.

The following is a summary of the evidence of past medical bills Plaintiff offered into evidence at trial:

### GENERAL MEDICAL

| FACILITY | EXHIBIT NUMBER | AMOUNT |
|---|---|---|
| Advanced Medical Group | 119 | $25,422.97 |
| Advanced Diagnostic Healthcare | 110 | $33,164.85 |
| Advanced Surgeons & Physicians | 112 | $107,206.42 |
| Dr. Henry Small | 114 | $7,875.00 |
| Ultimate Pain Solutions | 120 | $4,600.00 |
| Memorial Hospital | 68 | $5,336.17 |
| River Oaks Hospital & Clinics | 117 | $55,204.78 |
| Best Choice Anesthesia | 113 | $1,855.00 |
| Apex Network Physical Therapy – Shoulder & Neck | 76 | $15,219.00 |
| | | Sub-total: $255,884.19 |

### KYPHOPLASTY SURGERY - 03/15/18

| FACILITY | EXHIBIT NUMBER | AMOUNT |
|---|---|---|
| Advanced Hospital East | 111 | $45,000.00 |
| Republic Pain & Anesthesia | 98 | $6,134.60 |
| | | Sub-total: $51,134.60 |

### RIGHT SHOULDER SURGERY - 05/18/18

| FACILITY | EXHIBIT NUMBER | AMOUNT |
|---|---|---|
| Advanced Hospital East | 111 | $171,883.27 |
| Republic Pain & Anesthesia | 98 | $8,458.20 |
| | | Sub-total: $180,341.47 |

### CERVICAL SURGERY - 03/16/20

| FACILITY | EXHIBIT NUMBER | AMOUNT |
|---|---|---|
| Advanced Hospital East | 111 | $179,008.28 |
| Best Choice Anesthesia | 113 | $6,360.00 |
| East Houston Physicians Group | 115 | $1,500.00 |
| | | Sub-total: $186,868.28 |

### THORACIC SURGERY - 02/19/21

| FACILITY | EXHIBIT NUMBER | AMOUNT |
|---|---|---|
| Advanced Hospital East | 111 | $385,279.77 |
| Best Choice Anesthesia | 113 | $5,830.00 |
| East Houston Physicians Group | 115 | $5,430.00 |
| | | Sub-total: $396,539.77 |

| WRIST SURGERY - 08/18/21 | | |
|---|---|---|
| FACILITY | EXHIBIT NUMBER | AMOUNT |
| River Oaks Hospital & Clinics | 117 | $158,401.11 |
| Gazelle Healthcare Solutions | 118 | $1,876.91 |
| | | Sub-Total: $160,278.02 |

*Maintenance and Cure:* Watco testified its duty to pay maintenance and cure is independent from any demands or lawsuits. (Tr. Vol, III, at 360:24-361:4). Watco paid Plaintiff $35/day since Plaintiff's injury. *Id.* at 362:4-7. This is not enough to cover Plaintiff's expenses. *See generally id.* at 363:8-364:15. Plaintiff's mortgage is approximately $637/month. *Id.* at 363:8-11. And Watco paid Plaintiff $10/day for his meals. *Id.* at 363:12-15. Under Watco's maintenance payments, after paying for his mortgage and food, Plaintiff is left with approximately $80 to cover his utilities and reasonable living expenses for the rest of the month. *Id.* at 364:10-15.

Even after Watco subpoenaed Plaintiff's records and learned that its maintenance payments to Kevin would not cover his expenses, Watco chose not to increase maintenance. *Id.* at 366:19-23.

Watco filed an affidavit in the case regarding its care obligations. *Id.* at 367:8-10; Def.'s Exhibit 137. In that affidavit, Watco Senior Claims Manager Jamie Wilson stated that "Watco does not decide to pay a claimed medical bill based on whether it believes the treatment is the result of an injury caused by the alleged incident. Rather, it pays the bills if they are claimed by plaintiff. Watco did this to avoid any potential claims of failure to pay care under maritime law and thus avoid any claim for punitive damages." *Id.* at 368:6-12; Def.'s Exhibit 137.

Testimony from Watco corporate representative Christopher Spear contradicts the statements in the affidavit. (Tr. Vol. III, at 368:5-369:25). Spear testified that the statements made by Ms. Wilson were "inaccurate." *Id.* at 370:7-25. Spear testified that Watco—despite the

14

statement from Ms. Wilson—will only pay medical bills that Watco deems reasonable. *Id.* at 371:20-22. Additionally, there is no evidence that Watco entered into an agreement with Advanced Medical Group to write off any of Kevin's medical bills. *Id.* at 389:5-10. To date, Watco has only paid $381,461.58 for Kevin's medical bills. *Id.* 412:15-18; Exhibit 147.

***The following defense witnesses are not credible:***

**Defense Expert Rik van Hemmen**: whose report noted multiple variables that would affect the impact of the cable with Plaintiff. Hemmen conducted no testing and failed to gather information to determine these variables:

- Hemmen opined that the tension of the wire when it broke would affect the impact of the wire, but he did not conduct any testing to determine the tension of the wire when it broke. (Tr. Vol. III, at 498:5-20).
- Hemmen opined that the location where the wire broke would affect the impact, yet he made no effort to determine where the cable broke. *Id.* at 498:21-499:18.
- Hemmen opined that the wire would have been in a catenary shape when it broke but he did not conduct any testing to determine the shape of the wire at the time of the incident. *Id.* at 502:22-503:15.
- Hemmen opined that the height of the wire at the time of the incident would affect the impact, but again, Hemmen made no effort to determine the actual height. *Id.* at 503:16-504:17. In fact, Hemmen never went to the facility where the incident occurred. *Id.* at 504:18-22.
- Hemmen did not conduct any testing or take any measurements to confirm where the wire first made contact with the barges or dock barges. *Id.* at 525:18-23.
- Hemmen did not conduct any testing or take any measurements to determine the distance from the turning block to the wire break. *Id.* at 525:24-526:3.
- Hemmen did not take any measurements or conduct any testing to determine the drag in the turning block. *Id.* at 526:4-8.
- Hemmen did not take any measurements or conduct any testing to test the drag characteristics of the wire once it touched the water or another obstruction. *Id.* at 526:9-14.
- Hemmen did not take any measurements or conduct any testing to determine the final shape of the wire once it came to rest. *Id.* at 526:15-19.

Additionally, Hemmen did not calculate the speed the cable was traveling when it struck Plaintiff. *Id.* at 507:5-11). And he admitted that he could not provide, with any reasonable degree

15

of certainty, testimony regarding the force that was involved when the cable struck Plaintiff. *Id.* at 513:22-514:2.

As to his opinion that Plaintiff experienced more force from his 2011 or 2017 car accidents or his stair fall, Hemmen admitted that he did not take any measurements or conduct any testing as to either of those events. *Id.* at 527:9-530:10; 532:1-20. Due to Hemmen's failure to perform any testing or measuring, the Court finds Hemmen's opinions about the force of the cable, the car accidents, or Plaintiff's fall to be unreliable and unhelpful.

**Defense expert Dr. John Mattingly**: whose testimony that Plaintiff's injuries were not the result of the incident directly conflicted with the opinions of Watco's expert Dr. Robson who opined that Plaintiff's injuries did come from the November 12 cable incident. (Tr. Vol. IV, at 605:9-25; at 681:22-682:6). Dr. Mattingly's testimony that the kyphoplasty surgery was unnecessary also conflicted with the opinions of Watco's expert Dr. Robson who opined that Plaintiff's spine injuries necessitated bracing, kyphoplasty, and physical therapy. *Id.* at 606:13-607:6.

Dr. Mattingly—whose opinions in this case are based solely on his review of Plaintiff's imaging studies—admitted that he would never recommend treatment or withhold treatment solely by looking at imaging studies. *Id.* at 607:23-608:2. Importantly, the evidence shows that Plaintiff did not have a spine fracture or herniated disc after either the 2011 car accident, the 2015 stair fall, or the 2017 car accident. *Id.* at 611:24-612:10; 612:15-23; 613:9-21.

Dr. Mattingly also opined that Plaintiff's rotator cuff tear was preexisting but conceded that he did not have a comparison MRI from before the incident to back up his assertions. *Id.* at 622:2-9. Dr. Mattingly's opinions also directly contradicted those of Watco's medical expert who—unlike Dr. Mattingly—performed a physical examination of Plaintiff. *Id.* at 623:2-6. And

16

although Dr. Mattingly had opined on four previous occasions that Plaintiff was osteoporotic, a DEXA scan revealed that Plaintiff's bone density was normal and that he was not osteoporotic. *Id.* at 628:17-23. At trial, Dr. Mattingly withdrew his osteoporosis opinions. *Id.* at 628:24-629:4. The Court finds that Dr. Mattingly's opinions are unreliable and largely in contradiction with most of the medical evidence presented in this case.

**Defense medical expert Dr. David Robson**: who produced a written report almost two years before trial that indicated that Plaintiff "required treatment with regard to thoracic spine compression fracture, including bracing, kyphoplasty, and physical therapy" but testified on direct that he did not agree that Plaintiff required a kyphoplasty. (Tr. Vol. IV, at 679:18-681:12; 684:15-23). The Court finds Dr. Robson's testimony largely unhelpful and Dr. Robson not credible by changing some of his core opinions during trial.

**Defense billing expert Ms. Rebecca Reier**: who testified that she relied on both FAIR Health as well as the American Hospital Directory for her cost reasonableness opinions. Both FAIR Health and the AHD utilize Medicare and Medicaid rates, contrary to the AMA's definition of usual, customary, and reasonable. (Tr. Vol. V, at 775:19-776:8). Ms. Reier's opinions were struck in *Verci v High*, 2019 IL App (3d) 190106-B 161 N.E.3d 249, where the Illinois Appellate Court found that her use of the FAIR Health database made her opinions unreliable. *Id.* at 782:8-784:5. For the reasons set forth in *Verci*, this Court, in its role of fact finder, also finds Ms. Reier's opinions unreliable as based on improper methodology.

## CONCLUSIONS OF LAW

"The standard for causation in Jones Act cases is fairly lenient." *Green v. Seariver Mar., Inc.*, 248 Fed. Appx. 517, 520 (5th Cir. 2007). If the "employer's negligence 'played any part, even the slightest, in producing the injury,' liability attaches." *Gowdy v. Marine Spill Response*

17

*Corp.*, 925 F.3d 200, 208 (5th Cir. 2019). Thus, "expert testimony is not required in cases where the nature of the injury can be understood by lay fact-finders based on ordinary knowledge and experience." *Id.* at 207. Moreover, in Jones Act cases, "if the factfinder cannot separate injuries caused or exacerbated by the accident from those resulting from a pre-existing condition, the defendant is liable for all such injuries." *Stevens v. Bangor & Aroostook R. Co.*, 97 F.3d 594, 603 (1st Cir. 1996).

Multiple physicians provided causation testimony—that they arrived at in the normal course of their treatment—for all of Plaintiff's injuries. The Court finds that testimony credible. Those same experts ruled out in their course of treatment of Plaintiff any pre-existing injuries as the cause of the injuries Plaintiff complains about here. There is no credible evidence that Plaintiff's injuries were due to some other incident or pre-existing condition. The Court concludes that Plaintiff carried his burden to prove causation of his injuries.

"Maintenance and cure is a judicial remedy under General Maritime Law." *White v. Am. River Transp. Co.*, 853 F. Supp. 300, 300 (S.D. Ill. 1993). It is designed to "provide a seaman with food and lodging when he becomes sick or injured in the ship's service." *Id*. Entitlement to maintenance and cure is premised on whether the injured seaman was in the service of the vessel at the time of the injury, or manifestation thereof. *See Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166 (5th Cir. 2005).

"The shipowner's duty to pay maintenance and cure is virtually automatic" regardless of which party's negligence led to the plaintiff's injuries. *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 536 (9th Cir. 2018) *citing Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994). "It 'extends during the period when [the seaman] is incapacitated to do a seaman's

work and continues until he reaches maximum medical recovery.'" *Id*. citing *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962).

Based on the evidence outlined above, Watco is obligated to pay Plaintiff full maintenance and cure based on Plaintiff's reasonable living expenses and medical bills he has incurred because of the incident. The Court concludes that Watco owes Plaintiff $40/day in maintenance from the date of the incident up until 6 months after Plaintiff's thoracic spine fusion with Dr. Small. This amounts to an additional $15,840.00 in maintenance payments. The Court also concludes that Watco failed to honor its cure obligation to Plaintiff. However, the Court will award Plaintiff his past medical bills as past medical damages instead of cure.

## DISPOSITION

Based on the evidence discussed above, and the complete trial record, the Court comes to the following findings and conclusions: (1) Plaintiff was struck by a heavy, steel cable on the date of the incident causing him to be knocked over; (2) Plaintiff was seriously injured by the cable; (3) Plaintiff sought significant medical treatment that was all causally related to being struck by the cable (T7 fracture with resulting kyphoplasty, Cervical fusion, thoracic fusion, additional kyphoplasty, shoulder surgery, wrist surgery, and other non-surgical care); (4) Plaintiff did not reach maximum medical improvement until at the earliest six months after Dr. Small's thoracic fusion surgery; (5) Plaintiff will be unable to work in the future and is totally disabled; (6) Plaintiff's medical bills are reasonable under the A.M.A. standards; (7) Plaintiff will require significant medical care in the future; (8) Watco failed to pay Plaintiff adequate maintenance to cover his basic living expenses; (9) Watco failed to honor its cure obligation to Plaintiff.

As a result of these findings, and based on the evidence heard in the trial, the Court awards the following damages to Plaintiff:

| | |
|---|---|
| Past Medical Expenses | $1,556,964.36 |
| Future Medical Expenses | $789,531.26 |
| Economic Loss - Past | $203,422.00 |
| Economic Loss - Future | $563,756.00 |
| Physical Pain in the Past | $2,000,000.00 |
| Physical Pain in the Future | $3,500,000.00 |
| Physical Impairment in the Past | $1,000,000.00 |
| Physical Impairment in the Future | $3,500,000.00 |
| Mental Anguish in the Past | $1,000,000.00 |
| Mental Anguish in the Future | $2,000,000.00 |
| Past Maintenance Owed to Plaintiff | $15,840.00 |
| Total Damages Awarded | $16,129,513.62 |

IT IS SO ORDERED

DATED: _____

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Samantha Demuren*
Samantha Demuren
sdemuren@arnolditkin.com
Roland Christensen
rchristensen@arnolditkin.com
6009 Memorial Drive
Houston, Texas  77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure on this 24th day of January 2022.

*/s/ Samantha Demuren*
Samantha Demuren