IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN BEAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-CV-2018-SMY |
| | ) |
| WATCO TRANSLOADING, LLC, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Kevin Beam was injured on November 12, 2017, when he was struck by a metal cable while unloading coal barges on a floating dock at the Cora Illinois Terminal owned by his employer, Defendant Watco Transloading, LLC ("Watco"). At the time, Beam was working as a deckhand.

In a Second Amended Complaint, Beam asserted claims of negligence, unseaworthiness, and maintenance and cure, pursuant to the Jones Act negligence, 46 U.S.C. § 30104. Liability having been established on summary judgment (Doc. 128), the case proceeded to trial on the issues of causation and damages.

Following a five-day bench trial (Docs. 173-177), the Court now makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### Prior Injuries and Treatment

In 2011, Beam was involved in a car accident during which he hit a tree. (Tr. Vol. II at page 253 lines 17-19). As a result of the accident, he suffered a sprain to his right arm and sought

medical treatment. No surgery was required for his injury. (*Id.* at page 253 line 20 through p. 254 line 1). Beam did not miss any workdays due to the accident, and his injury did not affect his ability to do his job. (*Id.* at page 254 lines 7-12).

In 2015, Beam slipped and fell on a set of stairs. (Tr. Vol. II at page 252 line 23 through page 253 line 1). He sought medical treatment after his fall. (*Id.* at page 253 lines 2-6). His doctors diagnosed bruising. (*Id.* at page 253 lines 7-9). Beam did not miss any workdays due to the fall. (*Id.* at page 253 lines 10-16).

In June 2017, Beam was involved in a motor vehicle accident during which he was rear-ended. (Tr. Vol. II at page 249 lines 17-19). He received medical care following the accident, including an x-ray of his hand and ribs. (*Id.* at page 249 line 25 through page 250 line 4). He later underwent an x-ray and CT scan of his back (*Id.* at page 250 lines 11-22) and received chiropractic care and a corticosteroid injection. (*Id.* at page 252 lines 5-15). Beam did not miss any workdays due to his June 2017 injuries. (*Id.* at page 252 lines 1-4).

Beam began treating with Dr. Jodi Buskohl, a licensed chiropractor, in January 2016. (Deposition of Jodi Buskohl page 6 lines 10-13). On January 15, 2016, he informed her that his back had been painful for 35 years. (*Id.* at pages 10-11; D. Ex. 88 at page 2). Prior to the subject incident, Dr. Buskohl determined that Beam was suffering from chronic neck, mid back and lower back pain as a result of "cumulative postural stresses over the years and previous injuries, the aging process, just everyday things that happen to humans." (Deposition of Jodi Buskohl pages 20-21). When she last saw Beam on September 27, 2017, she concluded that he had suffered permanent injury to his spine in the area of his neck, back, and throughout his torso; attributable to his prior injury history and everyday postural stress. (*Id.* at pages 44-45). She anticipated that he would

continue to experience pain in his neck, thoracic spine, and lumbar spine for the remainder of his life. (*Id.* at page 45).

## Employment and the Accident

On November 12, 2017, Beam was employed by Watco and was working as a deckhand with the river crew. (Tr. Vol. II at page 260 line 22 through page 261 line 9 and page 262 line 9-11). When the incident occurred, he was standing towards the downriver end of the dock facing the river and the barge. (Id. at page 291 lines 14-19). He stepped up on the dock to give a dock reading, stepped back, and was hit on the right side of his hard hat, shoulder, and back by a large wire cable that was used to pull the barges along the loading area. (Id. at page 262 lines 15-19, 20-24, page 263 lines 14-20, and page 289 line 23 through page 290 line 1). The cable weighed 5407.5 pounds (Tr. Vol. III at page 505 lines 16-19; 23-page 506 line 2) and was 1,545 feet long. (Id. at page 505 lines 20-22). Beam was transported to the hospital by ambulance. (Tr. Vol. II at page 265 lines 21-25).

### *Expert Testimony Regarding Force of Impact/Causation*

Watco presented Rick van Hemmen as an expert witness. Van Hemmen is a licensed Professional Engineer and Diplomate in Forensic Engineering with experience in reviewing wire rope failures and the installation and evaluation of barge haul systems. He was retained by Watco to analyze the loads and forces associated with the broken cable and the injuries caused to Beam by the impact of the cable. (D. Ex. 7 at page 1). He offered the following testimony and opinions at trial:

> The cable that struck Beam ran through a winch and pully system that was designed to move barges up and down the coal dock for loading between the most upstream cell (cell number 1) and the most downstream cell (cell number 8). (Tr. Vol. III at pages 472-475; D. Ex. 7 at page 2). The cable ran a total length of about 1,340 feet between cells 1 and 8, hanging in a catenary shape between two pulleys. (Tr. Vol. III at pages 480-482; D. Ex. 7 at pages 2-3). Beam was near the most downstream cell (cell 8) when the cable broke in

its center section, a "thousand feet up" river from Beam's position. (Deposition of John Korando page 65; Deposition of Mark Williams pages 50-51). Beam was at a spot on the dock near cell 8 when he was struck by the barge haul cable. (Tr. Vol. II at page 290; D. Ex. 125).

The cable did not "whip" Beam; but, rather, it slackened and dropped down, with about 800 feet of the cable landing in the river. (Deposition of John Wingerter pages 22-23 & 55-56; Deposition of John Korando page 65). The combination of Beam's position near the downstream attachment point of the cable (cell 8) and the cable's deceleration after its break in the center section mitigated the cable's impact on Beam. (D. Ex. 7 at pages 7-11). Beam was not struck by the entire cable. Despite the significant total weight, most of the cable was already on the dock or in the river by the time part of the cable made contact with Beam, rendering that contact to have the force of a "strong and unexpected push in the back." (Tr. Vol. III at pages 493-494 & 538).

The Court finds van Hemmen's opinions largely speculative and unreliable, based upon his failure to take key measurements and conduct relevant testing to support his conclusions: He did not conduct testing to determine the tension of the wire when it broke (Tr. Vol. III, at 498:5-20); he acknowledged that the location where the wire broke would affect the impact, but did not conduct testing to determine where the cable broke (*Id.* at 498:21-499:18); he opined that the wire would have been in a catenary shape when it broke, but did not conduct testing to determine the shape of the wire at the time of the incident (*Id.* at 502:22-503:15); he opined that the height of the wire at the time of the incident would affect the impact, but did not conduct testing to determine the actual height (*Id.* at 503:16-504:17); and he did not calculate the speed the cable was traveling when it struck Beam (*Id.* at 507:5-11). Additionally, he admitted on cross examination that he could not state with any reasonable degree of certainty the force that was involved when the cable struck Beam. (*Id.* at 513:22-514:2).

## Medical Evidence

**ER Treatment:** The emergency medical technician that first treated Beam immediately after the incident in November 2017 noted his complaints of "upper back pain when he took too

deep an upper breath" and pain in his right wrist. (D. Ex. 180 at page 5). She also noted that Beam "denied hitting his head or any loss of consciousness…"denied any head or neck pain and denied any neck or back pain (along his spine) upon palpation." (*Id.*). After treating at Memorial Hospital on the date of the incident, Beam sought additional treatment at the Chester Clinic with his family practitioner, Dr. James R. Krieg, and Dr. Krieg's Physician's Assistant, Jamie Hess. (D. Exs. 83 and 84).

**Dr. James R. Krieg**: Jamie Hess' notes from November 14, 2017 indicate that Beam was experiencing pain in his "right shoulder, right elbow, right wrist and right fifth rib area." (*Id.*). Her notes from November 28, 2017, indicate that Beam was still experiencing pain from his rib fracture and right shoulder pain. (*Id.*).

Dr. Krieg saw Beam on December 4, 2017. (Deposition of James R. Krieg pages 24-27). Beam reported that he was still feeling pain in the area of his rib fracture and tenderness in the area of his right elbow. (*Id.*). Beam made no complaint of pain in his back or spine, and noted that the pain in his shoulder had "basically resolved." (*Id.* at page 27).

On December 18, 2017, Beam visited Dr. Krieg and made his first recorded complaint of back pain since the November 12, 2017, incident. (*Id.* at pages 32-33). Dr. Krieg noted tenderness in Beam's mid and lower lumbar region and noted that Beam's range of motion was adequate. (*Id.* at pages 33-34). As of Beam's follow-up visit with Dr. Krieg on January 10, 2018, he had no noted complaints of wrist pain. (*Id.* at pages 50-51).

Dr. Krieg referred Beam for additional medical imaging for his complaints of back pain to Dr. Swastik Sinha, a local orthopedic surgeon, for treatment. (*Id.* at pages 53-54; Deposition of Swastik Sinha at pages 9-11).

**Dr. Swastik Sinha**: Dr. Sinha diagnosed Beam with an acute compression fracture at T7 disc protrusions at T7-8 and T11-12. (Deposition of Swastik Sinha at page 16). Dr. Sinha did not view this as a surgical condition. He prescribed a back brace and expected Beam's T7 fracture to heal within 6 to 12 weeks. (*Id.* at pages 19-20 & 30). In Dr. Sinha's opinion, Beam's injuries were the result of him being struck by the cable. (*Id.* at page 47 line 23 through page 48 line 9). Dr. Sinha treated Beam from January 17, 2018, until February 14, 2018. (*Id.* at page 40 lines 17-21).

**Dr. Rajiv Thakur**: Beam first saw Dr. Rajiv Thakur in March 2018. (Tr. Vol. I at page 63 line 25 through page 64 line 1). Dr. Thakur is a board-certified vascular and interventional radiology specialist. (*Id.* at page 63 lines 1-13). Beam presented to Dr. Thakur with severe pain and indicated that he could not perform normal daily tasks. (*Id.* at page 68 lines 1-8). Dr. Thakur reviewed Beam's MRI that was taken in March 2018 and found that the spine fracture that he sustained in the incident had not healed. (*Id.* at page 66 lines 6-14). He performed a kyphoplasty to relieve Beam's pain from the fracture. (*Id.* at page 66 lines 15-21). Kyphoplasty is a minimally invasive treatment of the spine meant to stabilize fractures. (*Id.* at page 64 lines 7-13). Dr. Thakur testified that the kyphoplasty was medically necessary. (*Id.* at page 67 lines 13-15). In his opinion, Beam's injuries were caused by the cable incident. (*Id.* at page 71 line 19 through page 72 line 15).

Dr. Thakur is the CEO of the Advance Medical Group hospital system. (*Id.* at page 74 line 23 through page 75 line 2). He testified that the hospital's chargemaster rates are in line with other large hospitals in the Houston area. (*Id.* at page 79 lines 23-25). Through Advanced Medical Group (and associated entities), Beam has incurred $1,544,261.76 in medical bills. (*Id.* at page 82 lines 1-5). As of the time of trial, Watco had paid $313,333.68 towards the bills. (*Id.* at page 82

lines 6-8). Approximately $45,000.00 has been paid by Beam via loans he obtained. (*Id.* at page 82 lines 9-11). As of the time of trial, approximately $91,688.08 of the total charges from Advanced Medical Group had been adjusted or written off. (*Id.* at page 82 lines 12-15). The remaining balance owed to Advanced Medical Group at the time of trial was $1,094,240.00. (*Id.* at page 82 lines 16-21). He opined that the charges from Advanced Medical Group (and associated entities) are consistent with the American Medical Association's definition of usual, customary, and reasonable charges for the treatment Beam received. (*Id.* at page 86 lines 9-13).

**Dr. Ruben Bashir**: Beam first saw Dr. Ruben Bashir, a board-certified spine surgeon, on April 12, 2018, (Tr. Vol. I at page 12 lines 19-23; page 13 lines 21-25) and saw him a total of eleven times for treatment of his neck injuries (*Id*. at page 14 lines 1-4). Dr. Bashir's initial treatment included nonsteroidal medications, behavioral modifications, physical therapy, rest (*Id.* at page 14 lines 10-15) and a cervical epidural injection (*Id.* at page 14 lines 16-19). In March 2020, Dr. Bashir performed an anterior cervical discectomy and fusion at C5-C6 and C6-C7. (*Id.* at page 15 lines 4-22).

In addition to examining Beam and taking his medical history, Dr. Bashir reviewed his medical records, x-rays, CT scans and MRIs in conjunction with his care and treatment. (*Id*. at page 18 lines 1-22; page 20 lines 9-16). He found no evidence that Beam had osteoporosis. (*Id.* at page 24 lines 3-5). In his opinion, Beam also suffered from a thoracic fracture (*Id*. at page 17 lines 1-3; 23-24) and his cervical and thoracic spine injuries were sustained on November 12, 2017, during the cable incident as described to him by Beam. (*Id.* at page 23 lines 5-13). Dr. Bashir also testified that the treatment he provided Beam was medically necessary because of the cable incident. (*Id.* at page 26 lines 3-10).

**Dr. Lynanne Foster**: Dr. Lynanne Foster, an orthopedic surgeon, began treating Beam's shoulder in April 2018. (Tr. Vol. I at page 119 lines 1-5; page 122 lines 9-14). She initially attempted conservative treatment such as medication, therapy, heat and cold applications, but those treatments did not resolve Beam's pain. (*Id.* at page 123 lines 5-16). Ultimately, Dr. Foster performed an arthroscopic rotator cuff repair, labral repair, and long head biceps tenotomy with subacromial decompression and distal clavicle resection on Beam. (*Id.* at page 123 lines 20-24). In her opinion, Beam's injuries were a direct result of the cable incident (*Id.* at page 126 line 19 through page 127 line 7), and the procedures she performed were medically necessary (*Id.* at page 125 lines 6-9).

**Dr. Henry Small**: Dr. Henry Small, a board-certified orthopedic surgeon, began treating Beam in November 2020 (Tr. Vol. I at page 142 lines 9-14; page 144 lines 7-8) and saw him six or seven times for treatment (*Id.* at page 145 lines 16-21).

Dr. Small testified that he has performed kyphoplasty procedures on patients as long as 10 years after they had sustained a fracture. (*Id.* at page 146 lines 11-23). He performed a second kyphoplasty on Beam to place additional cement in his fracture to reduce the pain he was experiencing. (*Id.* at page 147 lines 5-12). In his opinion, the first kyphoplasty performed by Dr. Thakur was done properly and constituted a more conservative procedure (*Id.* at page 147 lines 13-17), and the kyphoplasty he performed was medically necessary. (*Id.* at page 147 lines 18-21).

Dr. Small also performed a thoracic fusion surgery on Beam. (*Id.* at page 147 line 22 through page 148 line 2). The damage to Beam's spine went from beyond what was shown by the T7 fracture. (*Id.* at page 149 lines 1-4). The surgery repaired a large herniation at T11-T12 that was compressing Beam's spinal cord. (*Id.* at page 148 lines 9-10). This type of surgery is very rare and only performed when absolutely necessary. (*Id.* at page 148 lines 16-20).

Dr. Small performed a wrist surgery on Beam on August 18, 2021. (*Id.* at page 149 lines 15-18; page 150 lines 12-15; page 151 lines 1-4). Beam had a torn ligament in his wrist that was located between the scaphoid and the lunate bones which was causing the scaphoid to rotate abnormally. (*Id.* at page 150 lines 18-25). The torn ligament was an older injury. (*Id.* at page 152 lines 15-19). He was aware of Beam's wrist injury during his initial treatment of Beam but chose to address his back injuries that were causing the most pain first. (*Id.* at page 152 lines 8-14). In his opinion, the wrist surgery was medically necessary. (*Id.* at page 153 lines 1-3). He further opined that Beam would be unable to work, even at a light-duty job, due to the nature of his injuries. (*Id.* at page 153 lines 16-20).

**Dr. Brett Prywitch:** Dr. Prywitch is a radiologist who reviewed and interpreted diagnostic images taken at various times throughout Beam's medical treatment before and after the November 2017 cable incident (between 2008 and 2018). (Deposition of Brett Prywitch pages 8-14). When comparing medical images of Beam taken in 2011 and 2015, Dr. Prywitch detected endplate spurring (a degenerative process by which bony protrusions can lead to symptomology) throughout Beam's cervical, thoracic and lumbar spine (*Id.* at pages 28-33).

He interpreted CT scans of Beam's thoracic, lumbar and cervical spine following his automobile accident in June 2017 (*Id.* at p. 34; D. Exs. 100, 101, 102) and found degenerative end plate spurring and arthritic changes in Beam's lumbar spine (Deposition of Brett Prywitch page 67; D. Ex. 102); degenerative changes in Beam's thoracic spine (Deposition of Brett Prywitch page 66; D. Ex. 101); and degenerative disc disease in Beam's cervical spine at levels C5-6 and C6-7 (Deposition of Brett Prywitch pages 38-39 and 65-66; D. Ex. 100).

**Dr. Victoria Do**: Dr. Victoria Do became Beam's primary care physician in March 2018. In her opinion, Beam's injuries were caused by the cable that struck him in the back, head, neck

and shoulder. (Deposition of Victoria Do at page 91 lines 4-12). She further opined that in his current condition, Beam will be unable to return to his job as a dock worker. (*Id.* at page 94 lines 3-7).

**Dr. David Robson**: Watco presented Dr. David Robson, a board-certified orthopedic surgeon, as an expert witness. Dr. Robson was retained to conduct an independent medical examination of Beam and to review and analyze his relevant medical records. (D. Exs. 1, 2, 4, 8, 12, 14, 23). In his opinion, Beam's compression fracture "may have been" caused by the subject incident. (Tr. Vol. IV at page 658). Because Beam's compression fracture caused height reduction in his vertebrae of less than 10%, kyphoplasty is medically contraindicated, causing "unnecessary risk and no reward." (*Id.* at page 665; pages 668-669). While his report refers to kyphoplasty as a treatment option for Beam, he testified at trial that this was included in his report by mistake. (*Id.* at pages 668-669). According to Dr. Robson, a review of Beam's medical imaging showed that Beam's thoracic spine at T11-T12 "remained identical" between his June 29, 2017, automobile accident and following the subject incident. (*Id.* at page 661). In his opinion, Beam suffered no permanent cervical or lumbar spine injury as a result of the incident. (*Id.* at page 664).

**Dr. John Mattingly**: Watco presented Dr. John Mattingly, a board-certified radiologist, as an expert witness. Dr. Mattingly reviewed all available medical records and imaging regarding Beam's cervical, thoracic and lumbar spine and right shoulder. (Def. Exs. 3, 5, 17, 18, 24). Based on his comparison of the CT scans taken of Beam's spine taken on June 29, 2017 and November 12, 2017 and the x-ray taken of Beam's spine on January 4, 2018, Dr. Mattingly opined that Beam did not suffer a compression fracture as a result of the incident because no fracture appears until the January 4, 2018 x-ray. (Tr. Trans., pp. 561-564, 565-569). He also offered the following opinions: it is not necessary, common, reasonable or accepted medical practice for a kyphoplasty

to have been performed on Beam (*Id.*, pp. 576, 579-580, 581-582); pre-incident medical imaging shows degenerative changes in his cervical spine that worsened in an expected fashion, unrelated to the November 12, 2017 incident (*Id.*, pp. 588-593); provided the same analysis and opinion regarding Beam's thoracic spine at T11-12 (*Id.*, pp. 593-596); there were no objective signs of injury to Beam's spine as a result of the cable incident (*Id.*, pp. 599-600).

"In the case of dueling experts…it is left to the trier of fact…to decide how to weigh the competing expert testimony." *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) (*quoting Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008)).  Here, Beam's treating physicians personally examined, evaluated, interacted with, and actively treated him, and their opinions regarding the nature and extent of the injuries he suffered were consistent with the medical record as a whole.

Conversely, the opinions and testimony of the retained experts conflicted at times with each other and/or the opinions contained in their reports. Specifically, while Dr. Mattingly testified that Beams injuries were not caused by the cable incident, Dr. Robson (who conducted an examination of Beam) opined that Beam did suffer injuries to his spine as a result of the incident. Similarly, while Dr. Mattingly opined that kyphoplasty was an unnecessary procedure in Beam's case, Dr. Robson listed the procedure as a treatment option in his report (the Court finds his testimony that the inclusion of kyphoplasty in his report was a "mistake" to lack credibility). And while Dr. Mattingly opined in his reports that Beam had osteoporosis which contributed to his symptoms and need for treatment, he withdrew the opinion at trial when confronted with a DEXA scan which revealed that Beam's bone density was normal.

The Court finds the opinions offered by Dr. Sinha, Dr. Thakur, Dr. Bashir, Dr. Foster, Dr. Small, Dr. Cowen, and Dr. Do regarding the severity and cause of Beam's injuries to be credible and persuasive.[1]

### Maintenance and Cure

From the date of injury through trial, Watco paid Beam maintenance in the amount of $35.00 per day, totaling $39,200.00. (Tr. Vol. III page 360 line 24 through page 361 line 4; D. Ex. 307). Watco also paid Beam $10.00 per day for meals. (*Id.* at page 363 lines 12-15). Beam's mortgage is approximately $637.00 per month. (*Id.* at page 363 line 8-11). Based upon Watco's maintenance payments, after paying for his mortgage and food, Beam was left with approximately $80.00 to cover his utilities and reasonable living expenses for the remainder of the month. (*Id.* at page 364 lines 10-15).

To date, Watco has paid $381,461.58 for Beam's medical bills under its cure obligation. (*Id.* at page 412 lines 15-18; D. Ex. 147). Beam offered into evidence medical bills totaling $1,231,046.33.

### *Expert Testimony Regarding Medical Billing*

Watco presented Rebecca Reier as an expert witness. Reier is a certified medical coding specialist and has expertise in medical billing. (Tr. Vol. V at pages 712 and 717). She reviewed Beam's medical bills and testified that the charges reflected in the bills for services rendered between March 6, 2018, and March 16, 2021, are not reasonable and customary. (*Id*. at pages 715-716). Specifically, according to Reier, Beam was billed $994,698 for medical services rendered between March 6, 2018, and November 20, 2020. Those charges are 297% of the customary and

---

[1] Prior to trial, the Court excluded testimony regarding causation by several of Beam's medical providers, including Dr. Small (Doc. 171). As such, there was no expert testimony presented at trial causally linking Beam's wrist injury treated by Dr. Small to the November 12, 2017 cable incident.

reasonable amount for those same services at the 75th percentile of medical providers in Houston, TX, which is $334,776 and are 472% of the customary and reasonable amount for those same services at the 75th percentile of medical providers in St. Louis, MO, which is $210,624. (*Id*.; Def. Ex. 25, p. 2). Beam was billed $402,791 for medical services rendered between November 21, 2020, and March 16, 2021. Those charges are 122% of the customary and reasonable amount for those same services at the 75th percentile of medical providers in Houston, TX, which is $330,401. They are 282% of the customary and reasonable amount for those same services at the 75th percentile of medical providers in St. Louis, MO, which is $220,848. (*Id*.; Def. Ex. 26, p. 2).

For her opinions, Reier relied on the FAIR Health database and the American Hospital Directory, both of which utilize Medicare and Medicaid rates, and are inconsistent with the American Medical Association's definition of usual, customary, and reasonable. (Tr. Vol. V, at 775:19-776:8). Significantly, Reier's methodology was recently deemed unreliable, and her opinions were stricken by the Third District Appellate Court of Illinois in *Verci v High*, 2019 IL App (3d) 190106-B 161 N.E.3d 249. That court noted that the FAIR Health database is not credible evidence of what area providers charge for medical services because (1) the data comes from an unknown number of insurance companies, not health care providers, (2) the database is used to determine reimbursement rates, not the reasonableness of provider charges, and (3) the data contained in the database is incomplete. *Verci v. High*, 2019 IL App (3d) 190106-B, ¶29. For the same reasons, this Court finds Reier's opinions unreliable, and therefore, disregards them and her testimony.

### *Economic, Vocational, and Life Care Planning Experts*

**Andrea Bradford**: Beam presented Andrea Bradford, a vocational rehabilitation counselor, as an expert witness. (Tr. Vol. II at page 212 line 7). Bradford reviewed Beam's

medical records, met with him, interviewed him, and conducted several aptitude and interests tests. (*Id.* at page 213 line 20 through page 214 line 17). She utilized the RAPEL methodology, which is a comprehensive and widely accepted methodology within the vocational counseling profession. (*Id.* at page 215 lines 7-23). Based on her evaluation, Bradford concluded that Beam has several work limitations resulting from the injuries he sustained in the November 2017 cable incident. (*Id.* at page 216 lines 3-8; Pl. Ex. 32).

In Bradford's opinion, Beam has physical limitations related to his back, spine, other parts of his body, mental health, and anxiety. (*Id.* at page 216 lines 10-15). As a result, he will not be able to be successfully employed in a competitive workforce anytime soon. (*Id.* at page 218 lines 13-14). According to Bradford, Beam is permanently and totally disabled due to his injuries. (*Id.* at page 220 lines 7-11).

**Dr. Kenneth McCoin**: Beam presented Dr. Kenneth McCoin, an economist, as an expert witness. (Tr. Vol. II at page 331 lines 11-13). Dr. McCoin calculated Beam's wage loss using a below market discount rate methodology. (*Id.* at page 333 lines 10-14). In his opinion, Beam's past and future wage loss as of December 6, 2021, was $767,178 (without reduction of post-injury capacity) and $638,466 (factoring in post-injury capacity reduction). (*Id.* at page 335 lines 16-25; page 336 line 20 through page 337 line 18; Pl. Exs. 30, 31).

**Dr. Todd Cowen**: Beam presented Dr. Todd Cowen as an expert witness. Dr. Cowen is a physical medicine rehabilitation, pain management, and life care planning expert, and is board certified in physical medicine and rehabilitation. (Tr. Vol. II at page 173 lines 16-19; page 175 line 24 through page 176 line 1). For his evaluation, Dr. Cowen reviewed Beam's medical records and conducted a physical examination. (*Id.* at page 178 lines 9-17). On examination, Dr. Cowen noted that Beam, had stiffness in his spine, difficulty moving his right shoulder, limited rotation

of the cervical spine, limitation of forward flexion of the cervical spine, tenderness in the cervical spine, tenderness in the parathoracic spine, and difficulty flexing in his thoracic and lumbar spine. (*Id.* at page 179 line 14 through page 180 line 9).

Dr. Cowen made a recommendation for Beam's future care and generated a life care plan for him. (*Id.* at page 180 lines 19-22; page 182 line 19 through page 183 line 1; Pl. Exs. 26 and 27). In his opinion, as a result of the injuries he suffered in the November 2017 cable incident, Beam will require future medical care, including additional surgeries, at a cost of $789,531.26. (*Id.* at page 186 lines 15-25; page 187 lines 1-4; page 188 lines 13-17). Beam will also be limited in his ability to work due to his injuries and future care needs. (*Id.* at page 189 lines 15-19).

Dr. Cowen also offered the following medical causation opinions: the injuries to Beam's cervical spine were caused by the November 12, 2017, cable incident (*Id.* at page 192 line 25 through page 193 line 3); Beam's T7 vertebrae injury was caused by the November 12, 2017, cable incident (*Id.* at page 193 line 25 through page 194 line 4); Beam's shoulder injuries were caused by the November 12, 2017, cable incident (*Id.* at page 194 line 5-8); Beam's T11-T12 disc herniations were caused by the November 12, 2017, cable incident (*Id.* at page 194 lines 9-12); Beam's anxiety, depression, and PTSD were caused by the November 12, 2017, cable incident (*Id.* at page 194 lines 13-16); and the injuries to Beam's lumbar spine were caused by the November 12, 2017, cable incident (*Id.* at page 194 lines 17-20).

The Court finds the opinions and testimony of Andrea Bradford to be credible and accepts her opinions regarding Beam's limitations and disability. The Court further finds Dr. Kenneth McCoin's calculations, opinions, and testimony regarding Beam's past and future wage loss to be reliable and based upon credible evidence.[2] In the absence of any evidence presented by Watco

---

[2] Watco presented no evidence to rebut the opinions offered by Ms. Bradford, Dr. McCoin, and Dr. Cowen.

to rebut Dr. Cowen's specific opinions, the Court also accepts his opinions regarding Beam's future care needs and recommended life care plan.

### Current Condition and Activities

Since the cable incident, Beam has been unable to enjoy many of the activities that he participated in before the cable incident, such as fishing and hunting. (TR. Vol. II at page 240 lines 3-4). Beam is the primary caretaker for his disabled son who lives with him. Since the incident, he physically has difficulty performing those caretaking duties and has had to enlist the assistance of another son to help him. (*Id.* at page 240 line 23 through page 241 line 8). Additionally, as a result of his injuries, Beam has trouble sleeping, experiences mood changes, and suffers from anxiety much more significant than he did previously. (*Id.* at page 258 lines 10-17).

### **CONCLUSIONS OF LAW**

"General admiralty law entitles an injured seaman to maintenance (shelter until he recovers) and cure (treatment), plus lost wages – all irrespective of any negligence on his part –." *Deering v. National Maintenance & Repair, Inc.*, 627 F.3d 1039, 1041 (7th Cir. 2010). "Maintenance" is the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the ship. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938). "Cure" is not a duty to "cure" in the literal sense, but to provide care, including nursing and medical attention. *De Zon v. Am. President Lines*, 318 U.S. 660, 667 (1943). Liability for maintenance and cure "extends during the period when [the seaman] is incapacitated until he reaches the maximum medical recovery." *Vaughan v. Atknison*, 369 U.S. 527, 531 (1962). Ambiguities or doubts regarding maintenance and cure are resolved in favor of the seaman. *Id.* at 532 (*citing Warren v. United States*, 340 U.S. 523 (1951)).

Based on the credible evidence adduced at trial, the Court concludes as follows: (1) Plaintiff Kevin Beam was struck by a steel cable on November 12, 2017 during the course of his employment as a deck hand for Defendant Watco Transloading, LLC; (2) Plaintiff suffered severe and permanent injuries and required medical treatment, including a T7 fracture necessitating two kyphoplasties, cervical fusion, thoracic fusion, shoulder surgery, and other non-surgical care; (3) Plaintiff will require medical care in the future as a result of his injuries; (4) Plaintiff reached maximum medical improvement on August 17, 2021; (5) Plaintiff is permanently and totally disabled as a result of his injuries; (6) The charges reflected in Plaintiff's medical bills admitted into evidence are reasonable and customary; (7) Plaintiff is entitled to maintenance of $40/day from November 12, 2017, through August 17, 2021; Plaintiff is entitled to the full cost of cure evidenced by the medical bills in evidence, minus the bills associated with his right wrist surgery and related treatment, and $381,461.58 previously paid by Watco.

## Damages

The Court **AWARDS** Plaintiff total damages in the amount of **$5,051,471.24** itemized as follows:

> **Maintenance Owed: $15,800.00**
> **Unpaid Medical Expenses (Cure): $978,961.98**
> **Future Medical Expenses: $789,531.26**
> **Past Wage (Earning) Loss: $203,422.00**
> **Future Wage (Earning) Loss: $563,756**
> **Past Pain and Suffering: $1,000,000.00**
> **Future Pain and Suffering: $500,000.00**
> **Physical Impairment/Disability: $1,000,000.00**

Judgment will be entered in the amount of $5,051,471.24 in favor of Plaintiff Kevin Beam and against Defendant Watco Transloading, LLC in accordance with this Memorandum and Order.

Plaintiff is awarded costs and shall file a petition for the same within 30 days from the entry of this Order.

 IT IS SO ORDERED.

DATED: November 8, 2022

                                                    **STACI M. YANDLE**
                                                    **United States District Judge**